**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| COMPEER FINANCIAL, ACA, COMPEER FINANCIAL, PCA, and COMPEER FINANCIAL, FLCA,<br>*Plaintiffs*,<br>—against—<br>CORPORATE AMERICA LENDING, INC.,<br>*Defendant*. | Case No. 24-cv-1896 |

**COMPLAINT FOR**
**INJUNCTIVE RELIEF IN AID OF ARBITRATION**

For their complaint for injunctive relief in aid of arbitration, Plaintiffs Compeer Financial, ACA f/k/a AgStar Financial Services, ACA, Compeer Financial, PCA f/k/a AgStar Financial Services, PCA, and Compeer Financial, FLCA f/k/a AgStar Financial Services, FLCA, each of which conduct certain business as Agri-Access (collectively, "Agri-Access"), by and through its undersigned attorneys, alleges, on knowledge as to its own acts and on information and belief as to all other matters, as follows:

**SUMMARY**

1. Agri-Access makes this complaint because Defendant has stolen nearly $58 million dollars, attempted to conceal that fact, and then steadfastly refused to return that property to Agri-Access—its rightful owner—or provide any factual or legal justification for its egregious conduct. This Court's intervention is required to restore the *status quo* and secure that property to prevent any further irreparable harm by Defendant

until its misconduct can be addressed in arbitration.

2. Compeer is a government-sponsored enterprise and member of the Farm Credit System, regulated by the Farm Credit Administration, and chartered to provide loans, leases, risk management, and other financial services throughout 144 counties in Illinois, Minnesota, and Wisconsin pursuant to the Farm Credit Act of 1971, as amended. Agri-Access is one of Compeer's business units that provides correspondent lending to banks and other loan originators across the country.

3. Defendant Corporate America Lending, Inc. ("CAL") is an originator and servicer of agricultural loans and agricultural real estate loans in California, and from time to time extends credits to customers as authorized by its license.

4. Agri-Access and CAL are parties to an Origination, Field Servicing and Master Participation Agreement dated April 15, 2015 (the "MPA"). Pursuant to that agreement, in or around 2018 and 2021, Agri-Access paid a total of $58,000,000 to purchase 100% ownership interests—called "Participations"—in the economic aspects of two agricultural loans made by CAL to certain borrowers (the "Borrowers")[1] [redacted] (the "[redacted] Loans"). As set forth in Section 2.3 of the MPA, Agri-Access's 100% Participation in the [redacted] Loans

[1] In addition to [redacted], the other borrowing individuals and entities include [redacted]

"constitutes a purchase of an interest in the principal amount of the loan and an ownership interest in the Loan Documents and their underlying debt." CAL has no ownership interest in the underlying debt but is paid a fee as the loan servicer.

5. In accordance with its ownership of the economic interest in the [redacted] Loans, the Borrowers (who are not parties to this dispute) made monthly interest and principal payments directly to Agri-Access. CAL executed sweeping powers of attorney in favor of Agri-Access that made clear that Agri-Access is the full legal owner of the economic interests in the [redacted] Loans and gave Agri-Access "full power on behalf of CAL to ask for, require, demand, or receive any and all loan payments and claims for money due or to become due under" them.

6. On or about April 29, 2024, the Borrowers refinanced the [redacted] Loans through a third-party [redacted]. CAL was aware of this refinancing before it even happened because the Borrowers asked CAL to calculate the amounts they needed to pay in full satisfaction of the [redacted] Loans. CAL provided those calculations, and on April 29, 2024, the Borrowers closed on their refinancing transaction. As a result of that transaction, Agri-Access understands that on April 29, [redacted] wired to CAL payments totaling $58,187,976.50, in full repayment of the [redacted] Loans (the "Payoff Proceeds").

7. Despite contractual obligations to do so, CAL never informed Agri-Access the [redacted] Loans had been repaid and, to date, failed to remit the Payoff Proceeds to Agri-Access. To the contrary, with more than $58 million now in hand, CAL took various steps to conceal from Agri-Access the fact that the [redacted] Loans had been fully

paid off and that CAL had received the Payoff Proceeds. On May 2, CAL's Chief Executive Officer Ron Cook initiated a one-time wire payment to Agri-Access—not of the Payoff Proceeds but for the amount of principal and interest that would have been due to Agri-Access on the [redacted] Loans in May if the loan had not already been paid off on April 29. The only reason to submit such a monthly principal and interest payment would be to conceal that the loan had been paid off. In fact, under the Borrowers' new loan with [redacted]—which CAL has *nothing to do with*—no payments are due until [redacted]. CAL also terminated the Borrowers' standing ACH instructions to pay Agri-Access directly—a move that had the practical effect of obscuring the Borrowers' ability to notice CAL's attempts to make a false payment on their behalf for the month of May.

8. CAL's efforts to fool Agri-Access into thinking the Borrowers had not refinanced the loan and had made a May principal and interest payment might have worked but for the fact that [redacted] also has a participation agreement with Agri-Access and informed Agri-Access about the [redacted] refinancing.[2] Thus, when CAL forwarded a supposed May principal and interest payment (for a loan that the Borrowers had already

[2] CAL and [redacted] are two of 127 originators from which Agri-Access purchases participation interests in agricultural loans from time to time. Agri-Access does not control when borrowers decide to refinance or with whom borrowers pursue such refinancing. But because [redacted] sold the participation in its [redacted] Loan refinancing to Agri-Access, Agri-Access became aware of the refinancing despite CAL's attempts at deception.

paid off), Agri-Access repeatedly attempted to contact CAL to get additional information, but Mr. Cook all but disappeared. When Agri-Access reached CAL's Chief Operating Officer Alex Aretakis by telephone, he specifically denied knowledge of the status of the [redacted] Loans—even though (as Agri-Access would later learn) Aretakis himself had prepared the payoff calculations for the refinancing less than a week earlier.

9. CAL then went radio silent, and referred all further communications to its lawyers, who have refused to provide *any* information about the Payoff Proceeds—including whether CAL still has possession of them. Until today, CAL and its counsel have likewise repeatedly refused to provide *any* factual or legal basis for its theft and conversion of the Payoff Proceeds more than three weeks later. To date, and despite repeated efforts by Agri-Access and its counsel, CAL has refused to return the Payoff Proceeds, in breach of numerous provisions of the MPA and applicable law.

