# UNITED STATES DISTRICT COURT DISTRICT OF MINNESOTA

COMPEER FINANCIAL, ACA,
COMPEER FINANCIAL, PCA, and
COMPEER FINANCIAL, FLCA,

        Plaintiffs,

v.

CORPORATE AMERICA LENDING,
INC.,

        Defendant.

**Court File No. 24-cv-1896 (JWB/ECW)**

**MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS'
MOTION TO CONFIRM
PARTIAL FINAL AWARD OF
MERITS PANEL ON PHASE I**

Barry W. Lee (pro hac vice)
Misa K. Eiritz (pro hac vice)
**MANATT, PHELPS AND PHILLIPS, LLC**
One Embarcadero Center, 30th Floor
San Francisco, California 94111
Telephone: (415) 291-7400
bwlee@manatt.com
meiritz@manatt.com

C. Russell Georgeson (pro hac vice)
**GEORGESON LAW OFFFICES**
7491 North Remington Ave., Suite 100
Fresno, California 93711
Telephone: (559) 447-8800
crgdanelaw@sbcglobal.net

**Attorneys for Defendant,
CORPORATE AMERICA LENDING, INC.**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................... 1

RELEVANT FACTS .............................................................................................. 2

   A.  The Parties. ................................................................................................ 2

   B.  Compeer Is Legally Barred from Purchasing Loans and Engaging in Direct
       Lending Activities in California. ................................................................. 3

   C.  Compeer's Contract, While Termed a "Participation" Arrangement, Improperly
       Allowed It to Purchase Loans and Engage in Direct Lending Activities in
       California. ................................................................................................... 4

   D.  The Bifurcated Arbitration Hearing and Partial Final Award. .................. 5

ARGUMENT.......................................................................................................... 6

   A.  The Partial Award Was Not a Final Award and Connot Be Confirmed ................. 6

   B.  Compeer's Motion Seeks to Enforce an Illegal and Unenforceable Contract. ...... 10

     1.  The Court May Not Confirm an Arbitration Award or Otherwise Assist in the
         Enforcement of an Illegal Contract. ................................................. 11

     2.  The Court May Also Not Enforce a Contract that Violates Public Policy. ........ 13

     3.  The MPA Violates the Farm Credit Act…… ..................................... 14

         a.  Compeer Is Barred by Statute from Engaging in Direct Lending and
             Acquiring  Loans in California……………………………………… 14

         b.  The Federal Farm Credit Act Regulates Participation Loans…...…… 16

         c.  The Terms of the MPA All But Eliminated CAL as Lender…...…… 19

         d.  The MPA Was Not a True Participation Agreement………………...… 20

   C.  The Arbitration Proceeding Was Fundamentally Unfair. .................................... 26

   CONCLUSION ................................................................................................ 28

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

12 U.S.C. § 2001 ............................................................................................... 16

12 U.S.C. §§ 2011, 2013, 2015, 2122 ............................................................... 16

12 U.S.C. § 2013(12) ...................................................................................... 3, 15

12 U.S.C. § 2015 (b)(4)(A) ................................................................................ 16

Farm Credit Act (12 U.S.C. § 2001, *et seq.*) ............................................ 10, 16

## FEDERAL CASES

*ACRO Bus. Fin. Corp. v. Marshall*, 357 B.R. 785 (Bankr. D. Minn. 2006) ............. 15, 20

*CAA Sports LLC v. Dogra*, No. 4:18-cv-01887-SNLJ, 2019 WL 1001041 (E.D. Mo. Feb. 28, 2019) ................................................................................ 7

*CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, No. 2:23-cv-2983, 2025 WL 601249 (S.D. Ohio Feb. 25, 2025) ................................................................ 12

*COKeM Int'l, Ltd. v. Riverdeep, Inc.*, Nos. 06–CV–3331 and 06–CV–3359, 2008 WL 4417323 (D. Minn. Sept. 24, 2008) ............................................ 7, 8, 9

*Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227 (1909) ...................... 18

*Crawford Grp., Inc. v. Holekamp*, No. 4:06-CV-1274, 2007 WL 844819 (E.D. Mo. Mar. 19, 2007) ................................................................................ 9

*Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.)*, 813 F.2d 266 (9th Cir. 1987) ................................................................................ 21

*Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231 (1st Cir. 2001) ................................. 9

*Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692 (6th Cir. 2017) ............................................................ 12

*Hurd v. Hodge*, 334 U.S. 24 (1948) ............................................................ 13, 14

*In re AutoStyle Plastics,* 269 F.3d at 736 ..................................................... 15, 20

*In re Good*, 131 B.R. ................................................................................ 27

*In re Okura & Co.*, 249 B.R. 596 (Bankr. S.D.N.Y. 2000) ........................................ 17, 18

*In re Sackman Mortg. Corp.*, 158 B.R. 926 (Bankr. S.D.N.Y. 1993) ............. 20, 21, 22, 23

*In re Yale Express Sys., Inc.*, 245 F.Supp. 790 (S.D.N.Y. 1965) .................................... 22

*Jackson Produce Rural Elec. Coop. Assn. v. Loc. Union 816, Int'l Broth. of Elec. Workers*, 646 F.2d 264 (6th Cir. 1981) ................................................... 11

*Kaiser Steel Corp. v. Mullins*, 445 U.S. 72 (1982) ..................................... 11, 18

*Kelly v. Kosuga*, 358 U.S. 516 (1959) ........................................................................ 11, 12

*Kozlov v. Associated Wholesale Grocers, Inc.*, No. 4:10-cv-03211, 2011 WL
3320972 (D. Neb. Aug. 2, 2011) ..................................................................... 27

*La. Fed. Land Bank Ass'n, FCLA v. Farm Credit Admin.,* 180 F.Supp.2d 47
(D.D.C. 2001) ......................................................................................................... 16

*Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718 (8th Cir. 1999) .............................. 7

*Local 36, Sheet Metal Workers Int'l Ass'n, AFL-CIO v. Pevely Sheet Metal Co.,
Inc.*, 951 F.2d 947 (8th Cir. 1992) ................................................................... 7

*McMullen v. Huffman*, 174 U.S. 639 (1899) ................................................. 11, 12

*Peden v. United States*, 512 F.2d 1099 (Ct. Cl. 1975) ........................................ 27

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174 (2d Cir.
1998) .......................................................................................................................... 7

*Sensoria, LLC v. Kaweske*, 581 F.Supp.3d 1243 (D. Colo. 2022) ..................... 12

*United Healthcare Servs., Inc. v. Guemple*, No. 24-cv-2606, 2024 WL 4380919
(D. Minn. Oct. 3, 2024) ....................................................................................... 7

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29 ........................ 13

*United States v. Kordel*, 397 U.S. 1 (1970) ........................................................... 27

*W.R. Grace & Co. v. Local Union*, 749, 461 U.S. 757 (1983) ........................... 13

