# JONES DAY

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071.2452

TELEPHONE: +1.213.489.3939 • JONESDAY.COM

Direct Number: +1.213.243.2175
jboylan@jonesday.com

March 17, 2025

VIA ECF

The Honorable Jerry W. Blackwell
United States District Judge, District of Minnesota
United States District Court
316 N. Robert Street
St. Paul, Minnesota 55101

    Re:    *Compeer Financial, ACA, et al. v. Corporate America Lending, Inc.*,
              Case No. 24-cv-1896 (D. Minn. May 21, 2024)

Dear Judge Blackwell,

In accordance with the Court's Order for Proposed Receivership dated March 11, 2025 (ECF No. 97), we write to provide the Court with Plaintiffs' Proposed Order Appointing Receiver (the "Proposed Order"), the names and qualifications of two proposed receivers, and certain additional information relevant to the Court's evaluation of the factual and legal rationale for why immediate, temporary receivership is necessary.

**I.   Detailed factual and legal rationale for why immediate, temporary receivership is necessary.**

The Court's March 11 Order summarizes Corporate America Lending, Inc. ("CAL")'s (1) failure to segregate and preserve the Payoff Proceeds; (2) unauthorized transfers and concealment of assets; and (3) false and misleading representations. This—and other—misconduct by CAL warrants the appointment of a receiver under Fed. R. Civ. P. 66. None of the arguments CAL previously raised in opposition require a different result.

    **A.   CAL's history of willful noncompliance warrants appointment of a receiver.**

It is well established that a court may appoint a receiver to protect a claimant's interest in property. *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 317 (8th Cir. 1993) ("A receiver may be appointed to protect a judgment creditor's interest in . . . property when the debtor has shown an intention to frustrate attempts to collect the judgment.") (internal quotation marks omitted); 12C Charles Alan Wright & Arthuer R. Miller, Federal Practice & Procedure § 2983 (3d ed. 2024). Although there is "no precise formula for determining when a receiver may be appointed," factors typically warranting appointment are: (1) a valid claim by the party seeking the appointment; (2) the probability that fraudulent conduct has occurred or will occur to frustrate

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID
MELBOURNE • MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

March 17, 2025
Page 2

that claim; (3) imminent danger that property will be concealed, lost, or diminished in value; (4) inadequacy of legal remedies; (5) lack of a less drastic equitable remedy; and (6) likelihood that appointing the receiver will do more good than harm. *Aviation Supply*, 999 F.2d at 316–17. Each of these factors is met here.

      ***1.     Agri-Access has a valid claim to the Payoff Proceeds, plus interest and attorneys' fees***.  Agri-Access's claim to the Payoff Proceeds has now been adjudicated and is undeniably valid.  In its Partial Final Award, which is before the Court on Agri-Access's Motion to Confirm (ECF No. 76 et seq.), the Panel found: the Payoff Proceeds are Agri-Access's property; CAL has no right to retain the Payoff Proceeds; CAL breached its contract with Agri-Access when it retained those Proceeds; CAL's defenses to that breach are meritless; and Agri-Access is entitled to recover the entire unpaid amount of those Proceeds, plus interest, attorneys' fees, and costs.  In its award, the Panel made clear that "[t]he evidence established that [CAL] acted in bad faith in thwarting Claimant's contractual right to receive the Payoff Proceeds."  ECF No. 80-1 (Partial Final Award) at 7.

      Based on these rulings, the Panel ordered that CAL pay Agri-Access the sum of $57,146,398.93, together with interest ($4,900,500.15 through March 17, 2025), attorneys' fees and costs awarded by the Emergency Arbitrator ($237,953.50), attorneys' fees and costs awarded by the Panel through Phase I ($3,593,601), and the AAA's administrative fees ($143,773.75) for a total of $66,022,227.33.[1]  CAL was ordered to pay all amounts within 30 days of the issuance of the Award—in other words, no later than March 6, 2025.  Additionally, the Panel ordered that CAL "[i]mmediately and without delay" transfer the $23 million in Payoff Proceeds (plus accumulated interest) being held in the trust account of CAL's counsel.  *Id.* at 4.

