UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

COMPEER FINANCIAL, ACA;
COMPEER FINANCIAL, PCA; and
COMPEER FINANCIAL, FLCA,

        *Plaintiffs,*

    v.

CORPORATE AMERICA LENDING,
INC.,

        *Defendant.*

Court File No. 24-CV-1896 (JWB/ECW)

**PLAINTIFFS' RESPONSE TO
DEFENSE COUNSEL'S RESPONSE
TO THE COURT'S MARCH 27, 2025
ORDER TO SHOW CAUSE**

Plaintiffs (collectively "Agri-Access")[1] respectfully submit their reply to defense counsel's response to the Court's March 27, 2025 Order to Show Cause ("OSC").

Nearly eleven months ago, on May 29, 2024, this Court held a hearing to ask CAL a simple question: Where is the money? Before that hearing, at the hearing, and ever since, CAL's attorneys have done everything in their power to avoid answering that question. Their response to the Court's OSC is simply more of the same. While Mr. Georgeson and Mr. Lee repeatedly tout their integrity and their many decades as officers of the court, their response makes clear that neither of them conducted anything approaching reasonable diligence in investigating the claims of a client whom they knew to be lying about fundamental facts in this litigation—and that they thus actively facilitated and prolonged

---

[1] Plaintiffs Compeer Financial, ACA f/k/a AgStar Financial Services, ACA; Compeer Financial, PCA f/k/a AgStar Financial Services, PCA; and Compeer Financial, FLCA f/k/a AgStar Financial Services, FLCA, each conduct certain business as Agri-Access® and are collectively referred to herein as "Agri-Access." Previous filings and Orders in this case refer to Plaintiffs collectively as "Compeer."

CAL's and Mr. Cook's fraud and obfuscation.  Mr. Georgeson and Mr. Lee also fail to address key issues that the Court raised in its OSC, continuing their pattern of withholding information from the Court.  Nor do they ever explain why, even after it became unmistakable that their client was flouting court orders and making material misrepresentations, they nonetheless continued to represent that client.  Agri-Access submits this response to identify the many shortcomings in Mr. Georgeson and Mr. Lee's submission, and to show how they have unreasonably multiplied these proceedings and thereby imposed significant burdens on Agri-Access and the Court.[2]

Mr. Georgeson and Mr. Lee's submission must be understood in light of a finding that the Court has already made—namely, that the May 29 declaration from Mr. Cook that they submitted, along with representations that Mr. Lee made to the Court at a conference that same day, were "materially false."  ECF 119 (Order to Show Cause) at 1–2.  That determination has great significance under the Minnesota Rules of Professional Conduct ("MRPC"), which this Court has adopted "as the standards governing lawyers who appear in its courts."  *Sanford v. Maid-Rite Corp.*, 816 F.3d 546, 549 (8th Cir. 2016); *see also* D. Minn. Local R. 83.6(a) ("An attorney commits misconduct by failing to comply with the Minnesota Rules of Professional Conduct.").  After all, the MRPC require a lawyer "to correct a false statement of material fact . . . previously made to the tribunal by the lawyer"; to "take reasonable remedial measures, including, if necessary, disclosure to the tribunal"

---

[2] As the Court has made clear, Agri-Access submits this brief without prejudice to its right to bring a separate motion for sanctions at the appropriate time.  ECF 143 (April 15 Text Order).

if the lawyer's client or witness "has offered material evidence and the lawyer comes to know of its falsity"; and to do the same if the lawyer comes to "know[] that a person . . . has engaged in . . . fraudulent conduct relating to the proceeding." Rule 3.3(a)(1), (a)(3), (b); *see also id.* at cmt. [10] (stating that a lawyer *must* "make such disclosure to the tribunal as is reasonably necessary to remedy the situation" if the lawyer offers material evidence in the belief that it was true, later comes to know that it is false, and cannot persuade his client to consent to the withdrawal or correction of the false evidence).

Mr. Georgeson and Mr. Lee have fallen far short of what the rules require. And the results have been catastrophic: As the Court has already recognized, CAL has a "history and pattern of willful noncompliance, evasion, and asset dissipation" (ECF 97 (Order for Proposed Receivership) at 2–3), and has "demonstrated [its] disregard for legal orders" through "extremely noncompliant, misleading, and obstructionist" conduct (ECF 128 (Mar. 26 Tr.) at 59:24–25, 61:11–13). The MRPC seek to prevent—and, as needed, remedy—precisely such "conduct that undermines the integrity of the adjudicative process." Rule 3.3 at cmt. [2].

This response is organized in three parts. *First*, we show Mr. Georgeson's and Mr. Lee's refusal, up to and on May 29, to provide Agri-Access or this Court with accurate information regarding CAL's transfers of the Payoff Proceeds. Mr. Georgeson's and Mr. Lee's response to the OSC fails to explain, let alone exculpate, their and CAL's critical misrepresentations during this period. *Second*, we explain that Mr. Georgeson and Mr. Lee knew by June 3—at the absolute latest—that Mr. Cook had lied to them and the Court regarding the location of the Payoff Proceeds. Yet they failed to exercise even a modicum

of diligence in verifying representations made by a client that they knew was not being truthful.  Nor did they show anything approaching the required candor with this Court and the Emergency Arbitrator, in the face of this knowledge.  *Third*, we walk through how Mr. Georgeson's and Mr. Lee's continued misconduct—including their repeated instructions to Mr. Cook to flout this Court's May 29 order—have needlessly multiplied proceedings and disrespected this Court's authority.

Mr. Georgeson's and Mr. Lee's deliberate and sustained abdication of their professional and ethical obligations have had enormous consequences.  As this Court recently observed, nearly a full year after CAL unlawfully took Agri-Access's property, "We *still* don't know where more than $35 million is."  ECF 128 (Mar. 26 Tr.) at 21:19–21 (emphasis added).  Because of Mr. Georgeson's and Mr. Lee's facilitation and cover-up of CAL's fraud, the Court-appointed receiver is only now obtaining bank records to begin the task that CAL's attorneys should have completed a year ago.  Their failures have vexed and misled this Court, the Emergency Arbitrator, the Merits Panel, and Agri-Access.

