## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA, | Civ. No. 24-1896 (JWB/ECW) |
| Plaintiffs, | |
| v. | **RECEIVER'S <u>FIRST</u> WRITTEN REPORT** |
| Corporate America Lending, Inc., | |
| Defendant. | |

---

T. Scott Avila, the Receiver appointed pursuant to the *Order Appointing Receiver*, dated March 27, 2025 (Docket No. 118) (the "<u>Receivership Order</u>"), hereby files this *Receiver's <u>First</u> Written Report* (the "<u>First Report</u>") in accordance with Paragraph 11 of the Receivership Order.

## <u>INTRODUCTION</u>

1.      On March 27, 2025, the Court entered the Receivership Order, appointing T. Scott Avila as receiver (the "<u>Receiver</u>") over the assets of Corporate America Lending, Inc. ("<u>CAL</u>") that constitute "Receivership Property," as defined in the Receivership Order. Among the duties assigned to the Receiver under the Receivership Order is the requirement, set forth in Paragraph 11, that the Receiver provide a written report to the Court, the Merits Panel, CAL and Compeer Financial, ACA, Compeer Financial, PCA, and Compeer Financial, FLCA (Compeer Financial, ACA, Compeer Financial, PCA, and Compeer Financial, FLCA collectively, "<u>Agri-Access</u>," and together with CAL, the

"Parties") regarding his investigation, the performance of his duties, and the progress of the receivership. Subsequent reports of the Receiver are to be filed every sixty (60) days thereafter.

2.    The Receivership Order gives the Receiver broad authority to, among other things, in the performance of his duties:

   a. Take any and all action the Receiver deems reasonable and appropriate to prevent waste of the Receivership Property and to preserve, secure, manage, maintain, and safeguard the Receivership Property;

   b. Access CAL's books and records with respect to CAL's business operation and other Receivership Property;

   c. Take and have complete and exclusive control and possession of CAL's assets;

   d. Investigate CAL's financial records and account information for the purpose of identifying, locating and segregating the Payoff Proceeds, as defined in the Receivership Order, from CAL's other assets;

   e. Deliver all amounts awarded by the Merits Panel and entered by this Court to Agri-Access;

   f. Employ and pay professionals and advisors to assist the Receiver in carrying out his duties;

   g. Communicate with or serve the Receivership Order upon parties he deems appropriate to inform them of the status of this matter or the financial condition of the Receivership Property; and

   h. Issue subpoenas from any state or federal court for the purposes of carrying out the rights and duties set forth in the Receivership Order.

Receivership Order ¶ 9.

## REPORT

### I.    The Performance of the Receiver's Duties

#### a.  Retention of Professionals

3.      Immediately after his appointment, in accordance with Paragraph 9(f) of the Receivership Order, the Receiver engaged Paladin Management Group ("Paladin") and Katten Muchin Rosenman LLP ("Katten") to serve as financial advisor and legal counsel, respectively, to assist him in carrying out his duties.  The Court entered orders authorizing the employment of Paladin and Katten on April 18, 2025.  (Docket Nos. 157, 158).

#### b.  $23 Million of the Payoff Proceeds

4.      Beginning March 31, 2025, the Receiver and Katten worked vigorously with Russell Georgeson, counsel for CAL, and Fresno First Bank ("FFB Bank") to allow Mr. Georgeson to disburse from his firm's escrow account approximately $23 million of the Payoff Proceeds to Agri-Access, as directed by the Merits Panel.  This effort took approximately five days and required Katten and the Receiver's team to coordinate closely with the EVP General Counsel & CCO of FFB Bank regarding the Receivership Order, the Receiver's authority, and the wiring requirements pursuant to FFB Bank's guidelines. Ultimately, on April 4, 2025, $23,427,517.60 was disbursed out of Mr. Georgeson's firm's trust account, leaving $33,718,881.30 as the remaining balance of the Payoff Proceeds.

#### c.  Initial Site Visit

5.      On April 2, 2025, three (3) members of the Paladin team traveled to CAL's office located at 5610 N. Palm Avenue, Fresno, California.  The purpose of the initial site visit was to secure, preserve, and safeguard any Receivership Property that may be located

at CAL's office, gain access CAL's books and records with respect to its business operations, take and have oversight, possession and control of CAL's assets, and investigate CAL's financial records and account information for the purpose of identifying, locating and segregating the Payoff Proceeds. Paladin's initial focus was to secure and gain access to CAL's cash accounts, facilities, records, IT systems and data.

