UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA, <br><br> Plaintiffs, <br><br> v. <br><br> Corporate America Lending, Inc., <br><br> Defendant. | Civ. No. 24-1896 (JWB/ECW) <br><br><br><br> **RECEIVER'S <u>SECOND</u> WRITTEN REPORT** |

_____

T. Scott Avila, the Receiver appointed pursuant to the *Order Appointing Receiver*, dated March 27, 2025 (Docket No. 118) (the "<u>Receivership Order</u>"), hereby files this *Receiver's <u>Second</u> Written Report* (the "<u>Second Report</u>") in accordance with Paragraph 11 of the Receivership Order and the Court's *Order on the Receiver's Motion Regarding Continued Sealing of Receiver's First Written Report and for Instructions on Sharing of Documents with Plaintiffs* entered on June 20, 2025 (Docket No. 206) (the "<u>June 20 Order</u>").

**PRELIMINARY STATEMENT**

1. Since the filing of the Receiver's First Written Report (the "<u>First Report</u>"),[1] the Receiver has made meaningful progress in identifying various transfers that appear to be transfers of the Payoff Proceeds, as well as the recipients of those transfers.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Report.

2.      The Receiver was charged with investigating, identifying, locating and recovering the Payoff Proceeds. As part of this mandate, the Receiver has undertaken an extensive review of CAL's bank records. As a result of this investigation, the Receiver has largely determined the disposition of the Payoff Proceeds. The findings to date are summarized in the following table, which outlines the principal categories of fund transfers, along with their corresponding amounts and recipients or destinations.



| Transaction | Transfer Amount |
|---|---|
| **Total Funds Sent to CAL - for Payoff of Agri Access Loan** | **58,188** |
| **Amounts Sent to** ▮ | |
| ▮ Transferred to ▮ | ▮ |
| ▮ Transferred to ▮ | ▮ |
| **Total Sent to** ▮ | ▮ |
| **Transfers to** ▮ | |
| ▮ | ▮ |
| **Total** ▮ **Transfers** | **(13,449)** |
| **Transfers to Other Parties** | |
| Net Transfers to CAL BofA Accounts | (5,454) |
| ▮ | ▮ |
| Law Firms | (4,164) |
| Net Amount Sent to "Cash Sweep Account" | (553) |
| ▮ | ▮ |
| **Total Transfers to Other Parties** | **(13,882)** |
| **Total Funds Sent from CAL Accounts** | **(60,114)** |
| **Net Funds Received by / (Sent From) CAL Accounts** | **(1,926)** |

3.      The analysis above represents the Receiver's efforts to trace the flow of funds, beginning with the inflow of $58.2 million in funds provided to CAL accounts for the payoff of the Agri-Access loans, and subsequently detailing the transfers made from CAL accounts to certain individuals or entities that are believed to have benefitted from the comingling of the Payoff Proceeds. Not included in the above analysis are certain

303482934

transfers, both to CAL accounts and from CAL accounts to other parties, that are believed to be operational in nature. For example, CAL accounts received monthly, recurring payments for ongoing loan servicing revenue streams and made payments to certain vendors on a monthly, recurring basis that were deemed to represent ordinary course business activities. While these transfers from CAL accounts may have involved commingled funds—on the basis of the fungible nature of cash—they were considered to be primarily funded with operational cash inflows and are therefore excluded from the summary above for purposes of tracing the Payoff Proceeds.

4. By identifying the cash balances in all of CAL's accounts at FFB and BoA as they existed prior to the receipt of the Payoff Proceeds, and by analyzing the subsequent inflows and outflows of funds, the Receiver has concluded that the Payoff Proceeds were likely directed to a limited number of recipients, which include the ▮▮▮▮▮▮▮▮ (defined below), two individuals located in Arizona, entities believed to be under the control of Mr. Cook and third parties believed to be associated with Mr. Cook in respect of other business dealings, various law firms, and upon information and belief, Agri-Access as repayment for an unrelated loan.

5. While the Receiver has determined the disposition of the Payoff Proceeds, work remains to be done to determine whether the recipients of the transfers continue to retain any portion of those transfers, and whether any of those transfers can be recoverable in satisfaction of the arbitration awards. What follows below is a report of the Receiver's activities, combined with the activities summarized in the First Report, that allowed the Receiver to come to the foregoing conclusions.

