**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA,<br><br>               Plaintiffs,<br>v.<br><br>Corporate America Lending, Inc.,<br><br>               Defendant. | Civ. No. 24-1896 (JWB/ECW)<br><br>**ORDER ON SHOW CAUSE RESPONSE** |

The central issue of this inquiry is whether defense counsel misled the Court about what became of $58.1 million in loan payoff proceeds—millions of which had been dissipated by their client, Defendant Corporate America Lending, Inc. ("CAL"), while the lawyers were telling this Court that the funds remained available.

**I.    Background**

CAL is a California-based agricultural loan originator and servicer. On April 29, 2024, it received $58.1 million as a payoff for two loans in which Plaintiffs Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial FLCA (collectively "Compeer") had purchased a 100% participation interest. Under the participation agreement, CAL was to notify Compeer and remit the funds upon receiving any payment.

CAL did neither on April 29. Instead, over the next week, its CEO transferred more than $35 million of the proceeds to other investors—requiring no collateral from them, no contracts, and no clear accountability for the funds. (*See* Doc. No. 80-5,

10/28/24 Interim Award at 3, 11–12; Doc. No. 80-7, 11/26/24 Sanctions Award at 4.)

As the funds were being diverted, CAL at the same time was misleading Compeer into believing the loans were still active and no payoff received. It fabricated receipt of a regular monthly loan payment from the borrower on May 2, 2024, as part of its effort to mislead Compeer about the existence of the April 29 payoff. (*See* Doc. No. 80-1, Phase I Award at 6–7; Doc. No. 2-5, Compl. Ex. 8 at 9; Doc. No. 9, Steele Aff. ¶¶ 16–17.). When Compeer suspected it was being misled and inquired about the payoff, CAL's COO—the same person who had signed the payoff instructions for receiving the $58.1 million just days earlier—said he knew nothing about it. (*See* Doc. Nos. 2-3, 2-6, Compl. Exs. 5, 9; Steele Aff. ¶ 18.) As contractually required, Compeer then initiated an emergency arbitration proceeding to recover the payoff funds.

The aforementioned events occurred before this Court's involvement. On May 21, 2024, Compeer filed suit and immediately sought an order requiring CAL to preserve or remit the payoff proceeds. On May 29, this Court held a conference to determine whether the funds could be sequestered while the emergency arbitration proceeded on the merits. What followed were oral representations from CAL's counsel and a declaration from its CEO which were revelatory for evading the most basic question: *where is the money?*

A.   **Factual Findings**

The May 29 conference was convened for one reason: to learn the location and status of the payoff proceeds. The goal was to protect the integrity of the arbitration by ensuring the money remained intact and available for a possible award—action the emergency arbitrator would soon also order. It is now well known that at that time, CAL

had already received the $58.1 million loan payoff. (*See* Doc. No. 80-1, Phase I Award at 5–7.) It did not disclose the payoff as contractually required but instead sought to prevent Compeer from recovering the money. (*See id.*)

Addressing the status of the funds, CAL's litigation counsel Barry Lee assured this Court that "there should not be a concern about the availability of funds," while at the same time saying that he did not know where they were. (*See* Doc. No. 33, 5/29/24 Tr. at 8–10). To clear the matter up, this Court required an explanation from CAL to confirm whether the funds were available to be sequestered while the arbitration proceeded. (*See* Doc. No. 29.) Ron Cook, CAL's CEO, was identified as the company representative who could address the status of the money. (Doc. No. 133, Lee Decl. ¶ 21.) The conference would reconvene in the afternoon to hear from Cook on the status of the funds.

Before the conference was set to reconvene, local counsel filed a declaration from Cook stating that CAL had received the payoff and that he was "willing to enter an agreement that preserves" the funds.[1] (Doc. No. 30.) The declaration suggested both the intent and ability to preserve, which appeared genuine because Cook could not reasonably preserve funds the company did not control—and his lawyer had represented there should be no concerns. After reviewing Cook's declaration, this Court did not reconvene the conference but issued an order requiring CAL to preserve the funds in escrow. (Doc. No. 32 at 1–2.)

---

[1]  The declaration was not signed by any attorney, even though a lawyer's signature is required on every filing. Fed. R. Civ. P. 11(a). Nonetheless, Lee attests that he and local counsel reviewed, edited, and approved Cook's declaration. (Lee Decl. ¶¶ 24–27.)