10. To protect its interest in the Payoff Proceeds and recover additional damages it is owed—including interest and attorneys' fees—on May 14, 2024, Agri-Access initiated arbitration pursuant to Section 7.1(a) of the MPA. The following day, on May 15, 2024, Agri-Access filed an application seeking the appointment of an Emergency Arbitrator and issuance of an interim award to require CAL to return the Payoff Proceeds immediately, or at least place them in escrow pending resolution of the arbitration. Because it could take several weeks before a confirmed and enforceable award can be issued by the Emergency Arbitrator, Agri-Access seeks this Court's

intervention to safeguard its property and preserve the status quo in the interim.[3]

## PARTIES

11. Plaintiff Compeer Financial, ACA f/k/a AgStar Financial Services, ACA, is a federal agricultural credit association headquartered in Sun Prairie, Wisconsin.

12. Plaintiff Compeer Financial, PCA f/k/a AgStar Financial Services, PCA, is a federal production credit association headquartered in Sun Prairie, Wisconsin, and is a wholly-owned subsidiary of Compeer Financial, ACA.

13. Plaintiff Compeer Financial, FLCA f/k/a AgStar Financial Services, FLCA, is a federal land credit association headquartered in Sun Prairie, Wisconsin, and is a wholly-owned subsidiary of Compeer Financial, ACA.

14. Compeer Financial, ACA, Compeer Financial, PCA, and Compeer Financial, FLCA each conduct certain business under the brand name Agri-Access®, which is a division and trademark of Compeer Financial, ACA.

15. Defendant Corporate America Lending, Inc., is a California corporation with its principal place of business located at 5610 N. Palm Ave., Fresno, California 93704.

---

[3] In this Complaint, Agri-Access asserts certain claims against CAL based on documents and information it has been able to gather in the short time since CAL misappropriated the Payoff Proceeds on April 29, 2024. Agri-Access expressly reserves the right to assert additional claims, in this or other judicial forums and/or the Related Arbitration (as defined below).

## JURISDICTION AND VENUE

16. This is an action for injunctive relief in connection with the parties' MPA.

17. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The parties to this action are diverse: the Compeer Financial entities are citizens of Wisconsin, and CAL is a citizen of California. The amount in controversy, including the objects of the litigation, exceeds $75,000 exclusive of interest and costs. Specifically, CAL has unlawfully retained at least $57,729,394.50[4] of Agri-Access's property.

18. This Court has specific personal jurisdiction over the parties, who have purposefully availed themselves of Minnesota law and agreed to a valid forum selection clause and choice of law provision under Section 9.1 of the MPA, which provides:

> This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without regard to its conflicts of law provisions. In the event of a dispute, the parties agree that venue shall be in Blue Earth County, Minnesota and the parties expressly consent to jurisdiction therein.

MPA § 9.1.

19. Venue is proper in this district because Section 9.1 of the MPA provides that "the parties agree that venue shall be in Blue Earth County, Minnesota," and this

[4] This figure represents the amount wired by [redacted] in connection with the refinancing of the [redacted] Loans on April 29, a total of $58,187,976.50 (*see infra* ¶¶ 44-45), minus the amount of the misapplied payment made by CAL on May 2, purportedly for the [redacted] Loans for the month of May, a total of $458,582.04 (*see infra* ¶ 47).

district encompasses and serves Blue Earth County.

## FACTUAL ALLEGATIONS

### A. The Parties' Master Participation Agreement

20. Compeer Financial, ACA is a member-owned, Farm Credit cooperative serving and supporting agriculture and rural communities. Compeer provides loans, leases, risk management and other financial services throughout 144 counties in Illinois, Minnesota, and Wisconsin. In addition to Compeer's offering of loans, leases, and other financial services in the upper Midwest, Agri-Access is a Compeer business unit that provides correspondent lending to banks and other loan originators across the country.

21. One way that Agri-Access provides capital for use in the origination of agricultural loans is by working with other agricultural loan originators and purchasing participation interests in loans originated by those other lenders. Through participation agreements Agri-Access may enter into with such other lenders, Agri-Access purchases an ownership interest in the principal amount of the loan, as well as an interest in the loan documents (such as the note, the loan agreement, and any security documents) and the underlying debt. Currently, Agri-Access has correspondent lending relationships with 127 originators throughout the United States.

22. CAL, based in Fresno, California, is one such originator and servicer of agricultural loans and agricultural real estate loans. In addition to originating such loans, CAL also sells participation interests in loans that it originates, thereby minimizing its exposure to the borrowers of the loans after the loans have been originated.

23. In April 2015, Agri-Access and CAL entered into the MPA.[5] Exhibit 1 (MPA). Pursuant to the MPA, CAL offered to sell to Agri-Access participation interests in agricultural loans and/or agricultural real estate loans made by CAL to borrowers for purposes permitted under the Farm Credit Act and the regulations of the Farm Credit Administration.

24. If Agri-Access accepted CAL's offer of participation, CAL provided an Offer and Certificate of Participation that documented Agri-Access's Participation in each Participation Loan (as defined in the MPA).

25. In exchange for the Certificate of Participation and the purchase of its Participation Interest, Agri-Access paid the funds as specified in that Certificate of Participation.

26. In addition to documenting the process by which CAL offered to sell and Agri-Access purchased Participation Interests, the MPA also sets forth the rights and obligations of the parties with respect to such Participation Interests and the ownership and servicing of the underlying loans.

**B. <u>The Origination, Participation, and Refinancing of the [redacted] Loans</u>**

27. Under the MPA, CAL sold Agri-Access a 100% Participation Interest in the two [redacted] Loans made by CAL to the Borrowers.

28. Specifically, on November 20, 2018, certain Borrowers executed a loan in

---

[5] On July 22, 2020, the parties executed an Addendum to the MPA, but did not alter any of the terms cited or quoted in this Complaint.

the total principal amount of $33,000,000, the proceeds of which were to be distributed in tranches over time. The loan number given to that loan in Agri-Access's systems is [redacted]0800 (hereinafter the "0800 Loan"). *See* Exhibit 2 (0800 Loan Certificate of Participation).

29. On December 7, 2018, CAL and Agri-Access executed an Offer and Certificate of Participation under the MPA for the 0800 Loan. *Id.* As reflected in that Offer and Certificate of Participation, Agri-Access purchased a 100% Participation of the initial loan disbursement of $12,825,000, as well as participations in the remainder of the loan as reflected in the Addendum thereto. *Id.* As a result, over time Agri-Access collectively acquired a 100% Participation in the 0800 Loan in the full principal amount of $33,000,000.[6] *See id.*

30. Subsequently, on May 1, 2021, the Borrowers executed an additional term loan facility with CAL for the total principal amount of $25,000,000, the proceeds of which were also to be distributed in tranches over time. The loan number given to that loan facility in Agri-Access's systems is [redacted]3400 (hereinafter the "3400 Loan"). *See* Exhibit 3 (3400 Loan Certificate of Participation).