## STATE STATUTES

Cal. Corp. Code § 2105 ................................................................................................ 15

Cal. Fin Code § 1044 ..................................................................................................... 15

Cal. Fin. Code § 22100 ................................................................................................. 15

## STATE CASES

*ACLI Int'l Commodity Servs., Inc. v. Lindwall,* 347 N.W.2d 522 (Minn. 1984) .. 12, 13, 14

*Anheuser-Busch Brewing Assn. v. Mason*, 46 N.W. 558 (Minn. 1890) ........................... 12

*Black Point Aggregates, Inc. v. Niles Sand & Gravel Co.*, 188 Cal.App.2d 375
(Cal. 1961) ..................................................................................................... 13, 14

*Holland v. Sheehan* 122 N.W. 1 (Minn. 1909) ........................................................ 12, 14

*In re Great N. Iron Ore*, 263 N.W.2d 610 (Minn. 1978) ..................................... 13, 14

*Indep. Sch. Dist v. Loberg Plumbing & Heating Co.*, 123 N.W.2d 793 (Minn.
1963) ..................................................................................................................... 13, 14

*Kniefel v. Keller*, 290 N.W. 218 (Minn. 1940) ....................................................... 13, 14

*McCauley v. Michael*, 256 N.W.2d 491 (Minn. 1977) ......................................... 13, 14

*Mohr v. Miesen*, 49 N.W. 862 (Minn. 1891) ...................................................................... 12

*Pries v. Hurning*, 15 N.W.2d 515 (Minn. 1944) ......................................................... 13, 14

*Vercellini v. USI Realty Co.*, 196 N.W. 672 (Minn. 1924) ......................................... 13, 14

# REGULATIONS

12 C.F.R. § 614.4325.................................................................................................... 16

12 C.F.R. § 614.4330.................................................................................................... 17

12 CFR § 614.4070 ................................................................................................ 3, 14

69 FR 8407 ................................................................................................................. 18

# CONSTITUTIONAL PROVISIONS

Fifth Amendment.................................................................................................. 6, 27, 28

Defendant Corporate America Lending, Inc. ("CAL") respectfully submits this Memorandum of Law in Opposition to Plaintiffs Compeer Financial, ACA, Compeer Financial, PCA, and Compeer Financial, FLCA's (collectively, "Compeer") Motion to Confirm Partial Final Award of Merits Panel on Phase I ("Motion").[1]

## INTRODUCTION

Compeer seeks to confirm a partial arbitration award that is neither final nor valid and enforceable. These fatal defects go to the very heart of the arbitration process, the contract underpinning the dispute, and the fundamental fairness of the proceedings.

First, the partial arbitration award is neither complete nor final. Rather than a final award, the arbitration panel issued what it acknowledges is only a "Partial Final Award of Merits Panel on Phase I" ("Partial Phase I Award"). Over CAL's objection, the Panel limited Phase I to only Compeer's claim of entitlement to certain loan payoff proceeds. The Panel has retained jurisdiction for Phase II, scheduled for May 26-30, 2025, at which time the Panel will hear all remaining claims and defenses, including most importantly CAL's affirmative defenses and counterclaims, including for offset. The Court simply should not confirm the Partial Phase I Award before this proceeding is concluded and the Panel determines the final, correct amount of the loan payoff proceeds to which Plaintiffs are entitled, if any. Simply put, consideration of the Motion at this time is premature; the Motion should be denied.

---

[1] CAL submits this Opposition without waiver of and expressly subject to the arguments and authorities detailed in CAL's Motion to Dismiss (Doc. 88)—scheduled for hearing before this Court at 2:00 p.m. on March 26, 2025—that demonstrate this action should be dismissed in its entirety.

Second, the contract on which the arbitration is based is illegal, invalid and unenforceable as against public policy; it should not be enforced by the Court. As detailed below, the contract on which this action is grounded—and which was designed and drafted by Compeer and presented to CAL as non-negotiable—constitutes a lending transaction that Compeer is prohibited from entering by federal law. Public policy considerations prohibiting the enforcement of illegal agreements are well-established, and the Court should decline to confirm the Partial Phase I Award, especially before the arbitration proceeding is even completed.

Finally, the arbitration hearing itself was inherently unfair due to the potential for self-incrimination. CAL's primary witnesses were placed in a position where they faced significant risks of exposing themselves to legal jeopardy due to the pendency of a federal criminal investigation that was triggered by Claimant. This concern was not adequately addressed by the Panel, which found that Compeer—not the individuals under investigation—would be prejudiced by continuing the hearing. As a result, CAL was forced to not offer any testimony in support of its Phase I defense.

As a result of these substantial issues, the Partial Phase I Award should not be confirmed. The Motion should be denied.

## RELEVANT FACTS

**A.    <u>The Parties.</u>**

CAL is a small California corporation that is duly licensed and authorized to make and service loans in California. It primarily services agricultural-related businesses.

Compeer is a conglomeration of federal credit associations in the Farm Credit

System. Under federal law, Compeer is prohibited from engaging in direct lending transactions outside its limited territory—Illinois, Minnesota, and Wisconsin. While Compeer may act as a "participant" in loans outside its territory, that is not what it did here.

**B.    Compeer Is Legally Barred from Purchasing Loans and Engaging in Direct Lending Activities in California.**

Compeer is subject to the terms and conditions of the Farm Credit Act ("FCA"). Pursuant to the FCA, Compeer is prohibited from engaging in direct lending activities to borrowers outside of its chartered territory, *i.e.*, outside Illinois, Minnesota, and Wisconsin. 12 CFR § 614.4070. Further, Compeer is prohibited from purchasing loans outside its territory. 12 CFR § 614.4325(b). To state the obvious, California is not part of Compeer's territory.

Compeer is permitted, however, to acquire participation interests in California loans. 12 U.S.C. § 2013(12). A participation is a contractual arrangement between a lender and a third party whereby the third party, referred to as the participant, provides funds to the lender. Under this arrangement, the participant is ***not*** the lender to the borrower and has no contractual relationship with the borrower. The participant's only contractual relationship is with the lender and the participant has no ability to seek legal recourse against the borrower. As discussed below, courts have clearly defined what constitutes a true participation agreement; the contract involved here is not a true participation agreement.

### C.  Compeer's Contract, While Termed a "Participation" Arrangement, Improperly Allowed It to Purchase Loans and Engage in Direct Lending Activities in California.

Compeer created a contract entitled the "Origination, Field Servicing & Master Participation Agreement" ("MPA") (Lee Declaration, Ex. 1, Steele Decl., Ex. 1).  As discussed below, the MPA placed all-encompassing powers in Compeer that allowed it to unlawfully engage in direct lending activities in California, including but not limited to making all decisions as to the creditworthiness of the California clients requesting loans; controlling the terms, conditions, and restrictions in the notes, deeds of trust, and other loan documents issued to the borrowers; determining borrower eligibility and controlling the loan documents that are used for the California loans; making all decisions regarding the administration of the loans, including but not limited to, matters concerning declarations of default, initiating foreclosure actions, covenant compliance, reporting requirements, payment deferrals, asset inspections, approvals, interest adjustments, and other aspects of the loans, and otherwise acting as the lender to California borrowers.