      Neither CAL nor its counsel have complied with the Panel's deadline and instructions.  A receiver is therefore appropriate to protect and enforce Agri-Access's valid claims to the Payoff Proceeds, interest, and attorneys' fees.

      ***2.     CAL engaged in fraudulent conduct to frustrate Agri-Access's claim***.  CAL has repeatedly made false statements to this Court and to the arbitrators to frustrate Agri-Access's ability to obtain an effective remedy.  These false statements have continued essentially unabated since this dispute arose with CAL's theft of the Payoff Proceeds on April 29, 2024.  By itself, the fraudulent conduct of CAL and its CEO justifies the appointment of a receiver.  *See Am. Express*

---

[1] The $57,146,398.93 figure, which is less than the full $58,187,976.50 of the Payoff Proceeds, accounts for Agri-Access's setoff of certain amounts that Agri-Access otherwise received or withheld from CAL.  Additionally, the Panel awarded interest at the Minnesota statutory rate of 10% on the $57,146,398.93 from and after May 9, 2024, and continuing on unpaid amounts ($15,656.55 per day).  ECF No. 80-1 (Partial Final Award); Minn. Stat. § 549.09(b), (c)(2).  Post-judgment interest also accrues at the same rate of 10% until the judgment is paid.  Minn. Stat. § 549.09(a), (c)(2).

JONES DAY

March 17, 2025
Page 3

*Travel Related Servs., Co. v. Forest Lake Ford, Inc.*, 2008 WL 227800, at *2 (D. Minn. Jan. 24, 2008) (explaining that "[f]ederal courts have routinely appointed receivers where, as here, a debtor has engaged in conduct constituting fraud," and collecting cases).

Prior to receiving the Payoff Proceeds, CAL surreptitiously altered the borrower's address and payment instructions, and then attempted to conceal its receipt of the Payoff Proceeds by sending Agri-Access a fake monthly payment to give the false impression that the loans had not been repaid in full. *See, e.g.*, ECF No. 1 (Compl.) at ¶¶ 41-43, 46-49, ECF No. 2-4 (Compl. Exhibit 6); ECF No. 2-5 (Compl. Exhibit 8). CAL's CEO later admitted that the borrowers never made any such payment. Exhibit 1 (Transcript of Oct. 22, 2024 Hearing) at 171:1-25; Exhibit 2 (May 14-15, 2024 Emails Between CAL and Yurosek Farms). And there can be no doubt that CAL's purpose in sending the fake payment was to hide that it had received the full Payoff Proceeds.

Thereafter, on May 29, CAL's counsel represented to this Court that "[t]he money, as I understand it, remains at Corporate America Lending, Inc. . . ." and that "there should not be a concern about the availability of funds." ECF No. 37 (5/29 Hearing Tr.) at 6. Those statements were false. As CAL's bank records subsequently revealed, within mere days of receiving the Payoff Proceeds on April 29, CAL and Mr. Cook had siphoned tens of millions of dollars into the hands of Mr. Cook's close friends and business partners: by May 6, CAL had transferred $32,992,792 to those individuals, and an additional $3,387,000 was transferred on May 22—a week before the May 29 hearing. Exhibit 3 (April 30, 2024 CAL Bank Statement); Exhibit 4 (May 31, 2024 CAL Bank Statement); Exhibit 5 (May 22, 2024 CAL Bank Statement).