**I.    Leading up to and at the hearing before this Court on May 29, 2024, Mr. Georgeson and Mr. Lee refused to provide key information regarding CAL's transfers of the Payoff Proceeds.**

**A.    In the weeks before the May 29 hearing, Mr. Georgeson and Mr. Lee rebuffed Agri-Access's efforts to locate and reclaim the Payoff Proceeds.**

As early as May 8, 2024, during a telephone conference with Mr. Lee, Agri-Access's attorneys attempted to engage CAL's counsel on the central question in this case: where are the Payoff Proceeds?  Rather than substantively responding to Agri-Access's counsel on this question, though, Mr. Lee rebuffed all efforts to locate and reclaim these

funds or to provide a truthful answer. *See* ECF 2-8 (May 9 letter from Jones Day to B. Lee) ("demand[ing] the immediate turnover of [Agri-Access's] property"); ECF 2-9 (May 10 letter from B. Lee to Jones Day) (vaguely replying that "[o]ur investigation and research regarding the [redacted] Loans and Agri-Access' conduct and business practices continues"); ECF 3-1 (May 15 letter from R. Georgeson to Jones Day) (ignoring the substance of Agri-Access's Demand for Arbitration and instead asserting that CAL had not been given an opportunity to cure); ECF 2-10 (May 15 letter from Jones Day to R. Georgeson) (noting that Mr. Georgeson's May 15 letter "is little more than additional evidence of CAL's continuing refusal to remit Payoff Proceeds owed to Agri-Access or to substantively address the claims and demands set forth in our May 9, 2024 letter").

Mr. Georgeson and Mr. Lee's submission is totally silent on these discussions. That is, they do not even claim to have undertaken a reasonable investigation, even as Agri-Access sought information on the fundamental question of where the Payoff Proceeds were being held. As a result of their refusal to shed any light on the whereabouts of these funds, or to conduct any real diligence, the location and status of the Payoff Proceeds was an open question going into the May 29 hearing.

> **B.    At the May 29 hearing, Mr. Lee made a vague statement regarding the Payoff Proceeds and then submitted a false declaration from Ron Cook that avoided saying where those Proceeds are being held.**

At the May 29 status conference, the Court quickly cut to the chase, asking Mr. Lee: "[W]here is the money?" ECF 37 (May 29 Tr.) at 6:2–3. Mr. Lee did not answer that question directly. Instead, he responded in carefully circumscribed terms, saying only that "[t]he money, as I understand it, remains at Corporate America Lending, Inc., CAL" and

that "it is my understanding that . . . there should not be a concern about the availability of funds." *Id*. at 6:4–5, 10–12. Mr. Lee also clarified that this representation was "based on . . . a few days' ago conversation," *id*. at 10:1–2, implying that he had in fact conducted basic diligence into Mr. Cook's representations in the preceding days. That implication is now demonstrably false, as the declaration that Mr. Lee has submitted does not recount any investigation that he undertook prior to the May 29 hearing. ECF 133 (Lee Decl.).

Given Mr. Lee's inability to provide a clear answer, the Court entered a minute entry ordering CAL to "identify an individual with authority within [CAL's] offices who can confirm the current status of the disputed funds and enter into an agreement to preserve the funds pending the arbitration outcome." ECF 29 (May 29 Minute Entry). The Court further stated that "[i]f [CAL] identifies such an individual in an email to chambers by 1:30 p.m. central time today, May 29, 2024, a Zoom status conference will take place at 3:00 p.m. central time, and the individual must attend the call." *Id.*

CAL easily identified the appropriate individual: its CEO, Ron Cook. So far, so good. But Mr. Cook did not appear for the follow-up conference that afternoon. Instead, because Mr. Cook was supposedly "not available" for the conference, Mr. Lee signed off on a proposal to have Mr. Cook submit a declaration to the Court—a self-help solution that the Court had not offered. ECF 133 (Lee Decl.) ¶¶ 22–23. The cursory declaration that CAL then submitted was again silent on the actual location of the Payoff Proceeds, instead cryptically saying only that Mr. Cook was "willing to enter into an agreement that preserves the Payoff Proceeds pending the resolution of AAA Case No. 01-24-0005-4234." ECF 30 (Cook Decl.) at 2; *see also* ECF 119 (Order to Show Cause) at 2 (noting that the declaration

"did not address the Court's actual concern: whether the funds had already been spent or dissipated in some other way").

As subsequently became clear, Mr. Cook's declaration was false and materially misleading, as he never had *any* intention of preserving the Payoff Proceeds—and had indeed by this point dissipated the majority of these funds to his business associates.  ECF 80-4 (Oct. 22 Tr.) at 100:23–101:4, 104:6–8, 106:5–6.  In other words, by the time of Mr. Cook's May 29 declaration, the funds were not even in CAL's or his possession for him to "preserve[]."  Mr. Lee's failure to conduct even the most basic diligence, including a review of CAL's May 2024 bank statement, meant the specifics of these transfers would not come to light for many months.

### C.    Mr. Lee's role in informing Mr. Cook to appear before the Court, and in drafting Mr. Cook's May 29 declaration, remains murky.

In their response to the OSC, Mr. Georgeson and Mr. Lee seek to brush aside any questions as to their handling of Mr. Cook's declaration.  But their response only raises further questions.

Start with why CAL submitted a declaration in the first place.  Mr. Lee attributes this to Mr. Cook, claiming to have learned at some point on May 29 that Mr. Cook was unavailable to attend the status conference—though Mr. Lee "cannot recall how or from whom I came to that understanding."  ECF 133 (Lee Decl.) ¶ 22.  But at the October arbitration hearing, Mr. Cook testified—repeatedly—that his counsel *never told him* that

the Court wanted him to attend a conference on May 29.[3]  Neither Mr. Lee nor Mr. Georgeson disputes that unwavering testimony.  Nor did Mr. Cook testify that he was, in fact, unable to attend the conference.