6. At the initial site visit, Paladin interviewed Ron Cook (CAL's Chief Executive Officer) and Alex Aretakis (CAL's Chief Operating Officer, Chief of Loan Production, and in-house counsel). Each of these individuals was specifically identified by the Court for cooperation. The Receiver's counsel, Katten, participated periodically by telephone.

7. A number of topics were discussed during the meeting with Messrs. Cook and Aretakis, including but not limited to:

    a. CAL's bank accounts (see below);

    b. An overview of CAL's assets, including a company vehicle;

    c. The office lease, as well as a conference office space located at 7498 N. Remington, Suite 103, Fresno, California;

    d. CAL's corporate structure;

    e. CAL's business strategy;

    f. All underlying loan documents, including Paladin's request to see a list of loans organized by outside servicer;

    g. Other servicers' loan portfolios;

4

h.  Accounting matters, including CAL's financial statements, outstanding taxes, and location of CAL's financial records.  Mr. Cook informed Paladin that CAL uses the accounting firm of Ryan, Christie, Quinn, Baker & Oakes, LLP for accounting services;

i.  The status of the $23 million CAL wired to the trust account of CAL's outside counsel, Georgeson Law Offices, which, as of the date of the initial site visit, had not been wired to Compeer; and

j.  Employment matters, including company credit cards issued to employees.

8.  The following day, on April 3, 2025, the Paladin team again met with Mr. Aretakis.  The Receiver learned that CAL no longer originates loans, operating as a servicer at this point.  New loan originations dropped dramatically in 2024.

9.  In addition, Mr. Aretakis gave the Paladin team a list of CAL employee names, security codes, and internal and external door keys to CAL's office.  This gave the Receiver access to the corporate office, documents and systems, going forward.

10.  On April 4, 2025, Paladin's team returned to CAL's office.  While on site, the Paladin team prepared a number of information requests, which were submitted to Messrs. Georgeson and Cook.  The team also discovered documents at the office referencing an entity called "Ron Cook dba Corporate America Lending."  Katten ran a fictitious name search for that name, but that search did not yield any results.

11.  That same day (April 4), Paladin's team met with certain representatives of FFB Bank and separately with a representative of Bank of America ("BoA"), the two

known financial institutions with CAL cash and operating accounts. The Receiver requested immediate access to CAL's bank records held at FFB Bank and BoA. With respect to CAL's bank accounts, discussed in greater detail below, at the time of the initial site visit, Mr. Cook's access to accounts at FFB Bank were frozen (due to the issuance of the Receivership Order), but his access to the BoA bank accounts were still active pending the completion of certain administrative protocols. The cash book balances for all identified accounts amounted to ███████████ as of April 7, 2025.

12.    Paladin's team also met with Paul Quinn of Ryan, Christie, Quinn, Baker & Oakes, LLP to discuss CAL's loan and business records and requested the production of CAL's financial statements. According to Mr. Quinn, CAL does not prepare monthly, quarterly or annual financial statements. Mr. Quinn further stated that his support of CAL is limited only to the preparation of annual tax returns.

13.    Paladin's team also met with CAL's third-party IT service company, Acuity Solutions, Inc. ("Acuity") to discuss the transfer of month-end back-up of data and email files. As discussed in greater detail below, and as observed by Paladin, CAL's IT environment is limited to a data server, an email server, and various desktops and laptops. All data and email servers are housed at CAL's corporate office, all data files are backed up at month-end, and CAL's data is presently commingled on common data servers with Mr. Cook's other ventures.

14.    At the conclusion of the initial site visit, CAL's loan files had been secured in a locked storage room at CAL's office. Paladin observed that employee access to CAL's general books and records will be necessary to continue loan servicing and normal

303078697v6

operations.  The Receiver notes that CAL's general books and records are commingled with Mr. Cook's other ventures.

15.    Following the initial site visit and prior to the April 17 Meeting (defined below), Paladin continued to investigate CAL's business operations and analyze historical banking activity.  During this period, the Receiver was limited to only the information that CAL's management and CAL's counsel provided.  The Receiver initially encountered challenges in gaining access to and control over CAL's banking records at FFB Bank and BoA.  Initial diligence requests, including but not limited to CAL's books and records, bank statements, loan documentation, and related items, were made on a timely and recurring basis.  Access to bank portals was granted on April 17, 2025 and electronic backups to the IT servers were provided beginning on April 18, 2025.  Prior to these events, Mr. Cook provided minor access to historical financial information, primarily in the form of printed, physical copies of bank and loan statements.  These documents were analyzed in full; however, subsequent information requirements were not possible until access to bank portals and IT data was provided.