303482934

6. As set forth in this Second Report, the Receiver's ability to act on his findings and to advance related discovery efforts was significantly impeded by CAL's continued assertions of privilege and/or confidentiality until the Court made its ruling on the Receiver's ability to continue with his mandate under the Receivership Order by way of the June 20 Order. This Second Report outlines the Receiver's findings since the First Report, the challenges encountered, and the Receiver's proposed next steps to advance the investigation and recovery efforts in accordance with the Receivership Order.

## REPORT

### I. The Performance of the Receiver's Duties

#### a. Bank Records

7. Since the filing of the First Report, the Receiver has continued to work with CAL's financial institutions—namely FFB and BoA—to develop a comprehensive understanding of the full universe of CAL's bank accounts. At this stage, the Receiver believes he is in possession of the bank records for accounts held in CAL's name. However, in the course of his investigation, the Receiver has identified additional bank accounts held in the names of entities and affiliates to whom funds were transferred from CAL, at least one doing business as CAL. Those findings are discussed below.

8. Additionally, with respect to CAL's bank records held at FFB, the Receiver initially noted material discrepancies between the bank records provided directly by FFB and those provided to the Receiver by Mr. Cook. Upon discovering these discrepancies, the Receiver attempted to address them and obtain clarification directly with FFB. The Receiver was compelled to formally notice the deposition of FFB under Rule 30(b)(6) of

4

the Federal Rules of Civil Procedure. Shortly before the scheduled deposition, however, FFB agreed to engage in an informal discussion with the Receiver, leading to the cancellation of the deposition. That discussion took place on May 28, 2025, during which the Receiver discussed with FFB the discrepancies between records provided by FFB and by Mr. Cook. FBB confirmed that the documents originally provided by Mr. Cook and available on FFB's web portal were accurate and appropriate as the basis for analysis. FFB also provided additional information regarding "cash sweep" activities within CAL's FFB accounts, as explained below.

### b. *Weekly Management Meetings Between CAL and the Receiver*

9.  Following the filing of the First Report, the Receiver scheduled recurring meetings between the Receiver and/or his team and CAL management, namely Messrs. Cook and Aretakis. These meetings were scheduled to occur on Tuesday of each week at 1:30 p.m. PT beginning on April 29, 2025. They were meant to serve several purposes, including to (i) discuss any operational developments in CAL's business, including the processing of checks physically delivered to CAL's corporate office or other payments to be deposited in FFB or BoA bank accounts held by CAL, ordinary-course operational disbursement needs for the ongoing CAL business, or any other material changes to the standard business practices of CAL; (ii) request any additional information relating to cash transfers to and from the CAL FFB and BoA bank accounts, including but not limited to supporting documentation for any third-party business agreements or management explanations of general business practices; and (iii) provide support on an as-needed basis to ensure that the Receiver did not interfere with the continued business operations of CAL,

in the event that CAL's management made the Receiver aware of any operational challenges.

10. The *first* weekly management call was rescheduled to April 29, 2025 to accommodate Mr. Cook's schedule. Messrs. Cook and Aretakis attended on behalf of CAL, and the Receiver, and Messrs. Nerland, Lembo and Urwin of Paladin on behalf of the Receiver. This was an introductory call and included Paladin's request that weekly discussions occur to discuss the items broadly described above.

11. The *second* weekly management call occurred on May 6, 2025. Messrs. Cook and Aretakis attended on behalf of CAL, and Messrs. Soong, Nerland, and Urwin of Paladin attended on behalf of the Receiver. This call included a request for supporting documentation regarding the remaining loans serviced by CAL, excluding any loans that had been assumed by Farmer Mac or Compeer as of the date of the call. In addition, Paladin requested copies of additional make-whole agreements between CAL and individual borrowers whose loans were serviced by CAL as of June 30, 2024, as the initial requests for these make-whole agreements were not fully satisfied. Mr. Cook indicated that these records would be made available.