3

The truth that ultimately came to light was that these commitments and assurances were misleading. They cast CAL as willing to cooperate and able to preserve the funds until the dispute was resolved. But most of the money was already gone, and CAL then spent months keeping that fact hidden behind even more obfuscation and delay.

C. Russell Georgeson, Lee's co-counsel, did not attend the May 29 conference and was not involved with the Cook declaration. He became involved shortly after by giving updates on CAL's efforts to comply with the orders to preserve the funds issued by this Court and the emergency arbitrator. He and Lee told the emergency arbitrator and this Court in June 2024 that escrow accounts were being set up and the funds were being recovered. (*See* Doc. No. 134, Georgeson Decl. ¶¶ 26, 28; Doc. Nos. 38-2, 38-4, 38-6, 39). Later, at hearings before the emergency arbitrator and before this Court, Georgeson readily admitted his client had not complied with the preservation orders. (Georgeson Decl. ¶¶ 29, 34, 38; *see also* Doc. No. 57, 9/3/2024 Tr. at 7:22–9:21). His reports had given the impression that compliance was just days and weeks away. It plainly was not.

Georgeson also eventually received what was left of the payoff proceeds. In October, $23 million of the $58.1 million was placed in a trust account with his law firm, months after those funds had been represented as recovered and were ordered to have been escrowed. (Georgeson Decl. ¶ 5; Doc. No. 38-6, 6/13/24 Report ¶ 4.) Between this Court and the arbitrators, escrow of the proceeds had been ordered—and ignored—at least five times. (Doc. No. 80-7, 11/26/24 Sanctions Award at 4.) Georgeson, aware of the orders, still created no escrow arrangement.

4

### B.   Counsel's Explanations

Lee says he had no idea the payoff proceeds had been dissipated when he suggested to the Court at the May 29 conference that the funds were intact. (Lee Decl. ¶ 19.) He claims he was relying on what Cook had told him. (*Id.*) As for the misleading declaration submitted in Cook's name (but not signed by any attorney), Lee explains that it was drafted by Cook; reviewed, edited, and approved by Lee and local counsel; filed on short notice; and accurately reflected Cook's willingness to preserve the funds. (*Id.* ¶¶ 24–31.) He says his comments at the conference were cautious and in good faith. (*Id.* ¶¶ 4, 17.) He points to his later disclosures during arbitration as proof that he had no intent to mislead. (*Id.* ¶ 60.) He also advances the view that once this Court stayed the case and referred interim enforcement to the arbitration, he no longer bore responsibility to clarify any misstatements that may have been made. (*See id.* ¶ 73.)

Georgeson disclaims any part in the May 29 events. (Georgeson Decl. ¶¶ 15, 19.) He says he learned about the missing funds months later. (*Id.* ¶ 16.) Like Lee, he blames the client. (*Id.* ¶ 41.) He again concedes that the company failed to follow the Court's May 29 order to preserve the funds independently in escrow (i.e., away from either party's control) and the similar arbitral directives that followed. (*Id.* ¶ 12.) Yet he insists that all of his representations about his client's efforts to recall and preserve the funds were true when he made them. (*Id.* ¶ 26, 30, 33–34, 42.) He confirms receiving $23 million from Cook in October and placing those funds in a trust account in his law firm's name. (*Id.* ¶¶ 5, 13.) Instead of directly confronting the evasive noncompliance and his possible role in it, Georgeson points to the emergency arbitrator, who assigned blame to

CAL for being misleading, and not to the lawyers. (*Id.* ¶ 37).

## II. Discussion

### A. Legal Standards

The above circumstances implicate the duty of candor that all licensed attorneys owe to the judiciary. Minnesota Rule of Professional Conduct 3.3(a)(1) prohibits lawyers from knowingly making or failing to correct a false statement to a tribunal. Rule 3.3(a) prohibits offering evidence a lawyer knows to be false, and if a lawyer learns that material evidence (such as a client's sworn declaration) is false, the lawyer must take reasonable remedial measures. Rule 3.3(b) also requires remedial measures if a lawyer knows their client engaged in fraudulent conduct related to a proceeding. The Rules of Professional conduct in California—where Lee and Georgeson are based—impose the same obligations. *See* Cal. R. Prof. Conduct 3.3.