31. On May 26, 2021, CAL and Agri-Access executed an Offer and Certificate of Participation for the 3400 Loan in which Agri-Access purchased a 100% Participation

---

[6] Tranche B, in the amount of $6,475,000 was disbursed on June 28, 2019, Tranches C and D were disbursed together for a total of $9,700,000 on August 30, 2019, and Tranche E in the amount of $4,000,000 was wired on April 7, 2020.

in the initial loan commitment of $15,000,000. As additional tranches of the 3400 Loan were distributed to the Borrowers, Agri-Access executed additional Offers and Certificates of Participation documenting its 100% Participation in the 3400 Loan. As a result, over time Agri-Access collectively acquired a 100% Participation in the 3400 Loan in the full principal amount of $25,000,000.[7] *See id.*

32. Pursuant to Section 2.3 of the MPA, Agri-Access's 100% Participation in the [redacted] Loans "constitutes a purchase of an interest in the principal amount of the loan and an ownership interest in the Loan Documents and their underlying debt." Exhibit 1 (MPA) at § 2.3. The MPA further defines the term "Loan Documents" to mean "any note, loan agreement, mortgage, deed of trust, and other documents executed by a Borrower to evidence a debt to [CAL]." *Id.* at § 1.1(g).

33. Both of the [redacted] Loans required the Borrowers to make payments of only interest (not principal) for the first several years following the loans' origination. For the 0800 Loan, the Borrowers were permitted to make interest-only payments until [redacted], and for the 3400 Loan the Borrowers were permitted to make interest-only payments until [redacted].

[7] Notably, Exhibit 3 contains a scrivener's error that should say "$25,000,000," as reflected in the relevant credit agreement (*see* Exhibit 4) rather than "$25,000." Following the initial $15,000,000 draw, Tranche A in the amount of $4,500,000 was disbursed on March 24, 2022, and Tranches B and C were disbursed together in the total amount of $5,500,000 on November 15, 2022.

34. Until recently, the payment history related to the Famoso Loans has been uneventful. As contemplated by the MPA, the Borrowers set up a standing ACH authorization by which their ordinary interest (and, if applicable, principal) was paid directly to Agri-Access—*not* CAL. Agri-Access received all payments due and owing from the Borrowers, and used a portion of each of those monthly payments to pay CAL servicing fees to which it was entitled under the MPA. *See* Exhibit 1 (MPA) at § 4.7.

35. Upon information and belief, in late 2023, as the end of the interest-only period on the 0800 Loan neared, the Borrowers began to explore the possibility of re-financing both of the [redacted] Loans.

36. In connection with that re-financing, the Borrowers requested that CAL calculate the amounts needed to fully repay both of the [redacted] Loans. *See* Exhibit 5 (CAL 4/25 Payoff Demand).

37. According to two Demands for Payment in Full prepared by CAL, signed by Alex Aretakis (CAL's Chief Operating Officer), and dated April 25, 2024, the outstanding principal balance on the [redacted] Loans was $25,000,000 and $32,780,266.33, and the total amounts due to pay off the [redacted] Loans in full were $25,182,066.69 and $33,005,909.81. *Id.*

38. When a refinancing occurs, it is typical (and often contractually required) for originators and servicers like CAL to consult with Agri-Access following such a request. Specifically, since Agri-Access is the 100% owner of the economic interest in the [redacted] Loans, Agri-Access (and not CAL) is the entity with the ultimate authority to determine that any payoff calculation is correct. Exhibit 1 (MPA) at §§ 2.3, 4.6.

39. The MPA codifies this duty of consultation in several places. Section 4.6 (emphasis added) provides that CAL and Agri-Access "agree to communicate to one another in a timely manner all material matters relating to each Participation Loan which come to the attention of the parties, *including but not limited to loan payoff information*." *Id*. at § 4.6; *see also id*. at § 9.10 (requiring mutual cooperation). Similarly, Section 4.13(e) of the MPA provides that "[CAL] *shall* furnish to Participant in a timely fashion all financial and other information relating to any Participation Loan." *Id*. at § 4.13(e).

40. Despite both typical industry practice and its contractual obligations, CAL did not inform Agri-Access of the Borrowers' request for payoff information, did not consult with Agri-Access in calculating the loan payoff amounts, and otherwise did not engage with Agri-Access regarding the potential re-financing of the [redacted] Loans.

41. On April 29, 2024, CAL's CEO Ron Cook affirmatively took action to terminate the standing ACH instructions that Agri-Access used to obtain ordinary interest and principal payments from the Borrowers on a monthly basis. Exhibit 6 (ACH Instructions Email). On information and belief, he took this action because he was aware that the [redacted] Loans were being re-financed and therefore paid off. *Id*.

42. In the same email correspondence, Mr. Cook also effected a change of address on the [redacted] Loans. Mr. Cook wrote: "See attached, cancelling ACH for 5-1 and thereafter, in addition confirming change of mailing/billing address to: [redacted]." *Id*. Mr. Cook purportedly received authorization for this change from the Borrowers, but it is worth noting that the

revised address is an address at which CAL itself maintains a "branch office."[8]

43. In addition to changing the mailing address and terminating the standing ACH instructions by which monthly payments were made to Agri-Access, upon information and belief, CAL also instructed the Borrowers to pay CAL—rather than Agri-Access—with the Payoff Proceeds it received through the refinancing with [redacted].

44. On April 29, 2024, the Borrowers closed on the transaction with [redacted] to re-finance the [redacted] Loans. Exhibit 7 (Final Closing Stmt.).

45. As a result of that refinancing transaction, upon information and belief, on April 29, 2024 CAL received from [redacted] wire payments—the Payoff Proceeds—totaling $58,187,976.50, in full repayment of the [redacted] Loans. *Id.*

46. Although CAL received the full amount of the Payoff Proceeds, it took deliberate action to conceal that fact and to give Agri-Access only a small portion of those Payoff Proceeds.