Such powers are so broad that Compeer itself maintains that the MPA "constitutes a purchase of an interest in the principal amount of the loan and an ownership of the loan and an ownership interest in the Loan Documents and their underlying debt" and that "following a purchase of the loan, [Compeer] owns the rights to the Loan Documents and the underlying debt, including the principal of the loan."  (Declaration of Chad Steele, dated May 15, 2024, attached as Ex. 1 to the Lee Declaration ("Steele Decl."), ¶ 5(b).) Compeer even requires borrowers to pay it directly and says it owns the notes, loan agreements, deeds of trust, as well as the underlying debt itself.  (*Id.* ¶¶ 5-7.)  As shown

below, inclusion of these terms in the MPA means the MPA is not a true participation arrangement, which in turn means Plaintiffs have engaged in illegal lending activities outside of its chartered territory; as such, the MPA is invalid, unenforceable and against public policy.

**D.    The Bifurcated Arbitration Hearing and Partial Final Award.**

Plaintiffs now move this Court to confirm the Partial Phase I Award issued by a three-member panel sitting before the American Arbitration Association ("Panel"). (Pls.' Ex. 1.) Two of CAL's procedural objections—both of which were rejected by the Panel— are relevant to the pending Motion.

First, on September 6, 2024, following various orders requiring the establishment of an escrow account to preserve the Famoso Hills Loan Payoff Proceeds, at Compeer's request over CAL's objection, the Panel bifurcated the arbitration hearing into two phases. Importantly, bifurcation was not ordered to streamline issues or increase economy; rather it was ordered to pressure CAL to turn over money that it did not (and does not) believe the Panel has authority to make it turn over: "The Panel believes it is preferable to adopt a bifurcated scheduling order along the lines proposed by Compeer, but with leave to CAL to seek an extension of the January 13, 2025, hearing date if and when it can show that CAL is compliant with the segregation/escrow orders.  In such a case, the January 13 hearing would be collapsed into a single hearing of all issues during the week of May 26-30, 2025."  (Pls.' Ex. 2.)  Following this order, CAL moved for reconsideration, which was denied.  (Declaration of Barry W. Lee In Support of Opposition to Motion to Confirm Partial Final Award of Merits Panel on Phase I ("Lee Decl."), ¶ 3.)  Because of the

bifurcated hearing, the scope of Phase I was "essentially limited to the right of Claimant to remittance of the Payoff Proceeds. Jurisdiction is reserved to hear all claims, defenses, and counterclaims that have been deferred to Phase II." (Pls.' Ex. 1, p. 2.)

Second, on December 23, 2024, CAL moved to stay the Phase I arbitration hearing once it became aware that Mr. Cook was being investigated by the U.S. Attorney's Office in Fresno, California in a parallel criminal proceeding that was triggered by Plaintiffs. (Pls.' Ex. 9.) The Panel denied the stay request, finding that the risk to Compeer's monetary claim outweighed the risk to Mr. Cook's Fifth Amendment rights and freedom. (Pls.' Ex. 10.)

After overruling both of CAL's procedural objections, on January 13, 2025, an evidentiary hearing was conducted on Phase I of the bifurcated arbitration. At the hearing, CAL was unable to have its principal witnesses testify to avoid any potential self-incrimination.[2] (Lee Decl. ¶ 4.) In post-hearing briefing, CAL argued, *inter alia*, that the contract between the parties was illegal and unenforceable. Following the hearing, on February 4, 2025, the Panel issued the Partial Phase I Award. (Pls.' Ex. 1.)

## ARGUMENT

### A.   The Partial Award Was Not a Final Award and Connot Be Confirmed

Confirming the Partial Phase I Award—which by its express terms is ***not*** a final award—would be contrary to law and this Court lacks authority and jurisdiction to do so.

---

[2] CAL's counsel here do not represent Messrs. Cook or Aretakis in the criminal investigation. Both have retained separate independent criminal defense counsel for that matter.

An arbitration award must be final to be confirmed. "The general rule is that an award is 'final' for the FAA's purposes if the arbitration is 'complete.'" *United Healthcare Servs., Inc. v. Guemple*, No. 24-cv-2606, 2024 WL 4380919, at *3 (D. Minn. Oct. 3, 2024); *Local 36, Sheet Metal Workers Int'l Ass'n, AFL-CIO v. Pevely Sheet Metal Co., Inc.*, 951 F.2d 947, 949–50 (8th Cir. 1992) ("For an arbitration to be final and therefore federal court jurisdiction to be proper, there must be a 'complete arbitration.'"). This rule exists "'to avoid piecemeal litigation and repeated judicial review.'" *Guemple*, 2024 WL 4380919, at *3 (quoting *CAA Sports LLC v. Dogra*, No. 4:18-cv-01887-SNLJ, 2019 WL 1001041, at *2 (E.D. Mo. Feb. 28, 2019)). CAL has not uncovered any exceptions to the finality rule that have been recognized by the Eighth Circuit. *COKeM Int'l, Ltd. v. Riverdeep, Inc.*, Nos. 06–CV–3331 and 06–CV–3359, 2008 WL 4417323, at *3 (D. Minn. Sept. 24, 2008).

To be complete, "the award must finally determine **_all_ of the claims and defenses submitted for arbitration**." *COKeM Int'l, Ltd.*, 2008 WL 4417323, at *2 (emphasis added). This requires that the award not only "resolve all of the issues submitted to arbitration" but also "resolve them definitively enough so that the rights and obligations of the two parties, *with respect to the issues submitted*, do not stand in need of further adjudication." *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 176 (2d Cir. 1998) (emphasis in original). A "partial final award" that leaves claims unresolved cannot be confirmed. *COKeM Int'l, Ltd.*, 2008 WL 4417323, at *2.

In this Circuit, courts consistently hold that a partial award—resolving only part of the dispute—cannot be deemed final. *Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718, 720 (8th Cir. 1999) ("An award cannot be final if significant issues still need to be determined.").

*COKeM International v. Riverdeep* is instructive. There, the Court denied the motion to confirm without prejudice because the partial award addressed only a portion of one claim and "resolved *nothing* with respect to nine of the ten [other] claims." *COKeM Int'l, Ltd.*, 2008 WL 4417323, at *3 n.4 (emphasis in original). "[T]o find jurisdiction to confirm or vacate the April 1 award would be a stretch even under the broadest exception recognized outside of the Eighth Circuit." *Id.* at *3. At bottom, the finality rule ensures that the confirmation of an award reflects the arbitrators' intention to resolve all claims submitted to them and brings the dispute to a definitive end. Without addressing all issues, an award cannot be final.