As explained in Agri-Access's previous filings, CAL's false statements and misrepresentations—and its "extended record of noncompliance with orders to preserve the Payoff Proceeds"—continued throughout the emergency phase of the arbitration leading up to the Court's September 20 Order. ECF No. 73 at 6. More recently, on October 22, Mr. Cook was asked about the whereabouts of the Payoff Proceeds during a hearing before the arbitral Panel. In response, Mr. Cook testified under oath that, in addition to the $23 million being held in a trust account by his counsel, the remaining $35 million had been transferred to—and was *still being held* by—three members of his inner circle: Dennis Morgan, Michael Graham, and Kristi Iness. ECF No. 80-4 at 100:23-25; 101:12; 104:4-105:13; 106:24-107:1; 194:3-5. At the time, Mr. Cook stated that those three individuals were holding the funds per his instructions and did not have any claims to the funds, which had been transferred to them without consideration. *Id.* at 103:17-18; 103:25-104:3; 104:12-14; 105:4-13; 106:7-15; 107:2-4. Then, after the Panel ordered CAL to reacquire and preserve the Payoff Proceeds (*see* ECF No. 80-5 (October 28 Interim Award)), Mr. Cook submitted a sworn declaration on November 15 purportedly detailing his unsuccessful efforts to reacquire the $35 million from Morgan, Graham, and Iness. ECF No. 80-6 (November 15 Declaration). In that declaration, Mr. Cook declared under penalty of perjury that (1) he had requested that each of

March 17, 2025
Page 4

those individuals return the funds; and (2) all had refused, claiming that the transfers were actually made in repayments of debts owed by CAL. *Id*. at 2–3.

As Agri-Access later learned, Mr. Cook's statements were only partially true. While $35 million had been transferred to those individuals, Agri-Access's subsequent efforts to recover those funds have revealed that *nearly the entirety* of the $35 million was returned to CAL by October 1—well before Mr. Cook's false statements on October 22. *See* Exhibit 6 (March 16, 2025 Declaration of Dennis Morgan) (declaring all funds received from CAL were returned by October 1, 2024); Exhibit 7 (March 17, 2025 Stipulation between Plaintiffs and Graham Defendants) (describing history of transfers and return of nearly all funds prior to September 20, 2024); Exhibit 8 (January 22, 2025 Counsel Email Documenting Meet and Confer).

CAL's efforts to frustrate Agri-Access's valid claims also include its willful failure to comply with binding orders. On October 28, 2024, the arbitral Panel issued an Interim Award that recounted CAL's failure to comply with orders directing it to preserve the Payoff Proceeds pending the outcome of the arbitration proceedings. *See* ECF No. 80-5 at 3 (listing orders and awards and finding that "[a]lthough CAL had actual notice of these Awards and Order, and Mr. Cook testified CAL had the financial capability to comply, it completely failed to comply within the time limits specified in those Awards and Order" and "CAL's late attempt to show compliance . . . did not materially comply with the prior Awards and/or Order."). And when CAL elected not to take advantage of its "final chance to comply," *id*. at 3, the Panel noted its concern "that CAL and its owner and CEO ha[d] misled the Panel relative to the disposition of the Payoff Proceeds . . . ." ECF No. 80-7 (November 26 Sanctions Order).

**3.   *Imminent danger exists that the Payoff Proceeds will be concealed, lost, or further diminished in value*.** Moving beyond the mere fact of the transfers to Morgan, Graham, and Iness, Agri-Access's communications with each of those individuals' attorneys have also revealed another important factor that weighs in favor of the appointment of a receiver: CAL's purported use of the Payoff Proceeds to repay unrelated obligations. *See New York Life Ins. Co. v. Watt West Inv. Corp*., 755 F. Supp. 287, 293 (E.D. Cal. 1991).

With regard to the $5,419,000 that CAL transferred to Dennis Morgan, Mr. Cook testified under oath that those funds represented a portion of the Payoff Proceeds, and that he had transferred to them to Mr. Morgan without consideration. *See* ECF No. 80-4 at 104:6-14. But that is not what CAL and Ron Cook told Dennis Morgan, as reflected in the Declaration of Dennis Morgan submitted herewith. In that Declaration, Mr. Morgan declares: "On May 3, 2024, CAL transferred $5,419,000.00 to the Chase checking account of J D Investments. When J D Investments received that transfer, I understood it to be a return of principal that CAL owed J D Investments. Prior to making that transfer, Mr. Cook called me to inform me that he would be returning principal on investments." Exhibit 6 at ¶ 6(a). Mr. Morgan later reinvested those same

March 17, 2025
Page 5

funds received in May in another investment with CAL by October 1, 2024.  *Id*. at ¶¶ 8(f), 12.  Demonstrating further risk to those funds, Mr. Morgan has also declared that he "does not have any formal paperwork (e.g., a note or agreement) documenting th[at] investment."  *Id*. at ¶ 8(f).