The timeline that Mr. Lee provides for the drafting of Mr. Cook's declaration is similarly murky.  He avers that Mr. Cook circulated "a draft of his proposed declaration" at 2:00 pm CDT, then circulated "his signed declaration" at 2:09 pm CDT.  ECF 133 (Lee Decl.) ¶¶ 24–25.  He also says that there was an editing process for the declaration before it was filed at 3:00 pm CDT—but without clarifying how that process relates to the apparent nine-minute gap between Mr. Cook's circulation of "proposed" and "signed" versions of the declaration.  *Id.* at ¶¶ 26–27.  At the very least, even by Mr. Lee's account, Mr. Cook was apparently available less than an hour before the scheduled status conference to go back and forth with counsel on his declaration.  *Id*. at ¶¶ 24–27.  So even now, it is unclear that there was any legitimate basis for CAL to submit a carefully worded

---

[3] ECF 80-4 (Oct. 22 Tr.) at 90:16–22 ("Q: Did your lawyers not advise you that CAL had been ordered to produce someone at a Zoom conference to –  . . . – to address Judge Blackwell? **A: No.**") (emphasis added); 90:23–91:6 ("Q: So you -- CAL had an opportunity to call in and talk with Judge Blackwell and let their voice be heard; right? **A: I -- like I said, I did not know this.** Q: You could have appeared as was ordered by Judge Blackwell and pled your case and aired for him all the complaints and gripes that you just testified to over the last several minutes; right? **A: As I said, I did not know this.**") (emphasis added); 91:16–22 (Mr. Cook confirming that he "believe[d]" that his "lawyers did not advise [him] of" the order.); 92:1–7 (Mr. Cook affirming that it was "[c]orrect" that his lawyers "didn't tell [him] that Judge Blackwell had ordered [him] to call in for a hearing" on the afternoon of May 29); Ex. 2 (Oct. 22 Tr.) at 89:11–14 ("Q: And in that [May 29] hearing, Judge Blackwell ordered you to appear by phone later that day. Is that correct? **A: I was not aware of that, no.**") (emphasis added).

declaration instead of having Mr. Cook appear for the status conference—which could well have prevented the subsequent goose chase.[4]

Mr. Lee is similarly evasive in explaining how the draft came into its final form. He says that he does "not know who prepared the draft" that Mr. Cook circulated at 2:00 pm CDT. ECF 133 (Lee Decl.) ¶ 24. He further explains that he and one of his colleagues "suggested revisions to Mr. Cook's declaration, some of which were accepted and some of which were not accepted"—without saying who was accepting and rejecting revisions, or the subject of the revisions. *Id*. at ¶ 26. Again it is unclear how to square this back-and-forth with the nine-minute window between proposed and signed declarations. But even setting that aside, Mr. Cook offered a very different characterization of the drafting process when testifying under oath at the October arbitration hearing. According to Mr. Cook, he was pressured into signing the declaration by his attorneys—"You will sign that declaration"—and "did not get [an] opportunity" to make changes to the declaration.[5]

---

[4] For his part, Mr. Georgeson maintains that "I had no role in preparing, submitting or filing the Declaration of Ron Cook dated May 29, 2024 with this Court." ECF 134 (Georgeson Decl.) ¶ 15. Nonetheless, within days of that declaration, Mr. Georgeson made a series of similar representations about CAL's willingness and ability to deposit the Payoff Proceeds in an escrow account to the Emergency Arbitrator, who had entered a jointly-drafted Interim Award adopting the Court's May 29 order. *See* Ex. 1 (June 3 Email) at 1 (including a joint proposed order to the Emergency Arbitrator that ordered CAL to submit a detailed report "outlining the steps taken to preserve the Payoff Proceeds" and place the Payoff Proceeds in escrow no later than June 5); ECF 38-6 (June 13 Report) at 2 (stating that "records ordered produced are only available through Ron Cook" but stating that the "plan for placement of the funds" in escrow included all Payoff Proceeds by the end of June 2024).

[5] *See* ECF 100-1 (Oct. 22 Tr.) at 85:13–17 (". . .I advised my attorney I was not going to sign that declaration, and that there was no way, unless I had an opportunity to be

There are thus two competing accounts: as Mr. Lee says, a declaration that originated with Mr. Cook and over which he (or someone else affiliated with CAL) maintained editorial control; or as Mr. Cook says, a declaration that was forced upon him by his counsel and over which *counsel* retained editorial control. Agri-Access and the Court have no way of knowing which account is true. This mystery is particularly troubling given that Mr. Lee of course knows what Mr. Cook testified to in October, and in fact listened to that testimony in real time. ECF 133 (Lee Decl.) ¶ 66. Yet Mr. Lee never raised questions as to Mr. Cook's testimony during that hearing, and makes no attempt to explain the disconnect between that testimony and the account that he now offers the Court.

Similarly unclear is what, exactly, changed over the course of the drafting process. This is a key question. It is undisputed that the as-filed version of the declaration, in which Mr. Cook falsely implied that CAL retained the Payoff Proceeds and was capable of "preserv[ing] them," was at odds with the reality that CAL had by that point transferred the lion's share of the Payoff Proceeds to others. But Mr. Lee refuses to shed any light on that issue, instead baldly assuring the Court that "I did not suspect that any of the rejected proposed revisions made the statements in the declaration untrue or misleading." *Id*. at ¶ 26. What basis did Mr. Lee have for assessing the veracity of representations that he

---

heard. I was advised by my attorney that '**You will sign that declaration.**'"); Ex. 2 (Oct. 22 Tr.) at 88:24–89:6 ("[Y]ou were, what, coerced into signing that declaration that you signed under penalty of perjury to submit to Judge Blackwell? Is that your testimony? A: I was advised by my attorney to go ahead and sign it. **I tried to go ahead and make attempts to change it, and I was not -- I did not get that opportunity to do it.**") (emphasis added).

himself believed should have been amended?  He does not say.  He instead asks the Court to simply take it on faith that he had no basis for questioning changes that resulted in the submission of a misleading declaration.