16.    Separately, the Merits Panel posed several questions for the Parties regarding the Receiver's appointment, namely the authority of the Receiver relative to the arbitration, including whether the Receiver should participate in the arbitration.  John Mitchell of Katten addressed these and other questions at a conference with the Merits Panel on April 15, 2025.

303078697v6

#### d. *April 17, 2025 Meeting*

17.     Recognizing that initial attempts to address outstanding questions and issues with CAL's management directly, through counsel, and by telephone and email were not progressing as efficiently as the Receiver would have liked, the Receiver scheduled an in-person meeting with the key parties in Fresno, California.  The meeting took place on April 17, 2025 at CAL's office (the "April 17 Meeting"). The purpose of this meeting was to expedite resolution of several outstanding matters, including, but not limited to, access to CAL's bank accounts at FFB Bank and BoA.  The Receiver and his advisors, including from Paladin and Katten, and Messrs. Cook, Aretakis, Georgeson, as well as Jeff Hammerschmidt,[1] were in attendance.  Various information requests were made related to historical bank account transfers and the transferees of those transfers, as described in detail below.  Mr. Cook requested clarification on the scope and ability of himself and his employees to continue to use CAL's office and conduct normal-course business operations. The Receiver confirmed that there are no restrictions in place on the use of CAL's office, employee functions, or normal-course business activities.  Employee access to CAL's office, email servers, books and records have not been materially interrupted as a result of the Receiver's appointment.  Furthermore, Mr. Cook provided the Receiver website login information for the BoA bank records at the April 17 Meeting.  Mr. Cook also coordinated getting the Receiver access to CAL's bank accounts at FFB Bank.

---

[1]     Mr. Hammerschmidt is Mr. Cook's personal counsel.

### e. CAL's IT Environment

18.    Upon Paladin's arrival in Fresno, California, it determined that one of the Receiver's most critical tasks would be to understand CAL's IT environment in order to access and investigate CAL's books and records with respect to, among other things, CAL's business operations, the Payoff Proceeds, and CAL's loans.  In furtherance thereof, the Receiver sought the services of Acuity, CAL's third-party IT support company that already works with CAL and has agreed to cooperate with the Receiver.  Initially, the Receiver observed that CAL's environment consists primarily of data servers and desktop workstations held at CAL's office.  There are a limited number of laptops in the possession of Mr. Cook and CAL's employees.  CAL's data servers hold data files and email supporting operations for CAL and Mr. Cook's other ventures.  The data files also hold CAL's loan and loan servicing records.

19.    The Receiver also engaged IDiscovery Solutions, Inc. ("IDS"), a professional services firm that specializes in digital forensics, eDiscovery & eDisclosure, structured data, cybersecurity, data privacy, and information governance.  On April 3, 2025, a meeting was held among Acuity, IDS and Paladin to understand the technical parameters of the data servers, redundancy and back-up protocols, and to coordinate subsequent activities.  The Receiver and IDS entered into a limited scope services agreement on April 10, 2025.

20.    On April 15, 2025, Acuity provided online access to CAL's data servers.  A subsequent preliminary review of the data files and organizational structure determined that CAL and non-CAL records are commingled with no apparent structure to

compartmentalize files by legal entity, and that CAL's loan files are contained in folders which are haphazardly organized, contain various loan servicing-related files, and do not appear to comprehensively include executed final loan agreements or make-whole agreements.

21.     On April 16-17, 2025, a representative from IDS performed a current back-up of the data and email files and obtained a copy of the March 2025 month-end back-up files.

### f.  Cash and Loan Management Process

22.     Pursuant to Paragraphs 9 and 16 of the Receivership Order, the Receiver is attempting to assume oversight of CAL's cash and loan management and cash flow functions.  The Receiver has requested that CAL cooperate in a process whereby CAL's management team is required to provide the Receiver all documents supporting any deposits into any CAL bank accounts and all documents supporting any payments by borrowers regarding any outstanding loans or any form of indebtedness by third parties.  In addition, the Receiver has requested that all planned operating disbursements be submitted to the Receiver for his approval.  The proposed protocol would further require CAL to provide a weekly summary of actual cash flow and keep the Receiver informed of all activities with respect to any new and existing loans.  As of the filing of the report, no response has been received from CAL.