12. The *third* weekly management call occurred on May 13, 2025. Mr. Aretakis attended on behalf of CAL, and Messrs. Soong and Urwin of Paladin attended on behalf of the Receiver. Notably, Mr. Cook did not attend. During the meeting, Paladin reiterated its requests for documents relating to the remaining loans serviced by CAL as of April 2025, as well as supporting documentation for the make-whole agreements that were identified as being associated with historical CAL loan agreements. Furthermore, Paladin requested

that CAL make available the Former Employees (defined below) for a discussion with the Receiver. Paladin's request for discussions with the Former Employees was accepted and a meeting with these three individuals occurred on May 15, 2025. *See* paragraphs 22-24, below.

13. The ***fourth*** weekly management call occurred on May 21, 2025 to accommodate for mutual scheduling conflicts of both CAL and Paladin. Messrs. Cook and Aretakis attended on behalf of CAL. Messrs. Soong, Lembo, and Urwin of Paladin attended on behalf of the Receiver. During the call, Paladin requested once more the provision of supporting documentation for remaining loans serviced by CAL, which were subsequently *partially* provided on May 21, 2025.

14. Another discussion point on the call was CAL's business relationship with ███████████████ and ███████████████████ (collectively, the "███████ ███"). Paladin had discovered certain transfers made from its FFB and BoA accounts managed by CAL to each of the ███████████ between April 1, 2024 and March 1, 2025. Paladin requested that CAL's management provide a brief description of the relationship. For the avoidance of doubt, Paladin did not request bank statements or other documents belonging to either ███████████. Mr. Cook indicated that he was unaware of any transfers from CAL to either ███████████. No additional information was requested by Paladin during that meeting.

15. The ***fifth*** weekly management call took place on May 27, 2025 between Mr. Aretakis of CAL and Messrs. Lembo and Urwin of Paladin on behalf of the Receiver. Mr. Cook did not attend this call. A general update was given on CAL's business operations,

7

303482934

including that no remaining loan payments had yet been received by CAL—either in electronic format or by delivery of physical checks from borrowers to CAL's corporate office, nor were any operating disbursements due to be paid by CAL.

16. Paladin interpreted this update to mean that CAL had not been prevented from performing ordinary-course business transactions, client management or servicing functions, or any other day-to-day management functions. Mr. Aretakis confirmed that he did not view the Receiver as impeding any of CAL's business practices.

17. The *sixth* weekly management call occurred on June 3, 2025 and was attended by Mr. Aretakis on behalf of CAL and Messrs. Nerland and Urwin of Paladin on behalf of the Receiver. Once again, Mr. Cook did not attend the call. Mr. Aretakis volunteered to facilitate Mr. Cook's future attendance for upcoming weekly management calls and indicated that Mr. Cook was unable to attend this and prior calls due to a combination of professional and personal commitments. Paladin inquired whether an alternative time for future calls would suit Mr. Cook's schedule better, but the parties agreed to maintain the current schedule.

18. The *seventh* weekly management call occurred on June 10, 2025 and was attended by Messrs. Cook and Aretakis on behalf of CAL and Messrs. Nerland and Urwin of Paladin on behalf of the Receiver. As had been communicated to Mr. Cook in an email dated May 21, 2025, the purview of the call was to discuss transfers made from CAL to the ▆▆▆▆▆▆▆▆▆ between April 2024 and March 2025. Mr. Cook indicated that he had no recollection of these transfers and would need to review his notes and records for the relevant time period. No subsequent communications were received from either Mr.

303482934

Cook or Mr. Aretakis regarding this information request. Paladin also inquired as to whether any checks were physically delivered to CAL's corporate office for the June time period. Mr. Cook indicated that approximately $2,000 had been received but not yet deposited. Paladin discussed with Mr. Cook how best to deposit these checks, as both the FFB and BoA accounts for CAL had been frozen by bank managers as a result of the entry of the Receivership Order. The Receiver had not requested that FFB or BoA freeze any of CAL's bank accounts or otherwise impede CAL's access to those bank accounts. Paladin offered to coordinate as needed with representatives of either bank in order to facilitate deposits of loan servicing checks and asked Mr. Cook to provide guidance on how to proceed. Mr. Cook initially indicated that he would contact a BoA representative who had previously done business with CAL; however, to date, Mr. Cook has neither informed Paladin of his preferred depository account nor indicated that delays in depositing these checks would result in operational impediments for CAL.