This District's Local Rules require that nonresident attorneys who are admitted pro hac vice—like Lee and Georgeson—must comply with the Minnesota Rules of Professional Conduct. *See* D. Minn. LR 83.6(a); *see also United States v. Gutierrez*, 351 F.3d 897, 902 (8th Cir. 2003). Both Lee and Georgeson signed affidavits acknowledging that they understood this requirement. (*See* Doc. No. 24 at 2; Doc. No. 42 at 2.)

### B. Analysis

#### 1. Preliminary arguments

As an initial matter, both attorneys argue that this Court's show cause order related to the present ruling lacked sufficient specificity. It did not. The order identified both the May 29, 2024 Cook declaration and the conference held that same day as the impetus for

6

the inquiry. Although Georgeson did not participate on May 29, his later actions were similarly evasive about the same matter of concern: the current status and need to preserve the payoff proceeds. The show cause order recited the factual context. And it told counsel what to explain. That is sufficient. The extensive record of evasiveness and misdirection—for which the arbitrators sanctioned their client, CAL—belie any claim for greater specificity.

Both lawyers also argue that this Court lacks authority to ask these questions. Once the case was referred to arbitration, they say, their responsibility shifted elsewhere. (*See* Lee Decl. ¶ 73; Georgeson Decl. ¶ 24.) Their argument implies that attorneys can violate their duty of candor (or other ethical obligations) so long as they "get out of town" before being called to account. That is not how professional obligations work. Lawyers are not free to flout their duties if a federal lawsuit is stayed pending arbitration. *See* Minn. R. Prof. Conduct 3.3, Comment [13] (obligation to rectify false information ends when final judgment has been affirmed on appeal or the time for review has passed); *see also* Cal. R. Prof. Conduct 3.3(c) (duties "continue to the conclusion of the proceeding"). Counsel's after-the-fact defenses, if accepted, would render Rule 3.3 practically meaningless.

Attorneys practicing before this Court are expected to speak with care and to correct the record when a representation proves inaccurate. That duty is heightened where the representation induces judicial reliance and potentially prejudices the administration of justice. It was especially critical here because, as this Court made clear, preserving the payoff proceeds would ensure the possibility of a meaningful end to contentious

7

litigation.

### 2.     Analysis of May 29 events

As stated above, this inquiry focuses on whether counsel misled the Court about the payoff proceeds. While both attorneys contributed to the problem, Lee's statements had a more direct impact because they directly discussed the state of the money and immediately preceded Cook's declaration. Cook confirmed the $58.1 million payoff had been received and stated he was willing to enter a preservation agreement. His "nothing to see here" declaration was provided to answer the Court's questions about the location and status of the funds, implying that CAL still had the funds such that its CEO could be willing to preserve them. These selective statements actively concealed that the funds had already been dissipated by tens of millions.

Lee's oral assurances and Cook's declaration worked together to obscure the truth. The declaration said only that CAL had received the funds on April 29 and was "willing" to preserve them—without disclosing that tens of millions had already been transferred away. That omission did not happen in a vacuum. It followed directly on the heels of Lee's representation to this Court that "there should not be a concern about the availability of funds." That combination of vague language and misplaced reassurance gave the false impression that the money remained available and could be preserved as directed. The declaration avoided the one fact that mattered: whether CAL still had control of the funds. Counsel's statements served to hide that critical omission, misdirecting this Court at a pivotal moment and undermining the utility of a preservation order this Court believed could still protect the proceeds.

8

The misdirection was not Cook's alone. Lee reviewed, edited, and authorized a declaration that evaded the question of accounting for the status of the payoff proceeds. He offered this Court assurances while either admitting he had no basis for giving them or hedging that he may not have the latest information. And he did not take steps to correct his prior representation after learning what happened to the money.

Though this Court accepts at this time that Lee may not have knowingly misled it, his failure to verify the facts, failure to recognize the possible misleading effects of his statements, and failure to clarify the record as the truth emerged obscured critical facts that should have been made clear.