47. Specifically, on May 2, 2024, CAL wired to Agri-Access $899,889.22. Exhibit 8 (Wire Confirm. & Correspondence) at p. 3. That wire payment amount corresponded precisely with the amount of regular interest and principal that was (or would have been) due on two sets of Loans: (i) the [redacted] Loans, for which $55,871.87 of principal and $223,143.48 of interest was due on the 0800 Loan, and $179,566.69 in interest was due on the 3400 Loan (for a total of $458,582.04); and (ii) three participation loans unrelated to the [redacted] Loans that were originated and serviced by CAL for an

[8] http://calending.us/ (accessed on May 15, 2024).

entity known as [redacted] (for a total of $441,307.18). *Id.* at pp. 6, 8-10.

48. While the amounts allocated to the [redacted] Loans corresponded precisely to the amounts that *would have been due* in May, in reality those loans had already paid off in full and CAL should have remitted the Payoff Proceeds in their entirety to Agri-Access. *See infra* Section C. CAL's ad hoc, one-time wire payment was therefore inconsistent with its obligations, and upon information and belief was deliberately undertaken in an effort to deceive Agri-Access into thinking that an ordinary interest and principal payment had been made on the [redacted] Loans and that those loans remained outstanding.

49. Indeed, in email correspondence dated May 2, 2024, from Mr. Cook to [redacted], Mr. Cook wrote: "Wire for [redacted] *and* [redacted] *May* payments has been sent, $899,889.22." Exhibit 8 (Wire Confirm. & Correspondence) at p. 8. As noted above, because the [redacted] Loans had already been paid in full and no further payments were due from the Borrowers to Agri-Access via CAL for May or otherwise—which Mr. Cook knew or should have known—this statement was deliberately deceptive.

50. Indeed, Mr. Cook's correspondence and wire payment had just that effect, at least temporarily: in email correspondence between Agri-Access personnel on May 2 shortly after receipt of the wire payment, [redacted], a Compeer employee, asked [redacted], another Compeer employee, "Do you know how the . . . 458582.04 is to be applied?" *Id.* at p. 3. [redacted] responded: "I think a portion is for [redacted]

as they have two loans with 5/1 payments due." *Id.* at p. 2. [redacted] then identified the precise amounts of principal and interest that would have been due on the [redacted] Loans—$179,566.69 for the 3400 Loan and $279,015.35 for the 0800 Loan—and concluded that "[t]hese two payments combined with the [redacted] payments total the wire amount of $899,889.22." *Id.* [redacted] then "posted" the payment to the [redacted] Loans even though (unbeknownst to her) they had already been paid off. *Id.*

51. Mr. Cook's wire transfer is especially suspicious because after the refinancing, no payments were due for the month of May under *either* the original [redacted] Loans or the new loans the Borrowers obtained through [redacted]. Instead, the Borrowers' first payment under the new loans—which CAL has no role in servicing—will not be due until [redacted].

52. After Agri-Access became aware of the Borrower's decision to move forward with the refinancing of the [redacted] Loans, it was extremely troubled by CAL's failure to remit the Payoff Proceeds and CAL's refusal to substantively respond to Agri-Access's questions about the status of the Payoff Proceeds.

53. Specifically, after receiving CAL's one-time wire payment, Agri-Access's Managing Director Chad Steele attempted to contact CAL directly to better understand the situation. Steele called Mr. Cook's cell phone approximately five times and CAL's offices approximately five more times. All ten calls went unanswered.

54. Steele was able to get in contact with CAL's Chief Operating Officer Alex Aretakis by phone on the evening of May 2. In email correspondence immediately following that conversation, Mr. Steele wrote:

Alex,

When we spoke by phone this evening, at around 6:45 PM Central Time, you said you were unaware of the deed of trust given by [redacted]. Furthermore, you stated you are unaware of any deed of trust or activity that would result in our security being released or of CAL receiving a loan payoff or early principal payment. If either you or we discover that CAL did receive a payoff or special principal payment, then we would ask that you provide confirmation of a wire transmission in the amount we are owed no later than noon Central Time tomorrow.

Chad

Exhibit 9 (Emails 5/2-5/3).

55. It was not until nearly noon the following morning that Mr. Aretakis responded by email disclaiming awareness of the status of the [redacted] Loans and deflecting responsibility onto Mr. Cook. Aretakis wrote:

Dear Chad,

Per our call last evening, I informed you that I was unaware of the status of the loan. Further, I do not have access to CAL's banking or accounts. Again, I ask that you wait until Monday, when Ron returns to this office, so we can look into this matter further.

Sincerely, [Aretakis Signature Block]

*Id.*

56. Upon information and belief, and contrary to his written statements, Mr. Aretakis *was* aware that the [redacted] Loans had in fact paid off in full and that CAL had retained the Payoff Proceeds. Among other things, Mr. Aretakis had signed the written Demands for Payment in Full just one week prior to his May 3 email with Mr. Steele; CAL had received the Payoff Proceeds by wire payment from [redacted] just four days earlier; and CAL had sent a one-time wire payment corresponding precisely to the regular

monthly principal and interest payments on the [redacted] Loans approximately 24 hours earlier. See Exhibit 5 (CAL 4/25 Payoff Demand); Exhibit 7 (Final Closing Stmt.); Exhibit 8 (Wire Confirm. & Correspondence). It is highly questionable that Mr. Aretakis, as CAL's Chief Operating Officer, was unaware of these facts.

57. Immediately following the exchange between Steele and Aretakis, CAL retained legal counsel. Agri-Access personnel spoke with CAL's counsel on May 6. During that conversation, CAL's counsel indicated that he had just been retained and that he was "in the process of investigating the [redacted] Hills matter." Exhibit 10 (Emails 5/6-5/7).

58. Undersigned counsel was then engaged. During an introductory conversation between counsel on May 8, counsel for CAL stated that CAL had received a loan payment but CAL believed it had been damaged by unspecified conduct purportedly undertaken by Agri-Access. CAL's counsel was either unable or unwilling to provide any factual detail regarding those claims and articulated no legal, contractual, or equitable basis upon which CAL claimed it was permitted to retain the Payoff Proceeds. CAL's counsel stated that it would provide a more substantive response by the end of the week. Agri-Access's counsel (Mr. Boylan) again reiterated Agri-Access's demand for immediate remittance of the Payoff Proceeds.