Here, the Partial Phase I Award contains none of the hallmarks of a ***final*** award. Instead, the Panel repeatedly makes clear that the first phase of the arbitration *did not* resolve all issues and that numerous issues—including claims that could reduce or eliminate the amount that Compeer alleges is due—remain to be resolved later. For example, the Panel states:

- "The Phase I hearing was conducted on and essentially limited to the right of Claimant to remittance of the Payoff Proceeds. Jurisdiction is reserved to hear all claims, defenses, and counterclaims that have been deferred to Phase II." (Pls.' Ex. 1, p. 2.)

- "The defense of set off was deferred to Phase II because it is duplicative of Respondent's counterclaims, is independent of and not a valid defense to the Phase I claim for remittance of the Payoff Proceeds, and is appropriately deferred to the Phase II hearing as a counterclaim, there being no urgency to include this counterclaim in Phase I because of Compeer's ability to respond to any award of damages in favor of Respondent." (*Id.*)

- "Pending further instructions from this Panel, continue to hold in trust, and take no action which would or may in any way release, transfer, dissipate, damage or

impair the Grant Deed described in the October 18, 2024 Declaration of C. Russell Georgeson submitted in this arbitration." (*Id*. p. 4.)

- "The Panel retains continuing jurisdiction with respect to Phase II respecting Claimant's remaining claims, Respondent's defenses to those claims, and Respondent's counterclaims." (*Id*. pp. 4-5.)

- "The bifurcation allowed Respondent the additional time it requested to defend against the other claims and to pursue its counterclaims in Phase II, while avoiding prejudice to Claimant of delay of the discrete claim for remittance of the Payoff Proceeds." (*Id*. p. 13.)

There is simply no question that this arbitration is not complete; it is not final. The Panel has retained jurisdiction to hear Compeer's other claims and the CAL's offset and other defenses, as well as CAL's counterclaims in Phase II. Ultimately, Phase II could result in a significant offset against the Partial Phase I Award. Put simply, the Partial Phase I Award is partial precisely because it does not fully resolve all claims and defenses submitted to the Panel.

Compeer may argue that bifurcation creates an exception to the finality rule. Not so. Such an exception exists only where the parties mutually agreed to bifurcation (not the case here); CAL has not located any Eighth Circuit decision recognizing such an exception. *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 235–36 (1st Cir. 2001) ("Though we hold that the district court can review the partial award in this case, we think it best to limit our holding to the situation in which there is ***a formal, agreed-to bifurcation*** at the arbitration stage.") (emphasis added); *see also Crawford Grp., Inc. v. Holekamp*, No. 4:06-CV-1274, 2007 WL 844819, at \*4 (E.D. Mo. Mar. 19, 2007) ("While the Eighth Circuit has approved of the use of bifurcated arbitration where the parties have agreed to use such a process, there appears to be no clear precedent in this Circuit as to whether an interim

award issued in such a process can be treated as final if it represents the final determination of a discrete issue, and is not subject to change or revision by the arbitrators.").

Here, the parties did not agree to bifurcation; to the contrary, the Panel ordered bifurcation over CAL's objection.  (Pls.' Exs. 2, 8.) To adopt an even broader exception than has been accepted in other circuits—allowing an objecting party to be subject to confirmation of a partial, non-final award in a bifurcated arbitration—is inappropriate and encourages piecemeal motion practice and appeals.

Ultimately, the Panel believed CAL's affirmative defenses and counterclaims, including offset, could wait for Phase II because of Compeer's perceived "ability to respond to any award of damages in favor of Respondent."  (Pls.' Ex. 1, p. 2.)  A party's continued solvency is never guaranteed and this is not how proceedings should be decided. The Panel was wrong to bifurcate and wrong to award damages while affirmative defenses including offset, as well as other claims and counterclaims are still pending.

For these reasons, the Partial Phase I Award cannot be confirmed and the Motion should be denied.

**B.    <u>Compeer's Motion Seeks to Enforce an Illegal and Unenforceable Contract.</u>**

Compeer is barred by the Farm Credit Act (12 U.S.C. § 2001, *et seq*.) from engaging in direct lending activity and from acquiring loans in California, which is outside of its chartered territory.  However, Compeer is allowed to purchase participation interests from California lenders.  As detailed below, in order to circumvent the restrictions imposed by the law, Compeer utilized a contract, nominally termed a "participation agreement," that provided it with sweeping powers to engage in direct lending activities and acquire loans

in territories where it was not authorized to engage in such activities lawfully. Thus, in order to confirm the Partial Phase I Award, this Court would have to enforce Compeer's unlawful contract, which it is prohibited from doing.

1.    **The Court May Not Confirm an Arbitration Award or Otherwise Assist in the Enforcement of an Illegal Contract.**

A federal court may not assist "'in any way towards carrying out the terms of an illegal contract.'" *Kaiser Steel Corp. v. Mullins*, 445 U.S. 72, 77 (1982) (quoting *McMullen v. Huffman*, 174 U.S. 639, 654 (1899) ("The authorities from the earliest of time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract."); *see also Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("[T]he effect of illegality under a federal statute is a matter of federal law . . . even in diversity actions in the federal courts[.]"); *Jackson Produce Rural Elec. Coop. Assn. v. Loc. Union 816, Int'l Broth. of Elec. Workers*, 646 F.2d 264, 267 (6th Cir. 1981) ("[O]ne who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction."). The Supreme Court's cases "leave no doubt that **illegal promises will not be enforced in cases controlled by the federal law**." *Kaiser Steel Corp*, 455 U.S. at 77 (emphasis added) (citing *McMullen,* 174 U.S. 639).

Courts distinguish between cases where parties seek to enforce "a promise that was legal, even though the promise was part of an agreement containing a separate, illegal

provision," and cases where the promise "was deemed illegal in and of itself." *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 699 (6th Cir. 2017). Courts decline to enforce contracts if "the judgment of the Court would itself be enforcing the *precise conduct made unlawful* by the federal statute." *Id*. at 698 (quoting *Kelly*, 358 U.S. at 520 (internal punction omitted, emphasis in original text). "The distinction matters. A court may enforce a legal promise without violating the law, even where separate, unrelated parts are unlawful. The same cannot be said in cases where the parties ask courts to ignore established law, accept illegal conduct, and reward parties accordingly. In those situations, by enforcing the illegal promise, courts ratify unlawful conduct and become complicit in the parties' illicit transaction. The doctrine against enforcement prevents exactly that. At its core, it protects courts from engaging in illegal activities." *CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, No. 2:23-cv-2983, 2025 WL 601249 (S.D. Ohio Feb. 25, 2025) (citing *Hemlock Semiconductor Operations, LLC*, 867 F.3d at 699-700 (enforcing a provision that was legal "in isolation") and *Sensoria, LLC v. Kaweske*, 581 F.Supp.3d 1243, 1259 (D. Colo. 2022) (courts cannot "tolerate one violation of the law . . . to redress others")). When the contract is illegal, "the law will leave the parties as it finds them." *McMullen*, 174 U.S. at 670.[3]