The same is true for the $5,400,000 transfer made on May 6, 2024 to Kristi Iness.  Specifically, Ms. Iness's (purported) counsel—C. Russell Georgeson and Barry Lee, who also represent CAL in this dispute—represented to Agri-Access that Ms. Iness understood that transfer to reflect a return of a prior investment she had made with CAL.  Ms. Iness's counsel have further represented that she reinvested those funds in another instrument and made an additional investment with CAL in September 2024.  Exhibit 8.

Moreover, Agri-Access still has very little information about what has actually happened to the Payoff Proceeds since CAL first received them last April, and almost no information about where that property is now.  Although CAL has been repeatedly ordered to provide detailed and extensive records relating to the Payoff Proceeds and what it did with them, CAL has steadfastly refused to comply.[2]  CAL has also been repeatedly sanctioned in the arbitration for its failures to produce responsive documents.  And CAL has stated that only Mr. Cook has access and control over CAL's bank accounts and records, a fact that only underscores the risk of further concealment or dissipation.  ECF No. 2-6 (Emails 5/2-5/3) at 1; ECF No. 38-5 (CAL June 13, 2024 Report) at 2.  Without a receiver to force CAL to provide the financial records and other documents it has been required to turn over since May, CAL will be free to continue leveraging its informational advantage to further conceal or dissipate whatever remains of the Payoff Proceeds.

**4.     *Agri-Access's legal remedies are inadequate.*** It is axiomatic that where a claimant will be unable to recover assets that have been transferred or dissipated, legal remedies are inadequate.  *See Pension Ben. Guar. Corp. v. Tempcon, Inc.*, No. 1:14-CV-782, 2015 WL 1249716, at *6 (W.D. Mich. Mar. 18, 2015) ("[L]egal remedies are inadequate because the [claimant] cannot recover assets that have been transferred . . . ."); *Cadence Bank, N.A. v. Manausa*

---

[2] *See, e.g.,* ECF No. 32 (May 29 Order) (requiring CAL to "submit a detailed report . . . outlining the steps taken to preserve the Payoff Proceeds"); ECF No. 38-1 (Interim Award) (requiring CAL to turn over to the Emergency Arbitrator monthly statements and balance information for accounts holding the Payoff Proceeds); ECF No. 38-2 (CAL June 3 Report); ECF No. 38-3 (Supplement to Interim Award) (requiring CAL to supplement its report with the required information); ECF No. 38-4 (CAL June 6 Report); ECF No. 38-5 (Second Supplemental Order) (reiterating prior orders and also ordering CAL to produce all "investment contracts or agreements, communications with third parties"); ECF No. 38-6 (CAL June 13 Report); ECF No. 41 (Emergency Arbitrator Recommendation) (recommending sanctions because CAL had "resolutely failed and refused to comply with most parts of the Court's Order and the Emergency Arbitrator's orders"); ECF No. 80-5 (Interim Award of Merits Panel) (noting CAL's failure to provide information and giving it "one final chance to comply"); Exhibit 11 (Panel's 12/26 Pre-Hearing Order) ("Because Respondent's Response to [Agri-Access's third submission on discovery issues] does not contest the factual allegations, the Panel will take those allegations to be true, showing repeated violations of discovery requirements and orders for discovery.").

*Holdings, LLC*, No. 4:12cv38-WS/WCS, 2012 WL 1252494, at *3 (N.D. Fla. Mar. 30, 2012) (appointing receiver after finding that claimant's "legal remedies are profoundly inadequate" because defendant "did not have the funds" and so would be unable to "adequately compensate" claimant).