The Court should reject that invitation.  The marked-up drafts of Mr. Cook's May 29 declaration, and any communications between Mr. Cook and his counsel regarding his declaration, are not privileged.  The crime-fraud exception to the attorney-client privilege applies where there is "a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel" and "the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it."  *United States v. Adams*, No. 017-CR-00064-DWF-KMM, 2018 WL 5311410, at *4 (D. Minn. Oct. 27, 2018), aff'd, No. CR 17-64 (DWF/KMM), 2018 WL 6446387 (D. Minn. Dec. 10, 2018) (quoting *Triple Five of Minn., Inc. v. Simon*, 213 F.R.D. 324, 327 (D. Minn. 2002)) (internal quotation marks omitted).  And as Mr. Georgeson and Mr. Lee effectively concede, CAL was engaged in fraudulent conduct when it submitted a declaration through its CEO representing to the Court that CAL retained possession of the Payoff Proceeds. ECF 133 (Lee Decl.) ¶ 67; ECF 134 (Georgeson Decl.) ¶ 39.  And CAL obtained Mr. Lee and Mr. Georgeson's assistance in furtherance of this fraud when it (i) used Mr. Lee and Mr. Georgeson to make false statements to the Court and Emergency Arbitrator and (ii) obtained legal advice from Mr. Georgeson and Mr. Lee while editing the May 29 declaration or providing information for the reports to the Emergency Arbitrator.  The drafts of Mr. Cook's May 29 declaration, the reports, and related communications are thus not privileged and should be disclosed.  Without seeing the drafts of the declaration and

the revisions that Mr. Cook allegedly rejected, the Court cannot assess Mr. Lee's diligence in submitting Mr. Cook's declaration. At minimum, the Court should conduct an *in camera* review of documents relevant to Mr. Georgeson and Mr. Lee's "inquiries." *See United States v. Zolin*, 491 U.S. 554, 572 (1989) (setting forth the lesser standard for in camera review of privileged materials where the facts would "support a good faith belief by a reasonable person" that *in camera* review will reveal evidence to establish applicability of the crime-fraud exception) (internal quotation marks omitted).

Even apart from the questions as to the drafting and revision process, there are serious questions as to Mr. Lee's diligence with respect to the May 29 declaration. As the Court recently reminded Mr. Lee (and Mr. Georgeson), their obligations go well beyond merely parroting their client's representations: "[Y]ou cannot stand on the fact that you went no further than a superficial repeating of what was told to you even though there are all kinds of indicia around it that would give you reason to question it or to doubt it." ECF 128 (Mar. 26 Tr.) at 55:2–8. Here, that would have meant pressing Mr. Cook for specific details regarding what had been done with the Payoff Proceeds—details Agri-Access had already been seeking *for weeks*—and what he meant in stating his willingness to enter into an agreement that would preserve those funds. But Mr. Lee does not claim to have done anything of the sort. Instead, he again offers a superficial account of how he signed off on the submission of a materially misleading declaration, without offering any insight whatsoever into any steps that he took to assess the veracity of the representations made in that declaration.

## II.    No later than June 3, 2024, Mr. Georgeson and Mr. Lee knew that their previous representations—made at the behest of CAL—were false.

### A.    On June 3, CAL submitted that the Payoff Proceeds were "in process of being re-acquired."

In reliance on Mr. Lee's and Mr. Cook's representations that CAL possessed the Payoff Proceeds and was willing and able to preserve them, the Court ordered CAL to put the Payoff Proceeds in escrow by June 5.  CAL did not do so.  Instead, on June 3, Mr. Georgeson and Mr. Lee submitted a "Report Pursuant to Paragraph 4, Judge Blackwell's Order" to the Emergency Arbitrator stating that the Payoff Proceeds were "in process of being re-acquired."  ECF 38-2 (CAL's June 3 Report).  This was the first time that they— or any other representative of CAL—revealed that CAL had transferred the stolen Payoff Proceeds and did not have immediate access to them.

More to the point, this statement was directly at odds with the representations that Mr. Lee and Mr. Cook made to the Court just five days earlier.[6]  It is thus undeniable that CAL, its attorneys, or both had made deliberate misrepresentations to the Court regarding the location of the Payoff Proceeds.  Mr. Georgeson and Mr. Lee seek to shift that blame exclusively to their client, asserting that it was only on June 3 that they "understood," based on "inquiries to CAL," that the Payoff Proceeds were not in CAL's possession.  ECF 133 (Lee Decl.) ¶ 35; ECF 134 (Georgeson Decl.) ¶ 26.  Again, tellingly absent from their submission is any detail about "[w]hat steps, if any, they took to verify the accuracy of the

---

[6] It was also at odds with Mr. Georgeson's representations to the Emergency Arbitrator when he submitted a proposed Order *that same day*—June 3—that "mirror[ed] the substantive terms of Judge Blackwell's Order" including placing the Payoff Proceeds in escrow no later than June 5.  *See* Ex. 1 (June 3 Email) at 1.

representations to the Court." ECF 119 (Order to Show Cause) at 4. But even assuming that June 3 is the point at which they learned the truth, from that date on both attorneys were on notice that their client was dishonest and willing to make misrepresentations to the Court—and to enlist them in that effort.

By this point, then, Mr. Georgeson and Mr. Lee had a choice. **Option A:** They could ensure that they would not mislead the Court in the future, by conducting proper diligence into all future representations that they made on CAL's behalf. Doing so would require them to elicit from CAL basic information and documentation about the location of the Payoff Proceeds—among other things, when and to whom they had been transferred, where they were now, and how CAL was attempting to re-acquire them—and then provide that information to the Court and the Emergency Arbitrator as CAL *was ordered to do*. After all, obtaining this information was the entire purpose of the May 29 hearing, Mr. Cook's declaration, and the June 3 report. Asking these basic questions and requiring supporting documentation would also ensure that CAL's counsel was not being paid with illicit funds. **Option B:** They could simply continue to rubber-stamp their dishonest client's representations, submit reports with unverified representations, and thus facilitate its efforts to keep Agri-Access, the arbitrators, and the Court from tracking down the stolen Payoff Proceeds.

Mr. Georgeson and Mr. Lee chose Option B. As further explained below, they consistently failed to conduct basic diligence into their client's assertions, and thereby joined CAL in its long-running effort to hide the money. Indeed, Mr. Georgeson and Mr. Lee made their choice clear that same day, submitting the June 3 report without providing

any details or supporting documentation as to the funds' whereabouts or the process for "re-acquir[ing]" them, and without correcting the earlier misstatements that Mr. Lee and Mr. Cook had made to the Court.

### B.    CAL continued to flout the Emergency Arbitrator's orders.

Mr. Georgeson and Mr. Lee doubled down in the days following their submission of the June 3 report. In response to that report, the Emergency Arbitrator ordered CAL to provide, by June 6, details regarding every transfer of any portion of the Payoff Proceeds. ECF 38-3 (Supp. to Interim Award) ¶ 6.