303078697v6

## II.     Material Findings of Receiver's Investigation So Far

### a. *Bank Accounts*

23.     Paladin has located five (5) bank accounts in CAL's name, including three (3) held at FFB Bank (bank accounts ending in ████████, and ████) and two (2) at BoA (bank accounts ending in ████ and ████).  PDF copies of monthly bank statements from the BoA accounts for the period of April 2024 through March 2025 were produced to Paladin on April 9, 2025.  The next day (April 10), Mr. Cook produced PDF copies of the three FFB Bank accounts.  These sets of bank statements form the basis for the analysis of the bank account activity below.

24.     The Receiver was required to personally appear at FFB in order to gain access and control over the FFB accounts.  Ultimately, he was provided website login information for the FFB Bank and BoA bank records on April 17, 2025.  Website access granted the Receiver a history of transfers to and from the BoA accounts, as well as images of checks written to third parties.  Paladin's review of the check-writing activity is ongoing.

25.     Also on April 17, 2025, FFB Bank designated the Receiver as the primary signatory on CAL's FFB Bank accounts.  This designation granted the Receiver access to a history of transfers to and from CAL's FFB Bank accounts.  If requested, the Receiver will allow Mr. Cook access to these accounts.

26.     In reviewing the FFB Bank accounts, Paladin made the following findings:

   a.  A series of transfers from ████████████████████████
████████████████████████████████████████
████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████.[2]



b. On May 3, 2024, ███████████ was transferred from ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

---

[2]  At the April 17 Meeting, Paladin requested further information regarding these transactions, namely the business relationship between CAL and ███████████ and the purpose of each transaction.  However, Mr. Cook indicated that there were a number of investments made with ███████████ but declined to comment further on the advice of counsel.

303078697v6



c. On May 6, 2024, ███████ was transferred from ████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████ .



d. Between April 1 and October 25, 2024, 32 separate transfers totaling
████████████████████████████████████
████████████ to bank accounts for which the Receiver does not have
identifying information yet.

e. On May 6, 2024, ████████ was sent to a bank account ending in
████, and on May 21, 2024, ████████ was sent from a bank
account ending in ████ to CAL's FFB Bank account. At the April 17

Meeting, Paladin requested information on the identity of the person or entity associated with the ███████ account, but Mr. Cook declined to respond.



f.  On April 22, 2025, Katten made a formal information request to FFB Bank to provide identifying information associated with the ███████ account.  No documents have been produced as of the date of this filing.

g.  Between April 1 and July 30, 2024, eight transfers were made from ████████████████████████████████████████████████ ████████████████.  At the April 17 Meeting, Paladin requested information on the identity of the person or entity associated with the █████ bank account, but Mr. Cook declined to respond.



h.  On April 22, 2025, Katten made a formal information request to FFB Bank to provide identifying information associated with account ███ No documents have been produced as of the date of this filing.

i.  Between April 30 and October 25, 2024, four transfers were made from ███████████████████████████████████████ ██████████████████. At the April 17 Meeting, Paladin requested information on the identity of the person or entity associated with the ███ bank account, but Mr. Cook declined to respond.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

j.  On April 22, 2025, Katten made a formal information request to FFB Bank to provide identifying information associated with the ███ bank account.  No documents have been produced as of the date of this filing.

k.  Between May 9 and October 1, 2024, eighteen (18) transfers were made ███████████████████████████████████████ ██████████████████████. At the April 17 Meeting, Paladin requested information on the identity of the person or entity associated with the ███ bank account, but Mr. Cook declined to respond.