19. A weekly management call was scheduled for June 17, 2025. However, due to mutual scheduling limitations of CAL and Paladin, this call did not take place. Similarly, a weekly management call was scheduled for June 24, 2025. However, on June 23, 2025, Mr. Aretakis informed Paladin that Mr. Cook would not be able to attend due to "serious health issues."

20. In summary, of the nine weekly meeting calls that were scheduled to occur, only seven proceeded, and Mr. Cook attended just four of those meetings. Of the four meetings in which Mr. Cook did participate, his attendance proved to be of limited value. Mr. Cook was often unresponsive to Paladin's questions, and on several occasions,

although he agreed to provide information requested by the Receiver during these meetings, the information was ultimately not delivered.

21. Importantly, however, CAL has not communicated to Paladin any difficulties in maintaining ordinary-course business operations to date, nor any perceived future challenges in conducting its normal business practices.

### c. Discussions Between the Receiver and CAL's Former Employees

22. On May 15, 2025, Mr. Urwin, on behalf of the Receiver, conducted a series of brief discussions with ▮▮▮▮▮▮, ▮▮▮▮▮▮, and ▮▮▮▮▮▮, all former employees of CAL during the May 2024-April 2025 period (the "Former Employees"). These discussions were also attended by Mr. Aretakis.

23. The purpose of the discussions was to determine whether any of the Former Employees was aware of, or had access to, any information related to the potential commingling of funds following the transfer of the Payoff Proceeds to CAL accounts in April 2024. These discussions did not include any requests for information outside the scope of CAL's activities, such as personal services provided by the Former Employees to Mr. Cook for the benefit of unrelated business entities. Discussions with each Former Employee lasted on average approximately 20 minutes.

24. Based on these discussions, as well as on prior discussions with Messrs. Cook and Aretakis, Paladin determined that none of the Former Employees had material access to information regarding CAL's alleged commingling of funds or supporting documentation for any business relations between CAL and the other parties or entities. Discussions with the Former Employees were concluded upon satisfaction that those roles

were performed without material insight into Mr. Cook's operational activities or relationships with third parties or entities. Notwithstanding the foregoing, the Former Employees did provide information regarding ▮▮▮▮▮▮▮▮▮▮, an entity that has been described by Mr. Aretakis as solely owning a private plane. It is presently unclear as to whether ▮▮▮▮▮▮▮▮▮▮ has any formal, legal connection to CAL.

### d. Update on CAL's IT Environment

25. As noted in the First Report at paragraph 19, the Receiver engaged IDS to perform backups of CAL's servers and data files for the relevant period. IDS has confirmed that all relevant, historical files had been copied and secured as of April 21, 2025.

26. In addition to the backups and securing of historical data hosted on CAL's servers, and in accordance with the limited scope service agreement dated April 10, 2025, IDS was also engaged to perform the following tasks:

> a. Utilize applicable technical functions to identify and segregate any files (including loan documents, email correspondence, and other data items) that could potentially be considered privileged communications between Mr. Cook and his counsel not explicitly falling within the scope of the Receivership Order. Paladin did not request, nor did it receive, any data items that were considered potentially privileged communications;
>
> b. Perform keyword search analyses to assist in identifying certain transfers to and from CAL's bank accounts, in particular transfers identified in paragraph 26 of the First Report; and

303482934

      c. Support the Receiver in any additional forensic accounting analyses as deemed possible and necessary based on initial reviews of server data.

27. Paladin contacted IDS on occasion between April 21, 2025 and June 18, 2025 to discuss IDS's findings, individuals or entities to include in keyword searches, and other relevant observations made by IDS. IDS provided the Receiver a report of its findings to date on June 25, 2025. The Receiver is reviewing these findings and will provide any relevant updates in future reports.

### e. Cash and Loan Management Process

28. As discussed in paragraph 21 of the First Report, the Receiver engaged with CAL management to establish protocols for oversight of CAL's cash and loan management and cash flow functions, effective April 19, 2025.