### 3. Analysis of events after May 29

Georgeson's involvement after May 29 reflected a similar evasiveness that warrants similar scrutiny. The chief concern is whether he sufficiently investigated the basis for his assurances that CAL and Cook were taking steps to retrieve and sequester the funds as ordered. *See* Minn. R. Prof. Conduct 3.3, Comment [3] (assertions on the lawyer's own knowledge may be made only when the lawyer knows the assertion is true or believes it to be true based on a reasonably diligent inquiry). Like Lee suggested at the May 29 conference that there should be no concern about the money, Georgeson's reports in June suggested CAL was actively pursuing compliance with the preservation orders.[2]

Georgeson's assurances became more suspect as CAL came no closer to complying in the weeks and months after his reports. Later, Georgeson readily admitted

---

[2] To the extent that Lee co-signed the reports and submissions, he was also responsible for their evasive effects.

to the arbitrators and to this Court that CAL had not complied with the preservation orders. Although Georgeson was commended at the time for these admissions, this Court will not overlook actors who disregard orders.

Georgeson's actions extended beyond his status reports; he eventually became more directly involved with the noncompliance. When he received a substantial portion of the missing money, he altogether ignored the orders to preserve the funds in escrow. Rather than comply, he kept the money in his law firm's trust account and then advocated for alternatives to the ordered arrangement. The law firm's trust account was hardly an appropriate escrow, and the preservation orders made that clear.

No trust agreement has been produced, and no evidence suggests that the funds were subject to third-party oversight. Georgeson, who retained his role as CAL's attorney, held the money in a manner that gave the appearance of independence without any reality of neutrality. The arrangement was not compliant and did not satisfy the need for meaningful custodial safeguards. Indeed, the funds apparently came from his client, CAL, with instructions and restrictions. (*See* Doc. No. 128, 3/26/25 Hrg. Tr. at 28:19–30:2; Doc. No. 110 at 1.) The funds were never fully severed from CAL's control and interests, despite that being this Court's stated objective from the start.

As compliance delays mounted and CAL's promises (through counsel) repeatedly failed to materialize, it became reasonable—indeed inescapable—to suspect, as the arbitrators did, that there was never any intent to comply. Georgeson's role in this timeline is troubling. Despite known concerns about CAL's evasiveness, he became the recipient of millions in dissipation-tainted funds, held them in a noncompliant account,

10

and argued against the very preservation mechanisms that had been ordered. Whether he saw himself as neutral observer or active facilitator is unclear. What is clear is this: Georgeson's conduct did not disrupt his client's defiance—it insulated it.

Though this Court does not find at this time that Georgeson knowingly misled the tribunal, his actions enabled his client's misconduct to continue, shielded from judicial scrutiny, in violation of court and arbitral orders.

**III.   Conclusion**

As stated in the show cause order, this is not yet a formal disciplinary matter but a serious threshold inquiry. Upon review of the relevant portions of the record and the parties' submissions, this inquiry will not be referred for formal disciplinary review. That decision reflects the limited nature of the inquiry, the lack of clear evidence of intentional dishonesty in the relevant materials, and deference to the arbitrators' decision to sanction CAL and Cook, not their lawyers, for evasive misconduct.

Attorneys are not hired guns. They are officers of the court, and that role carries obligations that go beyond zealous advocacy. Lawyers have a duty to safeguard the integrity of the judicial process, even when that duty cuts against the interest of their client. *See* Minn. R. Prof. Conduct 3.3, cmt. [2]; *see also United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457–59 (4th Cir. 1993). Representations to this Court must rest on facts, truth, and diligence—not inference, assumption, or speculation—and must be corrected when later information proves them inaccurate. These duties do not end when jurisdiction shifts. They do not expire while the case is pending. They do not wait for someone else to speak up.

The conduct of Lee and Georgeson fell short. Both contributed to a record that misled this Court in a matter involving millions of dollars subject to preservation. They submitted or allowed vague, incomplete, and misleading representations and appearances to stand uncorrected. They failed to disclose what they had come to know—or should have come to know—about the true status of the funds. They maintained the appearance of cooperation while the money was vanishing or already gone, even as they were addressing this Court. And when the truth emerged, they allowed the misimpression to persist.

This cannot happen again. The conduct here is serious, and while this Court stops short of imposing formal sanctions at this time, counsel should not mistake restraint for indifference. Misrepresentations—whether by overstatement, omission, or inattention—undermine the trust courts must place in attorneys as officers of the court. If similar conduct repeats in these proceedings, counsel will not receive the same degree of leniency.

**SO ORDERED.**

Date: October 23, 2025                                *s/ Jerry W. Blackwell*
                                                     JERRY W. BLACKWELL
                                                     United States District Judge