59. On May 9, Agri-Access issued a formal written demand for repayment, detailing its contractual entitlement to the Payoff Proceeds and CAL's multiple breaches of the MPA. Exhibit 11 (AA 5/9 Ltr.). In that letter, Agri-Access demanded repayment of the full Payoff Proceeds, with interest, by 5:00 pm PDT on May 10, 2024. *Id.* Agri-

Access also informed CAL that its continued failure to comply with its contractual, legal, and equitable obligations would cause Agri-Access to pursue imminent legal action to recover the Payoff Proceeds, and to seek its attorneys' fees, costs, and other damages incurred in pursuing enforcement of its rights under the MPA. *Id.*

60. On May 10, 2024, CAL's counsel responded by written letter stating "our investigation and research regarding the [redacted] Loans and Agri-Access' conduct and business practices continues. We expect to complete that analysis and be in a position to provide a more detailed substantive response no later than Tuesday, May 14, 2024." Exhibit 12 (CAL 5/10 Ltr.). Although CAL's counsel indicated that CAL did not agree with Agri-Access's assertions, counsel provided no facts supporting CAL's position. *Id.* CAL did not remit the Payoff Proceeds by the 5:00 pm PDT deadline, and to this day continues to hold the Payoff Proceeds unlawfully.

61. While CAL's counsel promised a response to Agri-Access no later than May 14, 2024, it failed to meet its own deadline. Instead, on May 15, CAL's counsel sent a short letter claiming CAL had 30 days to cure any breach. Exhibit 13 (CAL 5/15 Ltr.). That letter again failed to provide any facts regarding the status of the Payoff Proceeds, and the cure period cited by CAL's counsel is inapplicable to CAL's failure to remit the Payoff Proceeds, as counsel for Agri-Access explained in a letter response sent just hours after CAL's May 15 letter. Exhibit 14 (AA 5/15 Ltr.).

62. In the days since then, Agri-Access has repeatedly demanded that CAL remit the Payoff Proceeds, and, at a minimum, confirm that the Payoff Proceeds remain

segregated and in CAL's control.[9]

63. Prior to today, CAL's lawyers vaguely suggested (with no supporting facts) that CAL may have certain claims against Agri-Access. *See, e.g.,* Exhibit 12 (CAL 5/10 Ltr.). Even if CAL purportedly has been harmed by Agri-Access, CAL should have raised such concerns in the ordinary course of their business relationship. It did not, and Agri-Access is unaware of any conduct by Agri-Access that breached the MPA or otherwise resulted in any harm to CAL.

64. Earlier today, faced with the prospect of this additional action, CAL finally attempted to concoct such a claim by filing an action in California Superior Court. A careful review of that complaint reveals that despite its baseless assertions, CAL has *still* failed to articulate any credible basis upon which it could withhold the Payoff Proceeds, which are indisputably, by contract and operation of law, Agri-Access's property.

65. Despite multiple requests and formal written demands, CAL has refused to turn over the Payoff Proceeds to Agri-Access as required by the MPA, applicable law, and equitable principles.

## C. **Multiple Provisions of the MPA Require CAL To Turn Over the Payoff Proceeds**

66. CAL was and is under numerous, clear obligations to immediately turn over the Payoff Proceeds to Agri-Access upon receipt.

---

[9] Exhibit 9 (Emails 5/2-5/3); Exhibit 11 (AA 5/9 Ltr.); Exhibit 14 (AA 5/15 Ltr.); Exhibit 15 (Counsel Emails 5/16-5/20).

67. ***The Payoff Proceeds are Agri-Access's property***. The MPA provides that: "Each Participation accepted by [Agri-Access] constitutes a purchase of an interest in the principal amount of the loan and an ownership interest in the Loan Documents and their underlying debt." Exhibit 1 (MPA) at § 2.3. Because Agri-Access is the 100% owner of the economic interest in the [redacted] Loans, the Payoff Proceeds currently in CAL's possession are Agri-Access's property.

68. ***The Payoff Proceeds were required to be remitted as received***. The MPA, the Agri-Access Partner Site (including the Origination and Servicing Guide available on that site), and the Reconciliation and Reporting Procedures[10] applicable to the [redacted] Loans specify in numerous manners and locations that payments are to be remitted as received unless other arrangements are made ahead of time. Exhibit 16 (Recon. & Reporting Proc.) at § 3.4. CAL made no such advance arrangements with respect to the Payoff Proceeds, and it was therefore required to remit them to Agri-Access as they were received.

69. Among other things, the MPA requires that CAL "shall employ its customary servicing procedures," and "shall service the participation loans in accordance with all applicable federal, state and local laws, regulations, rules and ordinances and pursuant to the terms set forth in the loan documents." Exhibit 1 (MPA) at § 4.8

---

[10] Section 4.8 of the MPA incorporates by reference the Origination and Servicing Guide (which is available on the Agri-Access Partner Site) and the Reconciliation and Reporting Procedures. Exhibit 1 at § 4.8.

(incorporating by reference Exhibit 17 (Orig. & Servicing Guide) at Ch. 200). CAL's behavior as described above is contrary to industry custom and practice, violates customary servicing procedures, and violates multiple laws and rules. Loan servicers such as CAL do not customarily withhold Payoff Proceeds that are the direct, traceable property of a separate financial institution, and especially do not do so without any warning or legal or contractual basis.

70. ***CAL is required to immediately return any Acquired Property***. The MPA also provides that CAL is required to turn over any property related to a Participation Loan immediately upon request by Agri-Access. Section 4.16 states:

> In the event that [CAL] obtains any Acquired Property in connection with a Participation Loan, [CAL] *shall, immediately upon the request of Agri-Access*, transfer such Acquired Property to Agri-Access via a quit claim deed or its applicable equivalent as deemed acceptable to Agri-Access in the case of real property or bill of sale, assignment or its applicable equivalent as deemed acceptable to Agri-Access in the case of personal property.
>
> With respect to any proceeds of Acquired Property which [CAL] may receive, [CAL] *shall remit Agri-Access's share of such proceeds to Agri-Access via wire transfer within two (2) business days* of [CAL's] receipt of such proceeds.

Exhibit 1 (MPA) at § 4.16.

71. The MPA, in turn, defines "Acquired Property" as follows:

> "Acquired Property" means all real and personal property acquired by [CAL] or Agri-Access, as the case may be, in servicing a Participation Loan in full or partial satisfaction of a Participation Loan, whether upon foreclosure, trustee's deed in exercise of power of sale, bankruptcy trustee's deed, voluntary conveyance, or otherwise, excluding any regular loan payments.

*Id.* at § 1.1(l).

72. These provisions lay plain the parties' expectation that all proceeds from or

relating to any Participation Loan, including the [redacted] Loans, would be immediately remitted to Agri-Access upon request, regardless of the form of those proceeds.