---

[3] Minnesota law is substantially in accord. An illegal contract is one that is contrary to statute, common law, good morals, or public policy. *ACLI Int'l Commodity Servs., Inc. v. Lindwall,* 347 N.W.2d 522 (Minn. 1984); *Holland v. Sheehan* 122 N.W. 1 (Minn. 1909); *Mohr v. Miesen*, 49 N.W. 862 (Minn. 1891); *Anheuser-Busch Brewing Assn. v. Mason*, 46 N.W. 558 (Minn. 1890). A contract that is for an illegal end is void and unenforceable. *See, e.g., McCauley v. Michael*, 256 N.W.2d 491, 497 (Minn. 1977) (quoting *Black Point Aggregates, Inc. v. Niles Sand & Gravel Co.*, 188 Cal.App.2d 375, 381 (Cal. 1961) ("if the

Accordingly, a court may refuse to enforce an arbitration award as part of the general doctrine that courts will not enforce contracts that violate law or public policy. *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 42. "That doctrine derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act, and is further justified by the observation that the public's interests in confining the scope of private agreements to which it is not a party will go unrepresented unless the judiciary takes account of those interests when it considers whether to enforce such agreements." *Id.*

### 2. The Court May Also Not Enforce a Contract that Violates Public Policy.

Similarly, courts will not enforce contracts that are contrary to public policy. *W.R. Grace & Co. v. Local Union*, 749, 461 U.S. 757, 766 (1983); *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948). The determination of what constitutes public policy is ultimately a judicial responsibility. *W.R. Grace*, 461 U.S. at 766. If a contract violates explicit public policy, the court is obligated to refuse enforcement. *Id.*; *Hurd*, 334 U.S. at 35.[4]

---

illegal provision . . . is a major, if not the principal, aim and purpose of the agreement here, it follows that the contract as a whole is unenforceable"); *see also Lindwal*, 347 N.W.2d 522; *In re Great N. Iron Ore*, 263 N.W.2d 610 (Minn. 1978); *Vercellini v. USI Realty Co.*, 196 N.W. 672 (Minn. 1924); *Pries v. Hurning*, 15 N.W.2d 515 (Minn. 1944); *Kniefel v. Keller*, 290 N.W. 218 (Minn. 1940). If a contract transgresses the law or contravenes public policy, it is void. *Indep. Sch. Dist v. Loberg Plumbing & Heating Co.*, 123 N.W.2d 793 (Minn. 1963).

[4] Again, Minnesota law is similar. Courts examine the contract to see if the illegality has so tainted the transaction so that enforcing the contract would be contrary to public policy." *Isles Wellness, Inc.*, 725 N.W.2d at 92-93. Public policy is found in various authorities, including legislation and judicial decisions. *Holland,* 108 Minn. at 364-365; *McCauley*, 256 N.W.2d at 498 (holding that a contract is void as against public policy when it is

This prohibition extends to private agreements. *Hurd*, 334 U.S. at 34. Private agreements must always comply with the public policy established by the Constitution, federal statutes, treaties, and legal precedents. When enforcing a private agreement would violate this public policy, courts must refrain from doing so.

As described in more detail below, the MPA does not satisfy the requirements of the Farm Credit Act and cannot be enforced as both an illegal contract and in violation of public policy.

**3.    The MPA Violates the Farm Credit Act.**

      **a.    *Compeer Is Barred by Statute from Engaging in Direct Lending and Acquiring Loans in California.***

Compeer is a group of federal credit associations that are subject to the terms and conditions of the Farm Credit Act. Under the FCA, Compeer is prohibited from engaging in direct lending activities to borrowers outside of its chartered territory. *See* 12 CFR § 614.4070. Further, 12 CFR § 614.4325(b) prohibits Compeer from purchasing such loans directly: "No Farm Credit System institution may purchase any interest in a loan from an

---

"contrary to the terms and policy of an express legislative enactment" (citations omitted)). As the principal purpose of the MPA was to permit Compeer to circumvent the statutory and regulatory prohibitions against Compeer engaging in direct lending activities and acquiring loans in California in violation of 12 CFR § 614.4070, 12 CFR § 614.4325(b), and state law, the contract as whole is unenforceable. *See, e.g., McCauley*, 256 N.W.2d 491, 497 (quoting *Black Point Aggregates, Inc.*, 188 Cal.App.2d at 381 ("if the illegal provision . . . is a major, if not the principal, aim and purpose of the agreement here, it follows that the contract as a whole is unenforceable"); *see also Lindwal* 347 N.W.2d 522; *In re Great N. Iron Ore*, 263 N.W.2d 610; *Vercellini*, 196 N.W. 672; *Pries*, 15 N.W.2d 515; *Kniefel*, 290 N.W. 218; *Loberg Plumbing & Heating Co.*, 123 N.W.2d 793. Thus, MPA is unenforceable in its entirety.

institution that is not a Farm Credit System institution . . . ," with limited exceptions not applicable here, such as pooling, participation interests, and loans from the FDIC. Further, California law bars Compeer from conducting lending activities in that state.[5]

However, Compeer may participate in loan participation transactions to acquire interests in loans originated either by other farm credit banks or by non-farm credit banks. 12 U.S.C. § 2013(12). Participations start with an asset-based lender like CAL agreeing to make a loan, who thereafter sell off rights in the loan to other lenders through participation agreements. "Participations are not loans; they are contractual arrangements between a lender and a third party, in which the third party, or participant, provides funds to the lender." *ACRO Bus. Fin. Corp,* 357 B.R. 785 at 787-788 (citing *In re AutoStyle Plastics,* 269 F.3d at 736). The participant is not a lender to the borrower and has no contractual relationship to the borrower. A participation is a contractual arrangement between a lender and a third party whereby the third party, commonly referred to as the participant, provides

---

[5] Cal. Fin Code § 1044 bars Compeer from transacting business in California until the Commissioner of Financial Protection and Innovation has issued the company a certificate authorizing it to conduct banking activities. Compeer has not obtained such a certificate from the Commissioner. Cal. Fin. Code § 22100 bars an entity from engaging in the business of a finance lender or broker in California without first obtaining a license from Commissioner of Financial Protection and Innovation. Compeer has not obtained such a license from the Commissioner. Cal. Corp. Code § 2105 makes it unlawful for a foreign corporation to transact business in California without first obtaining from the Secretary of State a certificate of qualification. Compeer is conducting business in California without having obtained a certificate of qualification from the Secretary of State. 10 CCR § 10.14182 requires an institution engaged in banking in California to have provided proof of its bond and insurance policies to the Commissioner of Financial Protection and Innovation. Compeer has not provided such proof of its bond and insurance policies to the Commissioner.

funds to the lender.  The lender, in turn uses the funds from the participant to make loans to the borrower.  The participant is ***not*** the lender to the borrower and has no contractual relationship with the borrower.  The participant's only contractual relationship is with the lender and the participant has no ability to seek legal recourse against the borrower. *See La. Fed. Land Bank Ass'n, FCLA v. Farm Credit Admin.,* 180 F.Supp.2d 47, 53 (D.D.C. 2001).