Here, CAL presently owes Agri-Access more than $66 million in damages, including the return of the Payoff Proceeds. Yet despite all its purported efforts to recall funds to date, CAL has only re-acquired $23 million that is supposedly in a trust account controlled by CAL's counsel—and even then, CAL's counsel has refused to turn over those funds, in open defiance of the Panel's order that CAL do so no later than March 6, 2025. As to the remaining funds, the only logical conclusion to be drawn from CAL's conduct is that they have been dissipated in (still unknown) ways intended to frustrate Agri-Access's ability to collect. *See* Exhibit 1 at 78:8-81:14 (Mr. Cook explaining that he took the Payoff Proceeds, even though he knew he was obligated to remit them, because "I was very frustrated, did not understand why I was not being heard. Enough was enough."). Without a receiver, there is real doubt that Agri-Access will collect *any* amount from CAL (or its counsel), much less re-acquire the entirety of the Payoff Proceeds or otherwise identify sufficient assets to be made whole. *See id*. at 114:9-115:14 (Mr. Cook testifying that CAL does not have sufficient liquid assets to satisfy a judgment in Agri-Access's favor); ECF No. 2-14 (Counterparty Risk Assmt.); ECF No. 3-4 (LexisNexis Rpt.).

5. ***No less drastic remedy exists.*** Nor is there a less drastic remedy that would suffice. This Court previously observed that the "deadline for compliance has long since passed"—and that was nearly *six months ago*. ECF No. 73 at 7. In the time since the Court's initial May 29 Order, Agri-Access has obtained order after order from multiple decisionmakers requiring CAL to reacquire, segregate, preserve, and now return the Payoff Proceeds, and to provide information about what happened to those funds. CAL has refused to comply with *every single order*. Given this history, it would be unreasonable to expect CAL and its counsel to suddenly alter their behavior and start complying voluntarily with the orders and awards issued against them once they are confirmed by this Court. It was appropriate for the Court to consider the appointment of a receiver in September, and it is beyond credible dispute that a receiver is necessary now. *See Aviation Supply*, 999 F.2d at 317 (appointing receiver after other remedies "proved unavailing").

6. ***The balance of harm overwhelmingly weighs in Agri-Access's favor.*** In the face of CAL's long history of non-compliance with multiple binding orders and awards, there can be no doubt that the balance of harms weighs exclusively in favor of Agri-Access. For the reasons described above, without a receiver Agri-Access's considerable efforts to date will have been meaningless: CAL and its counsel will continue refusing to comply with the orders and awards entered against them, and Agri-Access will not be made whole for CAL's theft, its fraudulent attempts to cover-up that theft, or its ongoing scheme to hinder Agri-Access's recovery of the Payoff Proceeds. By contrast, the harm CAL will face from the appointment of a receiver is

March 17, 2025
Page 7

negligible—and indeed is "avoidable through obedience." *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). CAL, its officers, and its counsel chose to engage in a course of conduct that demonstrates that they will never voluntarily comply with any order or award issued against them. They can suffer no cognizable harm from facing the logical consequence of that choice: the appointment of a receiver to ensure CAL's compliance with binding orders and awards.

### B.  CAL's Arguments Opposing the Appointment of a Receiver Fail.

CAL previously objected to the appointment of a receiver after the Court's September 3, 2024 show cause hearing, primarily arguing that (1) *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), prohibits the Court from appointing a receiver to segregate the Payoff Proceeds, and (2) 28 U.S.C. § 754 requires a bond to be posted as a condition precedent to appointment of a receiver. *See* ECF No. 60. Both arguments were—and remain—meritless.

*First*, as this Court recognized in September, *Grupo Mexicano* does not apply here, where the principal object of this action is "an equitable remedy to support the arbitration process." ECF No. 73 (September 20 Order) at 4–5. Just as *Grupo Mexicano* did not bar this Court's preliminary order to segregate funds, it likewise does not bar the appointment of a receiver now to ensure CAL's prompt compliance with a judgment confirming the Arbitration Awards. And in the time since the Court's September 20 Order, the Panel has finally and conclusively determined that the Payoff Proceeds were "the traceable property of Claimant." ECF No. 80-1 (Partial Final Award) at 6. Thus, *Grupo Mexicano* remains inapplicable.