CAL flouted that order too. It did not identify *any* entities to which it had transferred any portion of the Payoff Proceeds. Instead, Mr. Georgeson and Mr. Lee submitted a report stating only that the Payoff Proceeds were "invested by CAL for purposes of preservation and creating a reasonable return on the funds." ECF 38-4 (CAL's June 6 Report) at 1. They also stated that $13 million had been "retrieved" and deposited into an unidentified bank account—though not an escrow account, as this Court and the Emergency Arbitrator had ordered. *Id.* at 2. Mr. Georgeson and Mr. Lee also claimed that the opening of an escrow account was "in process." *Id.*

When the Emergency Arbitrator then ordered CAL to provide a supplemental report that actually provided the required information regarding the transfers, Mr. Georgeson and Mr. Lee responded on CAL's behalf that "[t]his will not occur," citing a "serious medical condition" of Mr. Cook. ECF 38-5 (Second Supp. Interim Order); ECF 38-6 (CAL's June 13 Report) at 1. Mr. Georgeson and Mr. Lee again refused to identify any transfer recipients, instead vaguely reiterating that the "funds are being recalled by CAL as quickly

as they are available." ECF 38-6 (CAL's June 13 Report) at 2. CAL also refused to comply with orders of the Emergency Arbitrator requiring it to produce documents relating to the transfers of the Payoff Proceeds and written communications reflecting CAL's efforts to recover those funds. ECF 38-5 (Second Supp. Interim Order) ¶ 9(d), (e). CAL's attorneys assured the Emergency Arbitrator, however, that CAL was "unaware of and does not believe there are any claims, rights or obligations asserted by any third party." ECF 38-6 (CAL's June 13 Report) at 2.

Mr. Georgeson and Mr. Lee cannot feign ignorance as to their client's veracity by this point. Mr. Lee does not even attempt to do so. And although Mr. Georgeson *concedes* that he was at least by this time aware that CAL was willing to flout court orders, he implausibly seeks to insulate himself from responsibility for CAL's intransigence. Mr. Georgeson says that at some unspecified point "after June 17, 2024 and before July 17, 2024, I formed the opinion (not the knowledge) the orders may not be complied with by CAL and on July 17, 2024 so advised the Emergency Arbitrator." ECF 134 (Georgeson Decl.) ¶ 41. That tentative account—framing as a mere "opinion" what Mr. Georgeson already *knew* to be true, based on CAL's submission through its CEO of a materially misleading declaration—is hardly a defense. But more to the point, Mr. Georgeson's retelling is false: as the Emergency Arbitrator later observed, CAL never came out and said it would not comply with future orders. *See* ECF 80-3 (Interim Award) at 2. Instead, he continued acting as if CAL was fully prepared to comply with all orders and capable of satisfying a judgment—all while knowing that none of these representations were true.

16

Mr. Lee likewise maintained the charade that CAL was trying to comply with orders from the Emergency Arbitrator and this Court. In a letter dated June 20, 2024, Mr. Lee represented to the Court that "CAL has diligently attempted to comply with the Interim Orders," would be establishing a compliant escrow account "in the next few days," and would deposit "[a]dditional funds reacquired" in that account. *See* ECF 39 (June 20 letter). It is unclear how Mr. Lee could have made such representations given his lack of due diligence, and ultimately each of those representations turned out to be untrue: CAL never complied with the Interim Orders, never established a compliant escrow account, and never deposited any additional funds into such a compliant account.

CAL's flouting of the Emergency Arbitrator's orders—some of which its own attorneys participated in drafting—did not go unnoticed. On July 16, 2024, the Emergency Arbitrator issued a Report and Recommendations in which he recounted the various ways that CAL had defied clear orders, and recommended that the Court "issue an order requiring CAL to show cause why it should not be held in civil contempt for these violations." ECF 41 (R&R) ¶¶ 6–7. That same day, the Emergency Arbitrator issued his Order Imposing Sanctions, in which he observed that "CAL could have easily brought the emergency proceedings to a quick close by complying with Judge Blackwell's Order. Instead, it caused the proceedings to drag on by refusing to comply with the Order and the Emergency Arbitrator's orders even though it was within its power to do so, resulting in multiple filings, correspondence, hearings and orders." Ex. 3 (Order Imposing Sanctions) at 2–3. The Emergency Arbitrator subsequently entered an interim award sanctioning CAL for over $230,000 in attorneys' fees and costs that Agri-Access incurred in the emergency

arbitration proceedings (which CAL still has not paid). ECF 80-3 (Interim Award). As the Emergency Arbitrator explained, the conduct of CAL—through its attorneys— reflected a clear message: "CAL will never tell you where the $58 million went or where it is now so don't bother trying to get that information." *Id.* at 2.

Mr. Georgeson and Mr. Lee played a central role in dragging out these proceedings, as recognized by the Emergency Arbitrator. Because CAL feigned willingness to obey the Emergency Arbitrator, "[i]t only gradually became clear that CAL had no intention of complying with these orders." ECF 80-3 (Interim Award). But Mr. Georgeson and Mr. Lee helped CAL maintain the charade by "participat[ing] in drafting some of the Emergency Arbitrator's orders," (which CAL disobeyed within days), by "fil[ing] substantial papers in opposition," and appearing at each hearing before the Emergency Arbitrator. *Id.*

## III. Mr. Georgeson's and Mr. Lee's utter lack of due diligence, even after notice of Mr. Cook's continual lies, needlessly multiplied proceedings and disrespected this Court.

Mr. Georgeson's and Mr. Lee's early lack of diligence, in the face of their client's demonstrated untruthfulness, spurred needless further proceedings. Over the course of those proceedings, Mr. Georgeson and Mr. Lee repeatedly violated their professional and ethical obligations. Agri-Access highlights several such instances below.