15



l.  On April 22, 2025, Katten made a formal information request to FFB Bank to provide identifying information associated with the ███ bank account.  No documents have been produced as of the date of this filing.

m. Between April 24 and October 29, 2024, seven transfers totaling ███ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████.  At the April 17 Meeting, Paladin requested information on the transferee entity ████████████████████████████████████████ ████████████████████████████████████████████



, but Mr. Cook declined to respond.

n.  On April 22, 2025, Katten made a formal information request to FFB Bank to provide identifying information with respect to this entity, including, but not limited to bank account numbers.  No documents have been produced as of the date of this filing.

o.  FFB Bank statements indicate that the FFB Bank account ending in ▮ was subject to automated "cash sweeps" between FFB Bank account ending in ▮ and other unknown bank accounts.  These sweeps occurred 19 times between April 30 and August 26, 2024 for a net total of ▮

17



p.  On April 22, 2025, Katten made a formal information request to FFB Bank to provide identifying information for these cash sweeps, including, but not limited to bank account number(s) of any accounts involved in the cash sweeps and whether they are affiliated with individuals or entities.  No documents have been produced as of the date of this filing.

q.  Between May 6 and May 8, 2024, three (3) transfers totaling ███ ████████████████████████████████████████████████████████ ████████████████████████. These parties and their relationship to CAL are currently unknown to the Receiver.

18



    r.  At the April 17 Meeting, Paladin requested information regarding CAL's business relationship with ▇▇▇▇▇▇▇, but Mr. Cook declined to respond.

27.    At all relevant times, Mr. Aretakis claimed to have no knowledge of any of the finances, cash flows or other similar transactions of CAL, with all being handled personally by Mr. Cook.

### b.  Bank Record Request

28.    As noted above, Katten issued a formal request for production of documents relating to several transfers outlined above.  Pursuant to Paragraph 8 of the Receivership Order, FFB Bank has until April 30, 2025 to respond.  The Receiver intends to pursue ongoing discussions with FFB Bank to assess any and all information that may assist the Receiver in tracing the Payoff Proceeds.  If necessary, the Receiver will utilize formal legal process to obtain access to records.  To the extent the transferee banks, bank accounts, and account holders are identified, the Receiver will seek additional funds flow information from those institutions and third parties to determine any additional transfers and tracing of the Payoff Proceeds.

### c.  Loan Portfolio Review

29.    During Paladin's initial onsite visit, Paladin obtained access to hard-copy loan documents for Compeer and other lenders.  Paladin subsequently obtained from Mr.

Cook a schedule of loans dated June 30, 2024. During various in-person discussions with Mr. Cook, Mr. Cook indicated that ten (10) additional loans exist. On April 10, 2024, Mr. Cook provided handwritten notes that appear to include borrower names and initial principal amounts. Mr. Cook indicated that additional information regarding the ten (10) undocumented loans could be obtained from Mr. Quinn. On April 19, 2025, Katten sent a formal request to Mr. Quinn to produce records related to the loans. Mr. Quinn subsequently indicated that he does not have access to such records and that the only person likely to have that information is Mr. Cook. Katten has asked CAL's counsel to produce information regarding the undocumented loans as soon as possible. As of the date of this filing, the Receiver has not received this information.

### III.    Next Steps

30.    ***Bank Accounts and Other Assets***. As explained above, several requests for the production of bank records and other information related to transfers outside of CAL accounts have been issued. The response deadline for FFB Bank is April 30, 2025. Once these records and information is produced, the Receiver will continue to trace the Payoff Proceeds and audit transfer histories, unidentified bank accounts, shadow accounts, and similar activity.

31.    In addition, the Receiver is also tracing other property into which the Payoff Proceeds may have been transferred or otherwise commingled, or which may be lawfully recovered in satisfaction of the arbitration awards confirmed by the Court.

32. ***Cash and Loan Management Process***.  Once an agreed protocol is put in place, the Receiver will continue to review CAL's operations and transaction history to determine if relevant to tracing the Payoff Proceeds.

33. ***Make-Whole Agreements***.  The Receiver has conducted an initial review of the standard term make-whole agreements, but has requested that a complete set of such agreements be produced so that he can complete his review.  It is not yet known if the make-whole agreements are relevant to the Receiver's duties under the Receivership Order or the effort to find the Payoff Proceeds.

34. ***Information Requests to CAL and Its Counsel***.  The Receiver and his advisors have issued requests for the production of information to CAL's management, namely Mr. Cook, and CAL's counsel.  The Receiver will seek Court relief, if necessary, regarding access to information and production of financial records related to CAL and its affiliates.

35. The Receiver makes this First Report in accordance with the Receivership Order.  Should the Court require further information, the Receiver will file such supplemental reports as requested.

Dated: April 28, 2025                    Respectfully submitted,


                                         */s/ T. Scott Avila*
                                         T. Scott Avila, Court-Appointed Receiver