29. Based on discussions with CAL's management, the Receiver determined that no material, ongoing operational cash flow functions would be applicable to CAL for three reasons. First, servicing of most of CAL's loan agreements was assumed by Farmer Mac and Compeer in April 2025. Approximately 10 remaining loan agreements were reported in summary, with minimal supporting detail by Mr. Cook on CAL's balance sheet, but these loans represented *de minimis* cash collections and servicing cost requirements. Second, the Former Employees have been terminated by CAL as of the end of April 2025 and do not require further payroll expenses. Third, minimal operating expenses (described by Mr. Cook as comprising phone bills, minor utilities, and other facility-related costs) have been paid by individuals or entities separate from the CAL legal entity. As noted

above, Paladin has discussed with Mr. Cook whether any impediments exist to operating the remaining CAL business. Mr. Cook has indicated that these disbursements are discrete, of nominal value, and have been paid for by other accounts signed and operated by Mr. Cook without any hinderance to CAL's business practices. For all intents and purposes, CAL has ceased doing business, at least temporarily.

### f. No Additional Site Visits

30. As referenced in the First report, Paladin conducted several site visits between April 2 and April 17, 2025. These site visits provided Paladin with access to CAL's data and email files, as well as website login information for the CAL BoA bank records and printed copies of historical FFB bank statements, which were provided directly by Mr. Cook. A member of Paladin was also present in CAL's corporate office on April 28-29, 2025 to coordinate the first weekly management call. As Paladin considered both the IT backup services provided by IDS and the copies of historical bank statements provided by Mr. Cook to be sufficient in performing initial analytical services outlined in the First Report, no additional on-site visits were conducted from April 30 to June 29, 2025.

### g. Discovery

31. Broadly speaking, the Receiver was constrained from the time of the First Report's filing until the Court's June 20 Order due to CAL's assertions of privilege and/or confidentiality, which significantly hindered the Receiver's ability to conduct discovery regarding parties identified as recipients of the Payoff Proceeds.

32. As noted above, the Receiver served a formal deposition notice on FFB on May 14, 2025. Subsequently, FFB offered to make its representatives available for an

informal meeting with the Receiver in lieu of a formal deposition. That meeting took place on May 28, 2025 and as explained above, the Receiver addressed with FFB the discrepancies between records provided by FFB and Mr. Cook. By the end of the meeting, the Receiver was satisfied that the documents originally provided by Mr. Cook and available on FFB's web portal were appropriate as the basis for analysis.

33. On June 13, 2025, the Receiver sent a letter to ▮▮▮▮▮▮▮▮▮▮, who the Receiver identified as recipients of approximately ▮▮▮▮ of the Payoff Proceeds, seeking to arrange a call between ▮▮▮▮▮▮▮▮ and the Receiver to understand the context in which the transfers were made.

34. In ▮▮▮▮▮▮ email response to the Receiver's letter, she explained that Mr. Cook acted as their "loan broker" and managed their note payments and wired deposits to them on a monthly payment. The Receiver does not know what "loans" or "notes" are being referred to. With respect to the approximately ▮▮▮▮ transfer that was made from CAL, ▮▮▮▮▮▮ stated that CAL purchased the ▮▮▮▮ notes and when the payoff was short, CAL paid the discrepancy. She further stated that she and ▮▮▮▮▮▮ wired the entire payoff back to Mr. Cook for "corrections" because he "needed to wire pay off directly to our IRA." The Receiver needs to investigate these transfers further, either informally or through formal discovery.

## II. Update on Material Findings

35. The First Report details information requests outstanding as of May 5, 2025. The Receiver has since been able to obtain additional information regarding many of these previously unknown transfers to and from CAL's bank accounts.

303482934

    *a. Transfers To/From* ███████████████████████

36.    Based on the Receiver's review of the bank records provided by FFB and BoA, the Receiver currently believes that approximately ███████ was transferred to the personal account of ███████████████ between May and June 2024.[2] Of this amount, CAL bank records indicate that approximately ███████ was transferred back from the ██████ to CAL's FFB account.

37.    Additionally, CAL's bank records show that ███████████, who is believed to operate ████████████ received approximately ███████ between April and May 2024. Of this amount, CAL bank records indicate that approximately ███████ was transferred back to CAL's FFB account.

38.    CAL's bank records further show that ████████ received ██████████ in May 2024. In September 2024, ██████ was transferred back to CAL's FFB account.

39.    The Receiver has been unable to determine the purpose of the foregoing transfers or the purported business relationship between these individuals and CAL.