73. And indeed, the Payoff Proceeds are personal property acquired by CAL in full satisfaction of the [redacted] Loans, were not "regular loan payments," and therefore constitute "Acquired Property" that CAL was required to remit to Agri-Access by wire transfer within two business days of receipt.

74. ***CAL was required to correct its misapplied payment on the*** [redacted] ***Loans***. Section 4.14 of the MPA provides:

> "[CAL] *shall* fully cooperate with [Agri-Access] and *shall take any and all actions necessary or appropriate* to correct any misapplication of payment. The parties *shall* notify one another immediately upon discovery of the misapplied payment. The party experiencing the shortage *shall* be reimbursed for any such shortage within 5 business days of the discovery of the misapplied payment."

*Id*. at § 4.14 (emphasis added).

75. Here, upon information and belief, CAL received the Payoff Proceeds from [redacted] on April 29. Rather than immediately remitting the full Payoff Proceeds to Agri-Access as required, as noted above, CAL instead initiated a one-time wire transfer of $899,889.22, of which $458,582.04 corresponded precisely to amounts that *would have been due* for the month of May for ordinary interest and principal payments on the [redacted] loans originated by CAL. Exhibit 8 (Wire Confirm. & Correspondence).

76. Upon receipt of that payment, Agri-Access personnel applied that $458,582.04 payment to the [redacted] Loans for the month of May, even though those loans had *already been paid in full*. As a result of CAL's actions, a misapplication of payment occurred and only that amount was applied to the [redacted] Loans, rather than the

full amount of the Payoff Proceeds.

77. Upon information and belief, because CAL was already aware that it had received the full Payoff Proceeds when it initiated the one-time wire transfer, CAL not only discovered the misapplied payment immediately, but in fact *intentionally* submitted a misapplied payment to Agri-Access in furtherance of its scheme to commandeer the Payoff Proceeds and hide the true nature of its actions.

78. CAL was obligated to inform Agri-Access of that misapplication of payment "immediately," but failed to do so, in breach of the MPA. Exhibit 1 (MPA) at § 4.14.

79. CAL was also obligated to reimburse Agri-Access for the shortage of $57,729,394.50 within five business days of that discovery, but failed to do so, a separate and additional breach of the MPA. *Id.*; *compare* Exhibit 7 (Final Closing Stmt.) *with* Exhibit 8 (Wire Confirm. & Correspondence).

80. ***CAL was required not to take any action that may harm Agri-Access's Interest***. Section 4.13 also required CAL to remit the Payoff Proceeds. That provision states: "[CAL] *shall not* take any action with respect to any Participation Loan . . . which would or may adversely affect [Agri-Access's] rights or interest under or in the Participation Loan." Exhibit 1 (MPA) at § 4.13(a)–(b) (emphasis added).

81. Section 4.13 of the MPA also provides that "[CAL] agrees to consult with [Agri-Access] on all matters which may substantially affect collectability of, or security for, a Participation Loan." *Id.* at § 4.13(b).

82. By terminating ACH instructions, changing the Borrowers' address,

initiating an ad hoc one-time wire payment for May principal and interest payments that were not due (because the [redacted] Loans had already paid off), and then commandeering the Payoff Proceeds and using them for its own purposes, CAL has taken and continues to take action which has adversely affected Agri-Access's rights. In particular, CAL attempted to hide the fact that the [redacted] Loans had paid off, and has deprived Agri-Access of the free use of the Payoff Proceeds for other purposes, including to earn interest or otherwise obtain a return on its property.

83. By refusing to return the Payoff Proceeds immediately, CAL also has taken and continues to take action which may adversely affect Agri-Access's interest in the Payoff Proceeds in the future. CAL has converted the Payoff Proceeds to its own use, and has steadfastly refused to provide *any* substantive information regarding its actions or its legal position; instead it has engaged in an egregious, deliberate scheme to delay (or avoid) a meaningful exchange of information. Given CAL's conduct to date, until the Payoff Proceeds are turned over to Agri-Access they are at risk because CAL's refusal to comply with its clear contractual obligations, as well as its attempts to obfuscate its purpose to date, demonstrate that CAL does not respect, and does not intend to be bound by, its prior agreements and may use, dissipate, or otherwise harm Agri-Access's property—i.e., the Payoff Proceeds.

84. ***CAL executed sweeping Powers of Attorney in Agri-Access's favor***. Consistent with Section 2.3 of the MPA where Agri-Access became the owner of the economic interest in [redacted] Loans and their documentation, Section 4.6 of the MPA recognizes that CAL would only be acting on behalf of Agri-Access. This section

provides:

> "[CAL] hereby constitutes Agri-Access its true and lawful attorney-in fact with full power on behalf of [CAL] to ask for, require, demand, or receive any and all loan payments and claims for money due or to become due under any Participation Loan, to endorse checks or other instruments delivered to the lockbox or otherwise received by Agri-Access and constituting loan payments or sums legally due to a party under this Agreement. [CAL] further constitutes Agri-Access its true and lawful attorney-in-fact with full power on behalf of [CAL] to execute any and all instruments and/or documents relating to and/or connected with any loan for which AgriAccess is the Servicing Party."
>
> Exhibit 1 (MPA) at § 4.6 (authorizing powers of attorney).

85. Pursuant to this provision, on September 23, 2019, CAL's CEO Ron Cook executed a Power of Attorney for the 0800 Loan which stated in part:

> KNOW ALL BY THESE PRESENTS that, Corporate America Lending, a California Corporation ("CAL"), has made, constituted, and appointed and by these presents does make, constitute, and irrevocably appoint Agri-Access, a division and trademark of Compeer Financial, FLCA ("Agri-Access"), its true and lawful attorney-in-fact with full power on behalf of CAL to ask for, require, demand, or receive any and all loan payments and claims for money due or to become due under that certain Note, executed by [redacted] dated November 20, 2018, in the principal amount of $33,000,000.00 and the Deed of Trust of even date both with respect to Loan No. [redacted]0800 (the Note and Deed of Trust are hereafter collectively, the "Loan"), to endorse checks or other instruments delivered to the lockbox or otherwise received by Agri-Access and constituting loan payments or sums legally due to a party.
>
> Exhibit 18 (First POA).