### b.    *The Federal Farm Credit Act Regulates Participation Loans.*

Farm Credit Banks lending authority arises under the Farm Credit Act, 12 U.S.C. § 2001 *et seq.*  Farm Credit Banks can only lend money through non-system lenders, through participation agreements.  12 U.S.C. §§  2011, 2013, 2015, 2122.  The Farm Credit Administration is authorized to promulgate regulations to enforce the Act. 12 U.S.C. § 2015 (b)(4)(A).  Therefore, 12 U.S.C. § 2001 is the authorizing Federal authority which requires participation agreements between system banks (like Compeer) and non-system lenders (such as CAL).

12 C.F.R. § 614.4325 governs the purchase and sale of loan interests.  The "Lead Lender" is defined as "a lending institution having a direct contractual relationship with a borrower to advance funds, which institution sells or assigns an interest or interests in such loan to one or more other lenders."  12 C.F.R. § 614.4325(a)(2).  A "participating institution" is one that "purchases a participation interest in a loan originated by another lender.  12 C.F.R. § 614.4325(a)(4).

Under 12 C.F.R. § 614.4325(b), a Farm Credit institution cannot purchase any interest in a loan from a non-Farm Credit institution, except in certain limited

circumstances, including the purchase of a participation interest that meets specific regulatory requirements. These participation agreements must comply with 12 C.F.R. § 614.4330, which outlines particular requirements for such agreements.

The Farm Credit Administration has further clarified the rules around loan participations, specifically distinguishing between loan participations and loan purchases. *See* 69 FR 8407-12. The FCA has expressed concern that system banks should not be permitted to create a nationwide charter by purchasing a one hundred percent interest in participated loans, which could transform the participant into the lender. *Id*. That is precisely what Compeer has done with respect to loans originated by CAL. (Steele Decl. ¶¶ 5, 7.) The FCA stated that courts have recognized the legal distinction between participations and loan purchases and separate legal effects of loan participation agreements. *Id*.[6]

The FCA relies on *In re Okura & Co.*, 249 B.R. 596 (Bankr. S.D.N.Y. 2000), to define participation agreements within the context of the relevant regulations. *See* 69 FR 8407-12. *Okura* holds that a true loan participation does not transfer the lead lender's right

---

[6] The FCA published Loan Policies and Operations, which discusses prospective rules regarding removal of the fractional percentage participation purchase requirements as related to participated loans subject to 12 C.F.R. § 614.4325. *See* 69 FR 8407-12. In this notice, the FCA focuses on the distinction between loan participations and loan purchases, specifically whether a one hundred percent participation interest would make the participant the lender. The FCA's concern is that system banks are not permitted to create a nationwide charter by purchasing a one hundred percent interest in participated loans, thus transforming the participant into the lender. Within this analysis the FCA stated that courts have recognized the legal distinction between participations and loan purchases and separate legal effects of loan participation agreements.

to payment from the debtor or otherwise give the participation bank lender any right to payment from the debtor, as Compeer's MOA does.

The FCA's interpretation, consistent with *Okura*, is that a participation agreement involves two separate, independent relationships: one between the borrower and the lead bank, and another between the lead bank and the participant. 69 FR 8407. Participants do not typically have privity of contract with the borrower. *Id*. This is in contrast to syndicated loans, where each bank is a party to the loan agreement and has a direct contractual relationship with the borrower. *Id*. Importantly, FCA system banks, like Compeer, are prohibited from syndicating loans with non-system banks, such as CAL. Instead, they may only participate in loans with non-system banks.

These statutory requirements exist to protect the integrity of the Farm Credit System, its chartered banks, and their borrowers. Enforcing agreements that violate these regulations undermines public policy, and courts will not enforce such agreements. As established in *Kaiser Steel Corp.*, 455 U.S. at 77-78, the rule against enforcing illegal agreements prioritizes public policy over the interests of the parties involved. *Id.* (citing *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227 (1909)).

### c.    *The Terms of the MPA All But Eliminated CAL as Lender.*

Compeer sought to use its ability to enter into participation agreements as a mechanism to avoid the prohibitions of the Farm Credit Act. But the MPA was a participation agreement in name only and allowed Compeer to engage in direct lending activities and acquire loans within the State of California, which is obviously outside Compeer's chartered territory. Under the MPA, CAL was transformed into the Compeer's

marionette by terms that permit the following:

a. ***Compeer Required a Power of Attorney to be Signed by CAL Giving Compeer Control of all Aspects of The Loans***.  Section 4.1(d) of the MPA required CAL to execute a Power of Attorney in favor of Compeer that permitted Compeer to service the loan and enforce all loan documents between CAL and the borrower.

b. ***Borrower Eligibility, Loan Products, Loan Approval, and Loan Documents are Controlled By Compeer***.  Section 4.2 of the MPA required CAL to execute only the loan documents that Compeer approved.  Further, it provides that all of the loan applications are submitted to Compeer for approval and Compeer decided which products to offer and the borrower's eligibility for the loan.

c. ***Compeer Controls Pricing and Interest Rates***.  Section 4.3 of the MPA provided that Compeer established the pricing and interest rates.

d. ***Compeer Is Indemnified For Losses***.  Section 4.5 of the MPA required CAL to indemnify Compeer for any losses.

e. ***Compeer Obtained the Power to Collect Payment Directly From The Borrowers***.  Section 4.6 of the MPA required CAL to execute powers of attorney that granted Compeer the power to require, demand, and/or receive loan directly from the borrowers.

f. ***Compeer Serviced the Loans, Signed Instruments, and Declared Defaults***.  Section 4.6 provided that Compeer serviced the loans unless its assigns such duties to CAL.  The section further provides that Compeer is CAL's attorney in fact so that Compeer can demand and receive all loan payments as well as provides Compeer the power to "execute any and all instruments… ." Further, Compeer has the sole power to decide if a default has occurred.

g. ***CAL Is Barred From Acting***.  Section 4.13(a) barred CAL from taking any action that "would or may adversely affect [Compeer's] rights or interest under or in the Participation Loan."

h. ***All Decisions Are Made By Compeer***.  Section 4.13(b) required CAL to "consult with [Compeer] on all matters which may substantially affect collectability of, or security for, a Participation Loan."

i. ***All Property Belongs to Compeer***.  Section 4.16 required CAL to turn over any property acquired in connection with a loan immediately to Compeer.

By these terms, Compeer could engage in direct lending activities and acquire loans in

California in violation of the law, including 12 CFR § 614.4070 and § 614.4325(b).