*Second*, CAL's argument that a bond is required before a receiver can be appointed similarly fails. The statutory basis for CAL's argument, 28 U.S.C. § 754, provides that a receiver will be vested with jurisdiction "upon giving bond as required by the court." That statute thus grants the Court discretion to determine the amount of the bond, if any, and courts regularly appoint a receiver without requiring a bond at all (typically where the Court has made findings on the record as to why a bond is not necessary). *See, e.g.*, *Carney v. Beracha*, 996 F. Supp. 2d 56, 65 (D. Conn. 2014) ("The 'bonding requirement' in section 754 ('upon giving bond as required by the court') gives the appointing court discretion to require a receiver to post a bond. The statute does not require a receiver to post bond unless 'required by the court.' Here, the court has not required a bond . . . ."); *Hawes v. Madison Ave. Media, Inc.*, 2012 WL 12861096, at *3 (S.D. Fla. June 26, 2012) (affirming appointment of a receiver under 28 U.S.C. § 754 and F.R.C.P. 66 without requiring a bond because in "the absence of a mandatory statute, the matter of a bond [was] for the discretion of the trial court" and the defendant had "failed to demonstrate that posting a bond [was] necessary to protect its interests"). Moreover a bond is not necessary here because the Panel has already determined that CAL wrongfully remains in possession of Agri-Access's property—

March 17, 2025
Page 8

property which is more than adequate security against any risk that may arise from the appointment of a receiver to recover it. Thus, any demands by CAL for a bond should be rejected.

**II.     The Proposed Order**.

In accordance with the Court's instructions in the March 11 Order for Proposed Receivership Order and Response, the Proposed Order being submitted herewith outlines: "The scope and authority of the Receiver; Specific assets or categories of assets to be controlled by the Receiver; A detailed factual and legal rationale for why immediate, temporary receivership is necessary; and Any limitations on the Receiver's authority, to avoid undue disruption to Defendant's business operations." ECF No. 97 at 4. The detailed factual and legal rationale reflected in the Proposed Order is explained above, and each of the remaining components of the Proposed Order are described below.

***Scope and authority of the Receiver***. Agri-Access respectfully submits that the Receiver should have (1) all powers, authorities, rights, and privileges possessed by CAL and its CEO, Ron Cook, under applicable state and federal law, and under the governing charters, by-laws, articles, or entity operating agreements of CAL; (2) all powers and authority of a Receiver at equity; and (3) all powers conferred upon a receiver by 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule of Civil Procedure 66.

As described above, CAL and its CEO have engaged in fraudulent conduct specifically intended to frustrate Agri-Access's efforts to collect the Payoff Proceeds, do not have sufficient liquid assets to pay the Partial Final Award, have transferred more than $35 million to third-parties, have refused to provide required documents and financial records, have entered into undocumented investment agreements, and have apparently used the at-issue Payoff Proceeds to pay unrelated obligations to at least Dennis Morgan and Kristi Iness. It is therefore appropriate for the Receiver to have access to and control over all of CAL's bank accounts and other assets, in part because CAL has steadfastly refused to provide required discovery that would have otherwise permitted Agri-Access and the Court to consider a narrower scope of authority. For the same reasons, the Receiver should have access to and control over all of CAL's systems, devices, and documents— including all devices used by Messrs. Cook and Aretakis to perform business for CAL—as the Receiver may need that information to carry out its responsibilities. Given CAL's history of non-compliance, the Receiver also requires subpoena power to obtain records and information (especially if Messrs. Cook and Aretakis continue to refuse to comply), and must be recognized by third-parties that may possess the Payoff Proceeds or information relevant to the Receiver's performance of its duties to ensure that the Arbitral Awards are obeyed and that CAL does not further dissipate assets before those awards can be enforced.