### A. Mr. Georgeson and Mr. Lee repeatedly advised Mr. Cook to flout this Court's May 29 order.

On May 29, this Court prohibited CAL from "transferring" the Payoff Proceeds without Court approval. ECF 32 (May 29 Order) at 2. The Court also ordered CAL to

place the Payoff Proceeds in a "segregated, interest-bearing escrow account" at a "reputable financial institution." *Id.*

The undisputed evidence is that Mr. Georgeson and Mr. Lee advised Mr. Cook to flout these commands. Sometime in September—months *after* the Court prohibited CAL from transferring the Payoff Proceeds without Court permission—Mr. Cook transferred $23 million of the Payoff Proceeds to "provide a letter of credit." ECF 80-4 (Oct. 22 Tr.) at 111:6–10. At the October hearing where Mr. Cook revealed this fact, counsel for Agri-Access asked him why he did not instead put the $23 million in a compliant escrow account, as this Court had ordered and the Emergency Arbitrator had confirmed. Mr. Cook responded that this decision came from his counsel: "[a]fter speaking with [his] attorneys," he learned that the "letter of credit was apparently a better method" of compliance. *Id.* at 111:17–22. And by Mr. Cook's account, he was perfectly capable of putting the $23 million "in a compliant escrow" account at any point "[i]f that's what [he] was instructed to do." ECF 100-1 (Oct. 22 Tr.) at 115:18–20. In reality, this Court had not merely "instructed," but had *ordered*, CAL to put the money into a compliant escrow account. Yet per Mr. Cook's testimony, he did not do so because his attorneys repeatedly "instructed" him to disobey that order.

It did not end there. In October, Mr. Cook cancelled the letter of credit and "moved the [$]23 million" to a trust account held by Mr. Georgeson. *Id.* at 111:23–25, 112:1–8; ECF 134 (Georgeson Decl.) ¶ 5. Again, Mr. Cook testified that he did so because "[his] attorneys advised [him] to." ECF 80-4 (Oct. 22 Tr.) at 112:4–5. But, as this Court noted at its March 27 hearing, Mr. Georgeson's trust account was "not a proper escrow" account

19

for purposes of the Court's May 29 order.  ECF 128 (Mar. 26 Tr.) at 10–11.  Mr. Georgeson and Mr. Lee even agree that Mr. Georgeson's trust account was noncompliant.  *See* ECF 134 (Georgeson Decl.) ¶ 12 (conceding that the Payoff Proceeds "were never deposited by CAL in compliance with the May 29, 2024" order); ECF 133 (Lee Decl.) ¶ 69 (acknowledging that the "structure and status of Mr. Georgeson's trust account that held the $23 million did not comply with the Court's May 29, 2024" order).  So Mr. Cook moved $23 million from one improper location to another, all at counsel's behest.

Mr. Cook also testified that he did not *need* to comply with the Court's May 29 order because he had offered a grant deed to real property as collateral.  *Id.* at 119:23–120:4.  When asked why he had not mortgaged the property and placed the borrowed money in a compliant escrow account, Mr. Cook again pointed to his counsel, testifying that "[his] *attorneys*" had "advised" him that the deed collateral "would work."  *Id.* at 120:3–6 (emphasis added).

Mr. Georgeson and Mr. Lee do not now deny any of this.  Indeed, they do not even mention Mr. Cook's sworn testimony that they repeatedly directed him to flout this Court's May 29 escrow order.  Nor does Mr. Georgeson ever explain why he agreed to hold the funds in violation of this Court's orders, or why he did not himself put those funds into a compliant escrow account.  In other words, he offers no defense for himself directly flouting this Court's order.

**B.    Mr. Georgeson and Mr. Lee did not exercise due diligence after learning, by October 22 at the absolute latest, that Mr. Cook had lied for months about the Payoff Proceeds.**

After revealing on June 3 that CAL had dissipated the Payoff Proceeds and that those funds were "in process of being re-acquired," ECF 38-2 (CAL's June 3 Report) at 1, Mr. Georgeson and Mr. Lee went into damage-control mode. They submitted another report three days later asserting that Mr. Cook "began undertaking measures" on May 30— "including placing telephone calls"—"to recall and giv[e] notice for return of the" Payoff Proceeds that he no longer possessed. ECF 38-4 (CAL's June 6 Report) at 1–2. They also assured the Emergency Arbitrator that Mr. Cook was "working in good faith to expedite the return of the disputed funds," *id.* at 3, and that he was "recall[ing]" the Proceeds "as quickly as they are available." ECF 38-6 (CAL's June 13 Report) at 2.

These representations—which Mr. Georgeson and Mr. Lee never retracted between early June and the October 22 hearing—contained material falsehoods, as noted below. Mr. Georgeson and Mr. Lee would have known as much if they had conducted even the most rudimentary of investigations. But setting that aside, they could not possibly have believed that CAL's constant assurances of compliance were true after October 22. It was on that day that Mr. Cook finally testified under oath and revealed that he had transferred most of the Payoff Proceeds months ago—even before the May 29 hearing.[7]

_____

[7] In fact, Mr. Georgeson says that he learned of the May transfers on October 16 in preparing for the October 22 hearing. ECF 134 (Georgeson Decl.) ¶ 16. Mr. Georgeson fails to explain why he was able to get this information in October but not any earlier. And, in any event, neither Mr. Georgeson nor Mr. Lee told the Merits Panel or this Court about this critical development in the week between when Mr. Georgeson learned of it and the October 22 hearing at which Mr. Cook testified.

Of course, the revelation about the May transfers did not come out in the direct examination that Mr. Georgeson conducted. Mr. Georgeson opted to ask Mr. Cook almost nothing about the May transfers of the Payoff Proceeds—and *objected* when counsel for Agri-Access asked Mr. Cook to identify the May transferees, protesting that "[w]here this money went *doesn't make any difference*." ECF 80-4 (Oct. 22 Tr.) at 100:6–13 (emphasis added). "Forthright and candid," this was not. *See* ECF 134 (Georgeson Decl.) ¶ 37.