    *b. Transfers To Unknown Bank Accounts*

40.    The First Report identified the accounts below as unknown recipients of funds from CAL's FFB accounts. The Receiver has since identified the parties associated with these accounts:

---

[2] ███████████████████ are believed to be fifty percent (50%) owners of each of the ████████.

a. Account ending in ▮▮: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ net transfers from CAL to this account);

b. Account ending in ▮▮: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ net transfers from CAL to this account);

c. Account ending in ▮▮: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ net transfers from CAL to this account);

d. Account ending in ▮▮: A BoA account in the name of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The Receiver identified ▮▮ ▮▮ in net transfers from CAL to this account. A review of this account's bank records indicates that approximately ▮▮▮▮ was transferred to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, with other payments being made to law firms, the ▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮ and other recipients.

e. Account ending in ▮▮: ▮▮▮▮▮▮▮▮▮▮ (▮▮▮▮ net transfers from CAL to this account).

41.  The Receiver has requested additional information from Messrs. Cook and Aretakis on behalf of CAL, as well as FFB, to determine whether there was a longstanding history of transfers between CAL and these accounts. To date, neither CAL nor FFB has provided any additional information. The Receiver considers these transfers to be relevant as they involve commingled funds following the initial CAL receipt of $58 million.

303482934

### c. *Cash Sweep Activity Within the FFB Account*

42. As indicated in the First Report, numerous "cash sweep" transfers were made within the FFB account ending in ▇ between April and August 2024. The Receiver has since confirmed that these automated sweep activities were short-term transfers to a separate FFB money market account intended to capitalize on favorable interest rate returns and that no CAL funds are currently held in this account.

### III. Challenges

43. As noted throughout this Second Report, the Receiver was impeded between the time of the filing of the First Report and the Court's June 20 Order due to CAL's ongoing assertion of privilege and/or confidentiality. This limited the Receiver's ability to obtain relevant information and conduct necessary discovery, particularly with respect to parties identified as recipients of the Payoff Proceeds. The Receiver has encountered difficulties or delays in obtaining underlying information regarding certain bank accounts or the business purposes claimed by relevant parties to describe the nature of certain transfers from CAL's accounts. As the Receiver has access only to records held by CAL (primarily bank statements for the FFB and BoA bank accounts), the Receiver has been able to determine the beneficiary accounts of funds transferred from CAL but has limited access to details of those beneficiary accounts.

44. Approximately ▇ in total was transferred to the ▇ ▇; however, it is presently unclear whether these payments had a specific business purpose, whether any individuals had the ability to further commingle these funds, or whether these funds remain at the ▇.

45. Another challenge has been the inconsistent participation of Mr. Cook in the weekly management calls. These meetings were established to facilitate regular communication regarding operational developments in CAL's business, to respond to the Receiver's requests for additional information concerning cash transfers (including supporting documentation from any third-party business agreements), and to provide general support to ensure that the Receiver's involvement did not interfere with CAL's continued operations. Without Mr. Cook's participation, there are delays in obtaining information, reduced transparency regarding business activities, and diminished cooperation in efforts to monitor and evaluate CAL's financial transactions. This lack of engagement has made it more difficult for the Receiver to effectively carry out his duties under the Receivership Order.

### IV. Next Steps

46. ***Discovery.*** With the Court's June 20 Order addressing CAL's assertions of privilege and/or confidentiality, the Receiver may now freely proceed with discovery efforts that were previously constrained. This includes pursuing information from parties identified as recipients of the Payoff Proceeds, and obtaining documentation relevant to the Receiver's investigation, including their bank records.

47. ***Review and Analysis of IDS Findings***. The Receiver has begun reviewing and evaluating the findings of IDS on June 25, 2025. These findings are expected to provide further insight into the flow of funds, the nature of the transactions involving CAL or related parties, the nature of the relationships between CAL and the transferees, and the

context in which the various identified transfers were made.  The Receiver will incorporate this analysis into ongoing efforts to trace and seek recovery of the Payoff Proceeds.

Dated: June 27, 2025                                    Respectfully submitted,

                                                  _/s/ T. Scott Avila_
                                             T. Scott Avila, Court-Appointed Receiver

303482934