86. Similarly, on October 6, 2021, CAL's CEO Ron Cook executed a Power of Attorney for the 3400 Loan which stated in part:

> "KNOW ALL BY THESE PRESENTS that, CORPORATE AMERICA LENDING, a California corporation ("CAL"), has made, constituted, and appointed and does make, constitute, and irrevocably appoints Agri-Access, a division and trademark of Compeer Financial, FLCA ("Agri-Access"), its true and lawful attorney-in-fact with full power on behalf of CAL to ask for, require, demand, or receive any and all loan payments and claims for money due or to become due under that Credit Agreement executed by [redacted] Dated June 10, 2013 for an aggregate principal amount of $25,000,000 on May 1, 2021 and the Deed of Trust of even date both with respect to Loan No. [redacted]3400; (the Credit Agreement, and Deed of Trust are hereafter collectively, the "Loan"), to endorse checks or other instruments delivered to the lockbox or otherwise received by Agri-Access and constituting loan payments or sums legally due to a party."

Exhibit 19 (Second POA).

87. Section 4.6 of the MPA and these Powers of Attorney make clear that Agri-Access has the "full power on behalf of CAL to ask for, require, demand, or receive any and all loan payments and claims for money due or to become due under" both of the [redacted] Loans. That remains true now, while CAL wrongfully retains the Payoff Proceeds.

## D. Beyond the Payoff Proceeds, CAL Does Not Have Sufficient Assets to Satisfy A Money Judgment

88. When Agri-Access last performed a counterparty risk analysis for CAL in October 2021, it determined, using financial information provided by CAL, that CAL had total assets of just $4.5 million dollars. Exhibit 20 (Counterparty Risk Assmt.).

89. A LexisNexis Due Diligence Business Report generated for CAL on May

10, 2024, further confirms that the "sum of tax-assessed values for all properties that are currently owned by the business are from $1 million to $5 million." Exhibit 21 (LexisNexis Rpt).

90. Consequently, if CAL uses, dissipates, fraudulently transfers or otherwise conceals the Payoff Proceeds, CAL will not have sufficient funds to repay the Payoff Proceeds.

## E. <u>**Arbitration and Request for Interim Injunctive Relief**</u>

91. The MPA contains a provision requiring the arbitration of disputes arising from rights created by the MPA. That provision, Section 7.1(a), provides:

> "In keeping with the spirit of cooperation of [CAL] and Agri-Access and to reduce the chances of prolonged and destructive litigation, the parties both agree to submit disputes to binding arbitration on any issue or right created or affected by this Agreement which cannot be resolved satisfactorily between the parties themselves; *provided, however, that no provision hereof shall limit the right of either party to exercise other remedies, whether provided by this Agreement or by state or federal law*."

Exhibit 1 (MPA) at § 7.1(a) (emphasis added).

92. In accordance with that provision, as well as Section 7.1(b), on May 14, 2024, Agri-Access initiated binding arbitration against CAL to be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA Commercial Rules"). And on May 15, 2024, in accordance with Rules 38 and 39 of the AAA Commercial Rules, Agri-Access requested that the AAA immediately appoint an Emergency Arbitrator to obtain emergency relief and secure the Payoff Proceeds until the underlying arbitration can be resolved (the "Related Arbitration").

93. Agri-Access has alleged the same underlying facts, and will assert the same or substantially similar causes of action alleged herein in the Related Arbitration.

94. Agri-Access only seeks to have this Court adjudicate its request for injunctive relief to restore and secure the Payoff Proceeds pending resolution of the parties' disputes in the Related Arbitration. In particular, an interim order obtained from an Emergency Arbitrator pursuant to Rule 38 of the AAA Commercial Rules will likely require additional action and may take more than a month before that order can become confirmed and will be enforceable. For that reason, Agri-Access seeks this Court's intervention solely to preserve the Payoff Proceeds until a confirmed and enforceable order can be obtained in the Related Arbitration.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

95. Agri-Access restates and re-alleges the allegations set forth in paragraphs 1 through 94 above and incorporates them by reference.

96. Agri-Access and CAL entered into a valid contract: the Master Participation Agreement, as amended.

97. There are no conditions precedent for CAL to perform its obligations pursuant to the relevant contractual provisions, but even if there were, Agri-Access has fully performed all of its covenants and obligations under the MPA, except those whose performance has been waived or legally excused.

98. CAL breached, and continues to breach, the MPA in numerous material respects, including, without limitation, the following:

a. Failing to return Agri-Access's property and remit the Payoff Proceeds promptly after they were received;

b. Failing to remit Agri-Access's share of the proceeds of Acquired Property for the [redacted] Loans—the full Payoff Proceeds—immediately upon the request of Agri-Access and not later than within two business days of receipt;

c. Failing to inform Agri-Access immediately of its misapplied payment, and to correct that payment and reimburse Agri-Access for the $57,729,394.50 shortage within five business days;

d. Taking actions that have or may harm Agri-Access's rights or interest in the [redacted] Loans, including the Payoff Proceeds;

e. Failing to consult with Agri-Access on all matters which may substantially affect collectability of or security for the [redacted] Loans and the Payoff Proceeds;

f. Ignoring and acting in contravention of the sweeping Powers of Attorney CAL executed in favor of Agri-Access; and

g. Failing to communicate in a timely manner all material matters related to the [redacted] Loans, including loan payoff information and all financial and other information related to the [redacted] Loans and the Payoff Proceeds requested by Agri-Access.

99. As a direct and proximate result of CAL's breaches as described herein, Agri-Access has been and continues to be damaged, the exact amount of which will be

determined at in the Related Arbitration.

100. Agri-Access has and will sustain damages and irreparable harm as a result of CAL's past and ongoing breaches of the MPA if the Payoff Proceeds are not immediately returned or placed in escrow pending resolution of the Related Arbitration.

101. Agri-Access has no adequate remedy at law for the foregoing present and threatened future irreparable harm.

**SECOND CLAIM FOR RELIEF**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**

102. Agri-Access restates and re-alleges the allegations set forth in paragraphs 1 through 101 above and incorporates them by reference.

103. Every contract entered into in Minnesota carries with it an implied covenant of good faith and fair dealing. Through this covenant, each party promises it will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract. All parties promise to act in good faith—meaning they will act with honesty of purpose without any intention to mislead or to take unfair advantage of each other.

104. Here, Agri-Access and CAL entered into the MPA and Agri-Access purchased Participations in the [redacted] Loans in order for Agri-Access to become the 100% owner of the economic interest in the [redacted] Loans, along with an ownership interest in the Loan Documents and their underlying debt.