### d.    *The MPA Was Not a True Participation Agreement.*

The label of the contract is an "insufficient basis to support the finding of an participation agreement" as "[l]abels cannot change the true nature of the underlying transaction." *In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1993). Instead, the agreement must demonstrate the attributes of a true participation agreement, which are (1) money advanced by the participant to the lender; (2) the participant's right to repayment only arises when the lender is paid; (3) only the lender can seek legal recourse against the borrower and (4) the document is evidence of the parties' true intentions. *See Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 736-737 (6th Cir. 2001); *ACRO Bus. Fin. Corp. v. Marshall*, 357 B.R. 785, 789 (Bankr. D. Minn. 2006) (holding that the arrangement constituted a participation because only the lender could collect against the borrower and the participant had no right to assert any position in the loan, collateral, or against the borrower). The *AutoStyle Plastics* decision held that "[w]e believe that this definition accurately describes the factors that must be considered in order to determine if the parties have, in fact, entered into a participation agreement or another type of transaction simply labeled a participation agreement." *In re AutoStyle Plastics, Inc.,* 269 F.3d at 737.

First, in a participation agreement, the participant shares in the risk of default and the lender makes no guarantees about the borrower's repayment of the loan. *In re Sackman Mortgage Corp.,* 158 B.R. at 932. In this case, however, Section 4.5 of the MPA required CAL to indemnify Compeer for any losses. This is simply not a participation agreement:

"In determining whether a transaction is a loan or a participation agreement, courts have generally viewed the risk allocation as the most significant factor, finding that agreements whereby the 'participant' bears no risk of loss constitute debtor-creditor relationships in the form of loans rather than true participation agreements."  *Id*. at 933 (citing *Fireman's Fund Ins. Co. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987) and *In re Lendvest Mortg., Inc.,* 119 Bankr. 199 (9th Cir. BAP 1990)).  As all risk is placed on CAL, the MPA is not a participation agreement.

Second, the MPA fails to demonstrate two of the four attributes of a true participation agreement.  The MPA fails the second requirement of the "true" participation agreement test, that the participant's right to repayment only arises when the lead lender is paid.  The MPA at Section 4.6 states in relevant part:

> Financial Institution/Originator [i.e., CAL] hereby constitutes ***Agri-Access its true and lawful attorney-in-fact with full power on behalf of Financial Institution/Originator to ask for, require, demand, or receive any and all loan payments and claims for money due or to become due under any Participation Loan***, to endorse checks or other instruments delivered to the lockbox or otherwise received by Agri-Access and constituting loan payments or sums legally due to a party under this Agreement. Financial Institution/Originator further constitutes ***Agri-Access its true and lawful attorney-in-fact with full power on behalf of Financial Institution/Originator to execute any and all instruments and/or documents relating to and/or connected with any loan for which Agri-Access is the Servicing Party. Agri-Access shall have the sole right to determine that an event of default has occurred on a Participation Loan and that a declaration of default and liquidation of the loan is in its best interests***. Agri-Access shall notify Financial Institution/Originator in writing before declaring the Participation Loan in default. Financial Institution/Originator and Participant agree to communicate to one another in timely manner all material matters relating to each Participation Loan which come to the attention of the parties, including but not limited to loan payoff information.  (Emphasis added.)

Thus, Compeer has the right to directly receive all payments from the borrower. The MPA removes CAL's right to payment, circumventing CAL's status as the lender. Moreover, Section 4.16, "Acquired Property" requires CAL to immediately transfer any acquired property as directed by Compeer. Compeer has the sole authority to instruct CAL to transfer title acquired by quit claim deed or otherwise. CAL has no independent power as the lender. Compeer has the sole power. Thus, the second part of the test fails.

The MPA also fails to satisfy the third requirement of a "true" participation, that "only the lead lender can seek legal recourse against the borrower." Section 4.6 of the MPA provides that: "Agri-Access shall have the sole right to determine that an event of default has occurred on a Participation Loan and that a declaration of default and liquidation of the loan is in its best interests." The determination and declaration of default are actions of legal recourse against the borrower that, under a true participation agreement, can only rest with the lender, CAL. *In re Sackman Mortg. Corp.*, 158 B.R. at 935 (stating that, under a typical participation agreement, the lead lender determines the existence of default and "maintains sole discretion over selection of the appropriate response") (citing *In re Yale Express Sys., Inc.*, 245 F.Supp. 790, 792 (S.D.N.Y. 1965)). In *Sackman*, the court noted that, while the lender was the only party that could take legal action against the borrower in the event of default, the alleged participant had the power to determine the course of action to be taken: "Paragraph 5 [of the Participation Agreement] states that [EAB – the alleged participant] and [SMC – the lender] shall agree on a course of action, but in the event of any failure to agree upon any course of action . . . [EAB] shall have the right to determine the course of action. Such decision . . . shall be binding upon the parties

hereto." *In re Sackman Mortg. Corp.*, 158 B.R. at 935. Therefore, the Court found, "EAB had the power to determine SMC's actions with respect to any default by the underlying borrower. ***Such relationship is contrary to a true participation agreement.***" *Id.* (emphasis added). Here, the language of the MPA is even more offensive to the existence of a participation agreement as the asserted participant, Compeer, has the sole power to declare defaults and pursue the borrower. Section 4.6(d) and the powers of attorney unambiguously give outright to Compeer the right to determine defaults, as well as the right to determine and initiate actions and recourse, that will be undertaken in the event of a default by a borrower. Thus, the MPA fails to satisfy the third requirement of the test and therefore cannot be a true participation agreement.

Further, Section 4.6 of the MPA gave Compeer the "full power on behalf of Financial Institution/Originator [CAL] to execute any and all instruments and/or documents relating to and/or connected with any loan for which Agri-Access is the Servicing Party . . . ." Thus, Compeer has taken all of the lender's authority to execute all instruments and documents relating to the loans. The lender, CAL, by definition is the only party under a true participation agreement that has the right to "seek legal recourse against the borrower." Instead, Compeer, the supposed participant, has such power against the borrower. The MPA fails to satisfy the third requirement of the test of a true participation agreement on this basis as well.

MPA Section 4.1(d) provided that CAL was required to provide a power of attorney to Compeer "to permit [Compeer] to service the loan and enforce the loan documents (including without limitation foreclosure, claim and delivery and like proceedings).

[Compeer] will not exercise such power of attorney except (i) to act in its capacity as servicer, and/or (ii) upon default by Borrower under the Loan Documents, and/or (iii) upon default by Financial Institution/Originator under this Agreement."   Again, the MPA transferred from CAL, the lender, to the alleged participant, Compeer the right to enforce the loan documents.   Under a true participation agreement, this power must rest with the lender, CAL.   The MPA strips these rights from the lead lender, CAL, and instead grants them to the participant, Compeer.