March 17, 2025
Page 9

The Receiver should also be tasked with issuing a report on its findings within 60 days of appointment so that the Court and Agri-Access can evaluate whether further action may be necessary to address CAL's misconduct.

***Specific assets or categories of assets to be controlled by the Receiver***.  To date, CAL has provided information sufficient to identify only two known sources of assets: (i) its account with Fresno First Bank; and (ii) the account currently holding at least $23 million of the Payoff Proceeds that is controlled by CAL's counsel, C. Russell Georgeson (and which should be transferred to Plaintiffs immediately).  Because CAL has continuously failed to provide any information regarding what specific assets or categories of assets it possesses, neither Agri-Access nor the Court have sufficient information to meaningfully limit the scope of the Proposed Order to anything less than all of CAL's assets.  Given the conduct described above, including the fact that CAL has admitted it does not have sufficient liquid assets to satisfy the Partial Final Award, it remains entirely possible that CAL does not have *any* assets that are untainted by CAL's false statements and other misconduct.  CAL should not be heard to complain about the breadth of assets covered by the Proposed Order when it has repeatedly refused to provide the very information that might have permitted a narrower scope of assets subject to the Receiver's authority.

***Limitations on the Receiver's authority to avoid undue disruption to Defendant's business operations***.  As reflected in the Proposed Order, the Receiver will have express obligations to both CAL and its creditors (including but not limited to Agri-Access) to avoid wasting CAL's assets.  And it is in everyone's interest that CAL remains a going concern to the extent possible; so long as CAL is able to generate revenue from ongoing business operations, that revenue provides a source of potential recovery to satisfy the Arbitral Awards.  At the same time, until the Receiver can identify and segregate the Payoff Proceeds and satisfy those Arbitral Awards, CAL should not be originating new loans.  To the extent CAL has existing loans that require further funding, the Receiver will have the authority to fund such loans from CAL's other assets.  But any such funding requests should necessarily wait until the Receiver has identified and segregated the Payoff Proceeds, since it would be irresponsible (and potentially unlawful) for any businessperson to use the property of one party to pay another—as CAL has already apparently done here.

In all events, the key consideration here is the avoidance of any "*undue*" disruption to CAL's business operations.  CAL has ultimately brought this outcome upon itself through the conduct of its CEO and counsel throughout this action.  The cessation of fraudulent activity and the performance of an entity's obligations pursuant to binding orders and awards, no matter how disruptive, cannot be considered "undue"—especially where, as here, CAL has refused multiple opportunities to comply at a lower cost.

March 17, 2025
Page 10

**III.     Proposed candidates to be appointed as a Receiver**.

In response to the Court's order that Plaintiffs submit the names and qualifications of two proposed Receivers, Plaintiffs propose: (i) Joe Gardemal of Alvarez & Marsal or (ii) Scott Avila of Paladin Management. Supporting materials detailing the qualifications of these proposed receivers are being submitted herewith as Exhibits 9 (for Mr. Gardemal) and 10 (for Mr. Avila), and a brief summary of their qualifications and fee structure is included below.

**A.     Joe Gardemal, Alvarez & Marsal**

*Qualifications*. Joseph T. Gardemal III is a CPA, Forensic Accountant, and Managing Director in the Washington, D.C. office of Alvarez & Marsal with more than 35 years of experience in forensic accounting investigations, valuations, auditing, and financial management for publicly traded and closely held companies. Mr. Gardemal previously served as the court-appointed Monitor and currently serves as the court-appointed Receiver over GPB Capital Holdings, a private equity enterprise that raised more than $1.8 billion in capital. During his tenure as Monitor and Receiver in that matter, Mr. Gardemal has undertaken extensive efforts in pursuit of financial asset recovery and has performed or overseen forensic accounting analyses that have so far led to the recovery of approximately $1.3 billion in assets. Mr. Gardemal's experience highlights and curriculum vitae are being submitted herewith as Exhibit 9.