With Mr. Georgeson's spurious objection overruled, Mr. Cook was forced to provide details regarding the May transfers. He testified that he had transferred the Payoff Proceeds to Dennis Morgan, Michael and Cynthia Graham, and Kristie Iness, and that he had not asked any of those individuals *a single time* to return the Payoff Proceeds. ECF 80-4 (Oct. 22 Tr.) at 103:6–20; 105:14–17; 107:2–13. Mr. Cook also made clear that his failure to request the return of the Payoff Proceeds was no accident: He believed he was already in compliance with this Court's order—based on assurances from his attorneys—because CAL had "posted substantial collateral to satisfy the orders of the panel." *Id*. at 103:19–24; 105:14–106:3. He was again referring to the grant deed that he had offered as substitute collateral to satisfy any judgment, which he said his "attorneys" had "advised" him was "sufficient collateral and . . . would work." ECF 100-1 (Oct. 22 Tr.) at 116:2–6; 120:3–6.[8]

---

[8] Agri-Access will say more about the grant deed in its motion for sanctions. But to summarize just some of the problems with this position: Although Mr. Cook testified that Mr. Graham was a signatory to the grant deed, Ex. 2 (Oct. 22 Tr.) at 41:18–20, Mr. Graham has since represented that his signature was obtained through fraud and that he never consented—as half owner of the property in question—to pledge it as collateral for CAL's

Mr. Cook's October testimony blew a hole in the case that Mr. Georgeson and Mr. Lee had been putting forth all summer. Indeed, Mr. Georgeson's and Mr. Lee's representations to the Emergency Arbitrator in the reports submitted June 3, June 6, and June 13 were, according to Mr. Cook's sworn October testimony, materially false. Mr. Georgeson and Mr. Lee claimed in those reports that CAL was diligently seeking to re-acquire the funds—when in fact Mr. Cook testified under oath that he had done *nothing*, for nearly five months, to reacquire the Payoff Proceeds in order to comply with this Court's May 29 order. Mr. Georgeson and Mr. Lee would have this Court accept that due diligence could not have uncovered these facts at any point between early June and late October. Rather, they represent that they had not even *suspected* that anything Mr. Cook had told them had been false or misleading. *See, e.g.*, ECF 134 (Georgeson Decl.) ¶ 4; ECF 133 (Lee Decl.) ¶ 48.

That claim is impossible to take seriously. To have represented that CAL was "undertaking measures" to "recall" the Payoff Proceeds "as quickly" as possible and "in

---

debts to Agri-Access, Ex. 4 (April 4, 2025 Sarabian Email). And after Mr. Lee baldly told this Court (at the March 26 hearing) that the statements from Mr. Graham's counsel did not reflect Mr. Graham's views, ECF 128 (Mar. 26 Tr.) at 52:9–11, Mr. Lee was forced to admit that he was simply repeating what he had been told by Mr. Cook without having taken any steps to investigate that claim, and thus retracted it, *id.* at 53:16–56:23. Incredibly, Mr. Lee turned around and made *the same unsupported claim* to the Merits Panel just days later. Ex. 5 (CAL's April 4 Letter) at 3. CAL then doubled down and—in defiance of the representations from Mr. Graham's counsel—unilaterally recorded the deed in an unauthorized effort to satisfy the money judgment against it. *See* Ex. 6 (Order on Grant Deed) ¶ 7. The Merits Panel quickly rejected that effort, ruling that the deed was prematurely recorded and ordering CAL to comply with the Partial Final Award by delivering the grant deed for Agri-Access to hold. *Id.*

good faith" (as they assured the Emergency Arbitrator in early June), and that CAL "ha[d] diligently attempted to comply" (as Mr. Lee assured this Court in a June 20 letter (ECF 39, at 1–2)), Mr. Georgeson and Mr. Lee must have discussed with CAL what it had done, what it was doing, and what it planned to do to comply with the Court's order. And given that Mr. Cook had already shown himself willing to make misrepresentations as to the status of the Payoff Proceeds, Mr. Georgeson and Mr. Lee could not simply take his word for it. Instead, they had a duty to probe into the steps that CAL was taking, to require documentary support such as bank records, and to substantiate what they were told. The representations that they made in the June reports and in Mr. Lee's June 20 letter to this Court confirm their failure to exercise that basic diligence.

Not only did Mr. Georgeson and Mr. Lee fail to require CAL to provide them bank records to verify the information they submitted to the Court and arbitrators (and to comply with the Court's and Emergency Arbitrator's orders requiring production of such records), they also aided CAL in its obfuscation of bank records in the aftermath of the October hearing. In particular, after the Panel ordered it to do so, CAL produced bank records only from April and May 2024. Neither Mr. Georgeson nor Mr. Lee say in their declarations whether they ever requested additional bank records from CAL, which would have revealed that Mr. Cook's associates had returned the funds in the ensuing months. Nor do they explain why, if they made any such request only to have CAL refuse it, they nonetheless continued with their representation of CAL.

Mr. Lee tries to absolve himself of this failure of diligence by saying that he was not "actively involved" in this litigation or the arbitration proceedings from the end of

August until late November.  ECF 133 (Lee Decl.) ¶ 65.  But Mr. Lee cannot shield himself based on which meetings with Mr. Cook he attended.  He was counsel to CAL all along, he participated routinely in conferences and hearings with this Court and the arbitrators, and he either signed or was copied on all submissions in the proceedings.  He also listened to Mr. Cook's October 22 testimony.  *Id.* at ¶ 66.  In any event, Mr. Lee still had four months of "active[] involve[ment]"—May through August—in which he should have diligently investigated, and could have readily discovered, Mr. Cook's willful noncompliance.

In short, Mr. Cook's October testimony makes it undeniable that Mr. Georgeson and Mr. Lee failed to exercise anything approaching reasonable diligence.

### C.    Mr. Georgeson and Mr. Lee say absolutely nothing about Mr. Cook's materially false November 15 declaration.

Just a few weeks later, Mr. Cook submitted a declaration that once again demonstrated the falsity of representations that he and his counsel had been making for months.  Incredibly, Mr. Georgeson and Mr. Lee have nothing to say about this declaration.

As far back as June 13, Mr. Georgeson and Mr. Lee had told the Emergency Arbitrator that "CAL is unaware of and does not believe there are any claims . . . or obligations asserted by any third party" regarding the Payoff Proceeds.  ECF 38-6 (CAL's June 13 Report) at 2.  Mr. Cook repeatedly confirmed that assertion in October.  He testified, for example, that the "purpose" of the May transfers was to "maintain ongoing relationships and to make sure that the capital was working."  Ex. 2 (Oct. 22 Tr.) at 40:12–14.  He told the Panel that the transferees "understood" that they were "to hold [the Payoff

Proceeds] until further instruction." ECF 80-4 (Oct. 22 Tr.) at 194:1–5. He testified that in exchange for the transfers he received just a grant deed from the Grahams, *id.* at 101:5–12, nothing from Mr. Morgan, *id.* at 104:9–14, and nothing from Ms. Iness. *Id.* at 106:7–15. And he specifically denied that CAL had "any debt obligations." Ex. 2 (Oct. 22 Tr.) at 127:8–9. Mr. Lee and Mr. Georgeson were present and heard all that testimony.