105. Through its actions, CAL has prevented Agri-Access from receiving the benefits of the MPA by commandeering and refusing to remit the Payoff Proceeds, which

represent the full economic interest in the [redacted] Loans that Agri-Access previously paid $58,000,000 to acquire. In addition, as alleged, CAL has undertaken numerous actions and made several false statements apparently intended to dupe Agri-Access into believing that the [redacted] Loans did not pay off in full on April 29, or to otherwise delay Agri-Access's discovery of that fact. And in the time since it took action to misappropriate the Payoff Proceeds, CAL has refused to provide Agri-Access with material information about the Payoff Proceeds and the basis for CAL's refusal to remit them promptly to Agri-Access. In doing each of these things, CAL has not acted fairly and in good faith.

106. Agri-Access has already been harmed as a result of these breaches of the implied covenant of good faith and fair dealing, the exact amount of which will be determined in the Related Arbitration.

107. Agri-Access has and will sustain damages and irreparable harm as a result of CAL's past and ongoing breaches of the implied covenant of good faith and fair dealing if the Payoff Proceeds are not immediately returned or placed in escrow pending resolution of the Related Arbitration.

108. Agri-Access has no adequate remedy at law for the foregoing present and threatened future irreparable harm.

## THIRD CLAIM FOR RELIEF
## CONVERSION

109. Agri-Access restates and re-alleges the allegations set forth in paragraphs 1 through 108 above and incorporates them by reference.

110. Agri-Access holds a property interest in the form of its Participation in the [redacted] Loans, which includes the Payoff Proceeds.

111. Agri-Access has repeatedly demanded delivery and return of its property, the Payoff Proceeds, which CAL has wrongfully refused.

112. Through its actions, CAL and its officers Mr. Cook and Mr. Aretakis have willfully interfered with that property interest without lawful justification, and in doing so, they have deprived Agri-Access, the lawful possessor of that property, of its use and possession.

113. Agri-Access has and will sustain damages and irreparable harm as a result of CAL's and its officers' receipt and retention of the Payoff Proceeds if they are not immediately returned or placed in escrow pending resolution of the Related Arbitration.

114. Agri-Access has no adequate remedy at law for the foregoing present and threatened future irreparable harm.

## FOURTH CLAIM FOR RELIEF
## CIVIL THEFT

115. Agri-Access restates and re-alleges the allegations set forth in paragraphs 1 through 114 above and incorporates them by reference.

116. Through its Participation pursuant to the MPA, Agri-Access acquired 100% of the economic interest in the [redacted] Loans, which includes the full amount of the Payoff Proceeds. The Payoff Proceeds, therefore, are Agri-Access's property.

117. Through its actions, CAL and its officers have wrongfully and surreptitiously taken the Payoff Proceeds for the purpose of keeping or using them.

118. Agri-Access has and will sustain damages and irreparable harm as a result of CAL's and its officers' civil theft of the Payoff Proceeds if they are not immediately returned or placed in escrow pending resolution of the Related Arbitration.

119. Agri-Access has no adequate remedy at law for the foregoing present and threatened future irreparable harm.

## FIFTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT

120. Agri-Access restates and re-alleges the allegations set forth in paragraphs 1 through 119 above and incorporates them by reference.

121. To the extent that the MPA is held to be invalid or inapplicable to CAL's conduct as alleged herein—which Agri-Access expressly denies—Agri-Access pleads this cause of action in the alternative to the First Claim for Relief.

122. Between 2018 and 2022, Agri-Access paid $58,000,000 to acquire a 100% Participation in the economic interest of the [redacted] Loans.

123. Now that the [redacted] Loans have paid off in full, CAL and its officers have wrongfully withheld the Payoff Proceeds recently received from [redacted], which represent the full economic interest that Agri-Access previously acquired from CAL. CAL's and its officers' retention of the Payoff Proceeds is inequitable, and they have been unjustly enriched thereby.

124. Agri-Access has and will sustain damages and irreparable harm as a result of CAL's and its officers' unjust enrichment if the Payoff Proceeds are not immediately returned or placed in escrow pending resolution of the Related Arbitration.

125. Agri-Access has no adequate remedy at law for the foregoing present and threatened future irreparable harm.

**<u>SIXTH CLAIM FOR RELIEF</u>**
**MONEY HAD AND RECEIVED**

126. Agri-Access restates and re-alleges the allegations set forth in paragraphs 1 through 125 above and incorporates them by reference.

127. Between 2018 and 2022, Agri-Access paid $58,000,000 to acquire a 100% Participation in the economic interest of the [redacted] Loans.

128. Now that the [redacted] Loans have paid off in full, CAL received or obtained possession of the Payoff Proceeds, in which Agri-Access is the 100% owner pursuant to the MPA.

129. CAL and its officers have wrongfully withheld the Payoff Proceeds, which in equity and good conscience they must return to Agri-Access.

130. Agri-Access has and will sustain damages and irreparable harm as a result of CAL's and its officers' receipt and retention of the Payoff Proceeds if they are not immediately returned or placed in escrow pending resolution of the Related Arbitration.

131. Agri-Access has no adequate remedy at law for the foregoing present and threatened future irreparable harm.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs Compeer Financial ACA, Compeer Financial PCA, and Compeer Financial FLCA, collectively d/b/a Agri-Access prays that the Court grant the following relief:

132. During the pendency of this action and the Related Arbitration, a temporary restraining order and/or preliminary injunction requiring CAL to either (i) promptly return the Payoff Proceeds to Agri-Access; or (ii) place the full amount of the Payoff Proceeds in an escrow account which it does not control and cannot access pending resolution of the Related Arbitration;

133. An Order awarding Agri-Access its attorneys' fees and costs associated with prosecuting this action; and

134. Such further relief to which Agri-Access may be entitled as a matter of law or equity, or which the Court determines to be just and proper, including interest, general damages, and/or punitive damages.

Dated: May 21, 2024

Respectfully submitted,

**JONES DAY**

*/s/ Joseph Boylan*
Christopher J. Lovrien*
Joseph J. Boylan*
David J. Feder*
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Phone: 213-243-2175
Email: cjlovrien@jonesday.com
jboylan@jonesday.com
dfeder@jonesday.com

Trevor Parkes (MN #0402172)
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
Phone: 612-217-8924
Fax: 844-345-3178
Email: tparkes@jonesday.com

*Attorneys for Plaintiffs*
*Compeer Financial, ACA,*
*Compeer Financial, PCA, and*
*Compeer Financial, FLCA*