The power of attorney also gave to Compeer the irrevocable and "full power on behalf of CAL to execute any and all instruments and/or documents relating to and/or connected with the Loan and in the name, place, and stead of CAL to take all actions necessary or desirable to collect, foreclose, or to otherwise resolve said Loan, and further giving and granting to [Compeer] the full power and authority to do and perform each and every act and thing whatsoever requisite and necessary to be done, as fully, to all intents and purposes, as CAL might or could do if personally present, hereby ratifying and confirming all that my attorney lawfully does or causes to be done by virtue hereof with respect to the Loan.   The terms hereof shall remain in full force and effect and are binding upon CAL and [Compeer] and their respective legal representatives, successors and assigns.   This Power of Attorney is coupled with an interest and is irrevocable."   Under a true participation arrangement, the lender is to have these powers, not the alleged participant, as a participant does not and cannot hold the legal authority over the borrower. Thus, Section 4.1(d) of the MPA and the terms of the power of attorney also violate the third requirement of a "true" participation agreement as they irrevocably strip CAL's rights

as the lender and instead convey them the alleged participant.

In short, Compeer has used the MPA, a participation agreement in name only, to improperly engage in direct lending activities in California, including making decisions as to the creditworthiness of the California clients requesting the loans for their agriculturally related businesses; controlling the terms, conditions, and restrictions in the notes, deeds of trust, and other documents issued to the borrowers; determining borrower eligibility and controlling the loan documents that are used for California loans; making all decisions regarding the administration of the loans, including but not limited to, matters concerning declaring defaults, covenant compliance, reporting requirements, payment deferrals, asset inspections, approvals, interest adjustments, and other aspects of the loans, and otherwise acting as the *de facto* lender to California borrowers.

Compeer cannot contest that the MPA is not a true participation agreement. During Phase I, Compeer was very open about the effects of its MPA. As stated above, the law prohibits Compeer from purchasing loans directly. Compeer's executive, however, declared under penalty of perjury that the MPA "constitutes a purchase of an interest in the principal amount of the loan and an ownership of the loan and an ownership interest in the Loan Documents and their underlying debt" and that "following a purchase of the loan, [Compeer] owns the rights to the Loan Documents and the underlying debt, including the principal of the loan." (Steele Decl. ¶ 5(b).) This is directly contrary to how a participation agreement is to work. Further, it bears repeating that Compeer could not make the loan itself or purchase the loan without running afoul of CFR § 614.4070 and § 614.4325(b).

Compeer has also admitted that it controls the servicing of the loan. Instead of CAL

servicing its loan pursuant to its own polices, Compeer maintains that the MPA requires that the loan must be serviced pursuant to Compeer's Agri-Access Partner Site and the Agri-Access's Reconciliation and Reporting Procedures Manual. (Steele Decl. ¶ 5(c).) This is directly contrary to a participation arrangement. Compeer even requires that borrowers pay it directly for the loan, instead of remitting payments to CAL, the lender. (*Id*.) In a true participation agreement, the participant has no contractual relationship with the borrower and does not receive any payments from the borrower. But Compeer declared that it owns the notes, loan agreements, deeds of trust, as well as the underlying debt itself pursuant to the MPA. (*Id.* ¶ 7.) Once more, in a true participation agreement, it is the lender who owns the loan and the security interests.

The MPA was not a true participation agreement as permitted under the Farm Credit Act and its regulations. Compeer is prohibited from making loans outside its chartered territory without compliance with Section 614.4070 and may only participate in loans in California through a true loan participation arrangement, and Section 614.4325(b) prohibits Compeer from purchasing such loans directly. Compeer's terms and requirements fly in the face of the law, evidence an illegal contract, and violate public policy. The Court should not ratify those violations by confirming the Partial Phase I Award should not be enforced by the Court. The Motion should be denied.

## C. **The Arbitration Proceeding Was Fundamentally Unfair.**

Finally, the arbitration hearing should have been stayed pending resolution of the parallel criminal proceedings. CAL requested a stay and the Panel denied it. Instead, the hearing was conducted with CAL and Mr. Cook's arms tied behind their back, unable to

put forth a full-throttle defense lest there be a risk to the criminal defense. This is fundamentally unfair.

Although the Fifth Amendment does not mandate a stay of civil proceedings when related criminal proceedings are pending, courts may choose to stay a civil proceeding "pending the completion of parallel criminal prosecutions when the interests of justice seem[ ] to require such action." *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970); *Peden v. United States*, 512 F.2d 1099, 1103 (Ct. Cl. 1975) ("We believe it has long been the practice to 'freeze' civil proceedings when a criminal prosecution involving the same facts is warming up or under way").

Courts will weigh multiple factors when determining whether to stay the civil case, the most important of which is protecting against self-incrimination. "[T]he strongest case for granting a stay is where a party under criminal indictment is required to defend a civil proceeding involving the same matter. Under such circumstances, denying a stay might undermine a defendant's Fifth Amendment privilege against self-incrimination." *Kozlov v. Associated Wholesale Grocers, Inc.*, No. 4:10-cv-03211, 2011 WL 3320972, at *2 (D. Neb. Aug. 2, 2011). "The privilege against self incrimination is a privilege designed principally to protect the potential criminal defendant from admissions that may be damaging to him or her in a criminal proceeding." *In re Good*, 131 B.R. at 126.

Here, the Panel rejected these important considerations and proceeded with the hearing despite a pending criminal investigation of Mr. Cook by the U.S. Attorney's Office in a parallel proceeding. (Pls.' Exs. 9 and 10.) Thus, at the hearing, Mr. Cook and another witness were compelled not to appear to avoid self-incrimination and did not offer any

testimony.  Notably, Phase I concerned nearly exclusively the actions of Mr. Cook, and yet, Mr. Cook was not available in any meaningful sense to testify.  Thus, the Partial Phase I Award is based entirely on facts devoid of the most critical witness's testimony—testimony that was protected by the Fifth Amendment—and is merely reflective of the unfair nature of the proceeding.  It should not now be enforced by this Court.

## CONCLUSION

For the foregoing reasons, the Arbitration Awards cannot be confirmed and Defendant CAL respectfully requests that the Court deny the Motion in its entirety.

Dated:  March 5, 2025                          Respectfully submitted,


/s/ Barry W. Lee
Barry W. Lee (pro hac vice)
Misa K. Eiritz (pro hac vice)
**MANATT, PHELPS & PHILLIPS, LLC**
One Embarcadero Center, 30th Floor
San Francisco, California 94111
(415) 291-7400
bwlee@manatt.com
meiritz@manatt.com

/s/ C. Russell Georgeson
C. Russell Georgeson (pro hac vice)
**GEORGESON LAW OFFICES**
7491 North Remington Ave., Suite 100
Fresno, California 93711
Telephone: (559) 447-8800
crgdanelaw@sbcglobal.net

**Attorneys for Defendant,**
**CORPORATE AMERICA LENDING, INC.**