Mr. Gardemal's firm, Alvarez & Marsal, is a global professional services firm that provides advisory, business performance improvement, and turnaround management services. The firm is known for its expertise in restructuring and turnaround management, often stepping in to help companies in distress or undergoing significant change. It employs over 11,000 trusted advisors and interim leaders across six continents. Alvarez & Marsal is known world-wide for providing practical solutions to the unique problems of companies, investors, and government entities.

*Fee structure*. Mr. Gardemal proposes to be compensated on an hourly basis at the rate of $1,215 per hour. He anticipates retaining Alvarez & Marsal to support his efforts. The rates for Alvarez & Marsal personnel that may assist Mr. Gardemal as Receiver are as follows:

March 17, 2025
Page 11

| Title | Rate (USD/Hour) |
|---|---|
| Managing Director | 1,215 |
| Senior Director | 945 |
| Director | 765 |
| Manager | 725 |
| Senior Associate | 663 |
| Associate | 525 |

*Conflicts*.  Mr. Gardemal and Alvarez & Marsal have confirmed that they have not identified any known conflicts of interest.

### B.   Scott Avila, Paladin Management

*Qualifications*.  Scott Avila of Paladin Management has served as a court-appointed professional or Chief Restructuring Officer in more than 35 different matters, many of which have involved fraud or an alleged fraud.  Of note for this matter, Mr. Avila's recent roles include: (i) being retained as the court-appointed Financial Advisor to assist the Special Master in *United States of America v. Greg Lindberg*, to assist in the liquidation and restitution of over $3 billion in assets and claims; and (ii) being retained as the CRO of Easterday Farms & Ranches in Pasco, Washington, whose majority shareholder was convicted of defrauding Tyson Foods of more than $200 million.  As CRO, Mr. Avila resolved complex multi-party litigation involving Easterday.

Paladin Management also employs a number of other professionals with experience in financial asset recovery and forensic accounting, who would be available to assist Mr. Avila as appropriate.  Mike Lang is a former lender and auditor with experience in financial analysis and interim management, including recently leading a team that performed a forensic accounting analysis on a $250 million investor / lender that invested funds from 1,800 individual investors through seven funds across more than 35 legal entities.  Mr. Lang's analysis was presented to a bankruptcy judge who ultimately ruled that the company and its owners orchestrated a Ponzi scheme over a period of years.  Gary Lembo is a financial advisor with extensive experience in distressed situations and rescues, and has served as a financial advisor to retail mortgage lender Amerifirst Financial, served as interim CEO of the country's largest redwood lumber producer based in Humboldt County, California, and served as CRO for a large solar installation company overseeing all finance and accounting functions as well as operations for the company.  Nick Bednorz is a certified public accountant with more than 22 years of advisory experience specializing in risk management, forensic accounting, and litigation support, and has held senior executive roles in a variety of situations including as CRO, Chief Risk Officer, Chief Financial Officer, Chief Compliance Officer, and Director of Internal Audit.

JONES DAY

March 17, 2025
Page 12

    Paladin Management has also prepared a package of materials outlining their qualifications and experience that is being submitted herewith as Exhibit 10.

    ***Fee structure***.  Mr. Avila proposes to be compensated on an hourly basis at the rate of $850 per hour.  He anticipates retaining Paladin Management to support his efforts.  The rates for Paladin Management personnel that may assist him as Receiver are as follows:

| Name | Rate (USD/Hour) |
|---|---|
| Gary Lembo | 695 |
| Mike Lang | 695 |
| Nick Bednorz | 695 |

    ***Conflicts***.  Mr. Avila and Paladin Management have confirmed that they have not identified any known conflicts of interest.

*   *   *   *

    For the reasons set forth above, Agri-Access respectfully requests that the Court enter Agri-Access's Proposed Order Appointing Receiver.

Respectfully submitted,

/s/ *Joseph J. Boylan*

Joseph J. Boylan

cc:    All counsel of record (via ECF)