The declaration that Mr. Cook submitted on November 15 threw all of those representations overboard. In it, Mr. Cook asserted under penalty of perjury that he had told the May transferees that the Payoff Proceeds should be returned because they had been preliminarily found to belong to Agri-Access, but that the transferees had all asserted that the transfers "were the repayment of obligations owed by CAL to" them, that the funds had been invested, and that they "will not be recovered or liquidated." ECF 80-6 (Cook Nov. 15 Decl.) ¶¶ 3–6.

That narrative flatly contradicted the testimony Mr. Cook had given just a few weeks earlier. And it is false. In a separate, recently-filed federal action that Agri-Access brought against the May transferees in pursuit of the disbursed Payoff Proceeds,[9] Mr. Morgan has sworn (and provided supporting documentation showing) that he had transferred back to CAL by October 1 all of the money that Mr. Cook had transferred to him in May. ECF 101 (Morgan Decl.) ¶ 12. In that same action, Mr. Graham has denied that the May transfers were repayments of obligations that CAL owed him, and sworn that

---

[9] *Compeer Financial, ACA v. Graham*, No. 1:25-cv-00049-JLT-SKO (E.D. Cal. January 10, 2025).

he returned to Mr. Cook all but around $210,000 of the Payoff Proceeds by September. ECF 100-6 (Graham Stip.).

Mr. Georgeson and Mr. Lee never mention Mr. Cook's November 15 declaration in their responses to the OSC. And it is not hard to see why. By the time he submitted that declaration, Mr. Cook had made abundantly clear that he was untrustworthy and willing to lie to the Court. Despite having been on notice of that fact, Mr. Georgeson and Mr. Lee cannot—and so do not—represent to this Court that they diligently investigated the truthfulness of the November declaration before they filed it or that they fulfilled their duty of candor to this Court in doing so.

But there is another, no less important reason for their silence: Mr. Georgeson and Mr. Lee concurrently represent Ms. Iness in Agri-Access's suit against the May transferees. (That is, they represent both sides to the transfer of money that CAL had improperly taken from Agri-Access.) And the November declaration's statement about Ms. Iness—that the transfers "were the repayment of obligations by CAL owed to" her and that the funds had been invested and "will not be recovered or liquidated"—is the lynchpin of their argument that the claims against her should be dismissed. *See, e.g.*, Ex. 7 (Motion to Dismiss in *Compeer Financial, ACA v. Graham*, No. 1:25-cv-00049-JLT-SKO (E.D. Cal. January 10, 2025)) at 11, 13–16.[10] Saying anything about the November declaration here would risk crippling Mr. Georgeson and Mr. Lee's defense of Ms. Iness in the California matter. This

---

[10] The Court can take judicial notice of this filing. *See* Fed. R. Evid. 201(b)(2).

only further speaks to the degree to which Mr. Georgeson and Mr. Lee have tied themselves in knots attempting to defend CAL's conduct.

### D. Mr. Georgeson and Mr. Lee chose to keep this Court in the dark about Mr. Cook's continual lies.

There is yet one more way in which the May transfers demonstrate Mr. Georgeson's and Mr. Lee's failure to carry out their legal and ethical obligations. Even after learning of those transfers through the arbitration, Mr. Georgeson and Mr. Lee did not volunteer that information to this Court—notwithstanding that the transfers confirmed the falsity of representations that they and their client had previously made to this Court. *See* MRPC R. 3.3(a), (b). Mr. Georgeson and Mr. Lee say that they chose not to notify this Court of the transfers—and chose not to correct the record with this Court as more of Mr. Cook's lies came to light—because they "did not believe separate notification to this Court was necessary" (ECF 133 (Lee Decl.) ¶ 73), and because the Court "had delegated authority" to the Emergency Arbitrator and Merits Panel (ECF 134 (Georgeson Decl.) ¶ 24).

In other words, Mr. Georgeson and Mr. Lee—officers of this Court, who have a duty of candor to this Court and whose client this Court had ordered to comply—decided that the Court need not be told about newly discovered facts germane to the one question that the Court repeatedly asked at the May 29 hearing: where is the money? *See* ECF 37 (May 29 Tr.) at 5:25–6:3; 7:21–22; 9:18. There is no defense for this.

Nor do Mr. Georgeson's and Mr. Lee's explanations make any sense. At the September 3 hearing, the Court underscored the "need to protect the integrity of the arbitration and this judicial process"; told them that Mr. Cook must learn that "[y]ou don't

flout orders from federal courts" or "make mockeries of arbitration processes that are overseen by the federal court"; and stressed that the Court would "ensure respect for [its] orders." ECF 57 (Sept. 3 Tr.) at 4, 11–12. There is no way that Mr. Georgeson and Mr. Lee, having heard those statements, could have reasonably believed that the Court had lost interest in enforcing its own orders. Indeed, the Court was "clear" in September that it was "going to retain jurisdiction over this issue" and was "reserv[ing] the right to issue further orders as may be necessary to maintain the integrity of . . . this judicial process and the arbitration processes." *Id.* at 15. Mr. Georgeson and Mr. Lee thus provide yet more confirmation of the degree to which they have flouted this Court's authority, even as the Court told them that it would tolerate nothing of the sort.

## CONCLUSION

Agri-Access respectfully requests that this Court find that Mr. Georgeson and Mr. Lee have failed to show cause for their continued misconduct, warranting sanctions from this Court.

Dated: April 24, 2025                    Respectfully submitted,

                                         **JONES DAY**

                                         */s/ Joseph Boylan*_____
                                         Christopher J. Lovrien*
                                         Joseph J. Boylan*
                                         555 South Flower Street
                                         Fiftieth Floor
                                         Los Angeles, CA 90071
                                         Phone: 213-243-2175
                                         Email: cjlovrien@jonesday.com
                                              jboylan@jonesday.com

                                         W. Anders Folk (MN #0311388)
                                         90 South Seventh Street
                                         Suite 4950
                                         Minneapolis, MN 55402
                                         Phone: 612-217-8800
                                         Email: afolk@jonesday.com

                                         *Attorneys for Plaintiffs Compeer*
                                         *Financial, ACA, Compeer Financial, PCA,*
                                         *and Compeer Financial, FLCA*

                                         *Admitted pro hac vice*