UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| Compeer Financial, ACA; Compeer Financial, PCA; and Compeer Financial, FLCA,, | ) | File No. 24-cr-1896 (JWB/ECW) |
| Plaintiffs, | ) | **VIDEO CONFERENCE** St. Paul, Minnesota December 11, 2025 11:04 a.m. |
| vs. | ) | |
| Corporate America Lending, Inc., | ) | |
| Defendant. | | |

---

BEFORE THE HONORABLE JERRY W. BLACKWELL
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(CIVIL MOTION HEARING)**

Proceedings reported by certified stenographer; transcript produced with computer.

**APPEARANCES** (Via Zoom Video Conference):

For the Plaintiffs: Jones Day
W. Anders Folk, ESQ.
James Boylan, ESQ.
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402

For the Defendant: Cross Castle
Nicholas Nelson, ESQ.
2140 4th Avenue North
Anoka, MN 55303

For Receiver T. Scott Avila and Representative Financial Advisor Gary Lembo: Katten Muchin Rosenman LLP
Yelena Archiyan, ESQ.
John Mitchell, ESQ.
2121 North Pearl Street
Suite 1100
Dallas, Texas 75201

Court Reporter: Lynne M. Krenz, RMR, CRR, CRC
United States Courthouse
Suite 146
316 North Robert Street
St. Paul, Minnesota 55101

**P R O C E E D I N G S**

**IN OPEN COURT**

MR. BOYLAN: Good morning, can you hear me?

THE CLERK: Yes.

MR. BOYLAN: This is Joe Boylan on behalf of the Compeer Financial Plaintiffs.

THE COURT: Okay.

MR. BOYLAN: I'm also joined by my colleague, Anders Folk.

THE COURT: Okay. And for the the defense?

MR. NELSON: Good morning. Nicholas Nelson of Cross Castle for the defendant.

THE CLERK: Okay. And there's a couple more individuals on the line. Can you --

MR. MITCHELL: Yes, ma'am.

This is John Mitchell, if you can hear me, with Katten Muchin, counsel for the Receiver.

THE CLERK: Okay.

MR. MITCHELL: And I do have the Receiver and Representative Financial Advisor, Scott Avila and Gary Lembo, as well as my colleague, Yelena Archiyan. But I'll be speaking as counsel for the Receiver today if necessary.

THE COURT: Okay. Thank you very much.

And then I'll turn it over to Judge Blackwell.

Thank you.

THE COURT: Good morning to everybody.

MR. BOYLAN: Good morning.

MR. NELSON: Good morning, Your Honor.

THE COURT: We're here this morning on a couple of motions to confirm the Phase II arbitration awards and to modify the Receivership Order.

I had indicated before this morning that I only wanted to hear argument on the Receiver issue, and that is true -- that is really all I want to hear about this morning.

As for the other issues here's -- there will be a written order on all of this, but here's where I come down on the other matters.

Beginning with the confirmation of June 16 interim merits award. CAL didn't oppose that confirmation. There was no motion filed to vacate, and the FAA's 90-day deadline has passed. So nothing that I see in the record suggests a statutory grounds to either vacate it or to modify it. So I find that confirmation is mandatory, so it is confirmed.

As to the confirmation of the August 12th final attorney fee award.

The attorney's fee award was solely uncontested and filed --

(Recording-in-process announced.)

THE COURT: All right. Who is the recording-in-progress? Is that the court reporter?

THE CLERK: That was me.

THE COURT: Oh, all right. Okay.

As to the confirmation of the August 12th final attorney fee award. That award is similarly uncontested and not challenged and it's final also. Again, confirmation's required and no argument is needed on it.

The third issue, finality of the April 23 grant deed order. That grant deed order resolved the discrete, fully submitted dispute arising from CAL's post-award recording of that deed. Finality under the FAA turned on whether the arbitrators resolved the issues before then, not whether all conceivable questions about the deed were resolved.

On this record, the order is sufficient and final to confirm, and so I do confirm it.

The next one, *functus officio*. *Functis officio* -- and I do hope I'm pronouncing that properly. I've never used it in a sentence before. It doesn't apply where an arbitrator addresses new post-award conduct rather than reopening a prior award. Even if it did, the doctrine has to be raised through a timely motion to vacate, which in this case there was not one. The objection is forfeited and that argument is rejected. It doesn't apply.

And then Number 5, reliance on the Phase I reasoning section. The arbitrator's award carries the day, not the reasoning in that the award itself governs confirmation.

The Phase I award required CAL to pay damages. It did not direct CAL to record or convey the deed. The stray reference in the reasoning section does not bar confirmation of the grant deed order and it is confirmed.

Then, CAL's failure to move to vacate or modify. Just to be clear, that objections to that award, including arguments about access of authority, have to be raised within 90 days per Sections 10 and Section 11 of the FAA. That didn't happen in this case and CAL can't revive those arguments through opposition to the confirmation. I think that procedural default independently requires confirmation.

All right. So that's the history.

Now I received the submissions from both sides yesterday afternoon, late. So I want to pause there, and for each side to tell me what's -- what's going on?

What is the status?

I want to start with CAL since you sent first a correction of the amounts that were frozen, and it seems it was off by roughly 2-and-a-half million dollars of the $3 million.

So why don't I first hear from CAL, from Mr. Nelson, about what is happening here and how did that error come about?

MR. NELSON: Yes. Good morning, Your Honor.

As for what is happening. I guess, you know, my understanding is that of course there's a judgment out there that's $61 million before interest, which was entered on $58 million of payoff proceeds, which I know have been at issue in this case from the very beginning.

CAL has paid 23 million, 22 million. I mean, the parties give those two numbers up, but that amount was, you know, in California counsel's trust account several months ago and was paid. I don't think there's a dispute about that.

The Receiver has reported that CAL made another payment of approximately $10 million. I understand that there's now -- there are questions about what that was for -- or whether that was in partial satisfaction of the judgment. I don't think those have been raised in the briefing today, but that's -- that's the status of that.

And so this case is about -- or I'm sorry, this motion is about Compeer's attempts to collect the rest.

So the California litigation is, you know, that Compeer had -- we filed that about a year ago now, I think, saying that they were attempting to recover basically the

balance of the 58 million beyond the 23 million that Compeer -- sorry, that CAL had put in trust. That is, of course, the subject of our factual correction.

Basically what -- the way it came about is we simply -- we misunderstood what happened in that case.

Compeer does claim that the -- that it was all of the rest of the money that got transferred to the defendants in that case, the entire balance of the payoff proceeds.

Early in the case they stipulated, both the third-party defendants and Compeer, stipulated to a stay of the claims against them. And the four defendants who stipulated that were the recipients, according to Compeer, of about $30 million of the payoff proceeds.

So our misunderstanding -- well, the stay was the defendants agreed to freeze the funds that they had. Our misunderstanding was our belief that they still had the entire funds that Compeer was claiming they had when actually their position was, Well, no. We've disposed of most of this money and what was left was the approximately $500,000 that they agreed to freeze, so.

I, you know, did a detailed review, of course, in preparation for this argument today, realized that mistake, conferred with Mr. Boylan and that was what led to the letter correcting that number.

THE COURT: All right. Thank you.

Mr. Boylan, anything Compeer wants to add the statement about the status?

MR. BOYLAN: Well, assuming we'll address the motion separately, the only thing that I want to respond to on the status is that Mr. Nelson's references to the Eastern District of California action I think refer to the complaint that was filed in that action which occurred before the Receiver was appointed and before we got any discovery from any of those individuals. And so, obviously our understanding that the balance of the $58 million that those individuals received, which was our understanding based on false statements from Ron Cook himself, has changed with what we've learned from the Receiver. And the Receiver confirms those defendant's stories that they, in fact, transferred virtually all of the money back to CAL and then CAL then distributed those funds, dissipated those funds, to various other entities that are not the subject of litigation by Compeer or not all the subject of litigation by Compeer. That would include Mr. Cook's other business entities, Prosperity Farms, Prosperity Development, Mr. Cook and his wife, himself, as well as some of Mr. Cook's other clients.

So the -- you know, the status is we'd like to take the natural logical next step in the receivership and

expand the Receiver's authority to, now that the investigation has revealed what happened in the payoff proceeds, expand his authority to permit him to file claims on CAL's behalf to go get them.

THE COURT: All right. We've now sort of transitioned into the Receiver-then issue that we're here to talk about. And as I understand it, Compeer's seeking to expand the Receiver's authority in three ways:

First, to execute assignments under the Phase II awards and to effectuate the grant deed order.

And then second, to initiate litigation against third-parties to recover the missing payoff proceeds.

And then third, to continue funding the Receiver with a super priority right to repayment.

And as I understand it, CAL opposes only the deed-related authority and the litigation authority.

So the request to continue funding receiver with the super priority right to repayment is granted and we don't need to discuss that either.

So if we could just get to the expansion of the receiver's authority with respect to litigation, I'd like to hear what Compeer's case is for that. And I do note that in my March 2025 order appointing the Receiver, there was an effort at that time to give that receiver expansive litigation powers, which I limited, and so I'm most keen to

hear what is different now that makes this somehow necessary.

MR. BOYLAN: What makes this necessary now, Your Honor, is what the Receiver has found.

And so I just because of the apparent confusion from Mr. Nelson's letter last night about what's happened in this case, I do want to quickly sort of provide some context as to what's owed, what's happened, what the Receiver has found and why that matters for purposes of this request.

So as the Court's aware, you know, we've been in litigation for a year and a half. CAL owes -- so not only the $58 million in payoff proceeds, but it also now owes more than $8 million in interest that's accrued to date, more than $5 million in attorneys' fees, including the Phase II awards, for a grand total of nearly $71 million.

Of that, what's been paid over to Compeer is 23-and-a-half million dollars. I think Mr. Nelson referenced the funds that were in Mr. Georgeson's trust account earlier this year, as well as the -- an additional around million dollars or so in the fake monthly payments on the Famosa loans that CAL made in last May and June.

As reflected in the Receiver's report, there was also another payment of around $8 million that CAL paid to Compeer last August. At the time though, Mr. Cook represented that those funds were, in fact, a special

principal payment that was being made on the Verve loans. So those weren't payments made by CAL related to the Famosa loans or the payoff proceeds or anything like that. But when the Receiver's reports did not show any such payment coming in from Verve, we asked Verve about it and their counsel told us that Verve never made any special principal payment.

But the bottom line is, even if that $8 million can be credited against what CAL owes, which remains to be seen, that still leaves only about 31-and-a-half million dollars that have been recovered so far. 27 million of the payoff proceeds is still outstanding and nearly 40 million that CAL would need to come up with to fully satisfy the judgment as it stands today.

What -- has the Receiver found that CAL has left to pay any of that? Nothing. There's nothing left.

The Receiver's reports show conclusively that CAL and Ron Cook transferred away nearly all of its assets to other parties, leaving basically nothing left to cover the remainder. They instead recorded the invalid grant deed and are attempting to use that to satisfy the judgment. And I don't -- I don't need to, I think, get into that given the Court's orders this morning.

But the "through" line is relevant in that, you know, Ron Cook and CAL are trying to use the grant deed as a

substitute to avoid turning over money from Prosperity Farms -- I'm sorry, money that they stole from Compeer. And we think that because CAL -- the Receiver's reports also show that CAL did not have sufficient assets to make any of the payments that it made in May and June and July of 2024 and also pay Compeer what it owed, there are really good, strong, clean fraudulent transfer claims that CAL holds. Those are claims that would be asserted on CAL's behalf to avoid or recollect those fraudulent transfers and we think that, you know, the Receiver was initially empowered to investigate what happened to the payoff proceeds. It did that. It determined that CAL and Ron Cook don't have the assets to satisfy the judgment. And it also established the foundation that those transfers that Mr. Cook made were fraudulent transfers. That they made them without the ability to repay what CAL owed to Compeer.

THE COURT: Mr. Boylan, what other related litigation is ongoing currently, apart from this case?

MR. BOYLAN: There's quite a bit, Your Honor.

There are -- let's see. There's a couple of cases that CAL brought. Two cases that CAL brought asserting claims very similar to the claims that were its affirmative defenses in the underlying arbitration. Those are presently stayed.

There is a interpleader action brought by the

Verve Greens borrowers because CAL instructed Verve not to pay Compeer and Verve Greens essentially didn't know what to do, so it went to the Court and created an interpleader action.

There's a foreclosure against Prosperity Farms because the situation with Prosperity Farms is dire and a Receiver has been appointed over Prosperity Farms to administer that and address the significant debt on the Prosperity Farms property, as well as the ownership disputes between Mr. Cook and Michael and Cynthia Graham.

There's obviously the Eighth Circuit appeal that will be heard next week. There is a judicial recision action that Compeer brought against Prosperity Farms in an effort to rescind the grant deed order consistent -- I'm sorry, to rescind the grant deed consistent with the grant deed order.

I'm trying to think. There may be others. There's -- you know, nine or ten. It's a significant amount of litigation that has ballooned as a result of this.

THE COURT: Are there any --

MR. BOYLAN: There's also the Eastern District of California action against the -- Graham Morgan in this who received initial amounts of the payoff proceeds and then, you know, based on the Receiver's reports, transferred most

-- a tremendous amount of money back to CAL.

But there's not litigation to recover the payoff proceeds that were transferred to Prosperity Farms, Prosperity Development, the Crookhams, or to Ron and Jennifer Cook.

THE COURT: Are there any prosecutions?

MR. BOYLAN: There's an ongoing criminal investigation in the Eastern District of California. I'm not sure where that stands.

THE COURT: So here's part of my concern, Mr. Boylan.

That given all of the other litigations that are extant swirling around the issues that are central here, I'm concerned about empowering a receiver with broad litigation authority and the ways that that could impact all of the existing litigation, which could end up being just an entire mess, and which is why I'm kind of more interested in what would be a laser approach to what authorities a receiver might have in this regard.

I was reluctant to grant those kind of authorities at the outset for this reason because I saw this evolving in litigations. And when I talk about a scalpel approach, I'd want to be clearer about who it is that receiver would be suing, you know, what claims would be pursued, why such litigation is necessary now and why the alternatives to

litigation that the Receiver has at its deposal are insufficient.

So I want the case to be made and then the focus to be narrow, as opposed to broad sort of plenary authority to step into shoes of CAL to -- essentially to sue whomever or to take over, in some respects, the business.

MR. BOYLAN: Well, Your Honor, I can say authoritatively that Compeer has no interest in expanding litigation or engaging in duplicative litigation. We're just trying to recover what we can given the facts as the Receiver has revealed them which show that, you know, CAL transferred all of this money.

So as to who the claims would be against. I think right now the claims would -- and by the way, Compeer -- you know, because CAL doesn't have any assets, that's part of the reason why Compeer asked to be permitted to fund the Receiver's operations. And so, any action that, you know, the Receiver takes, we would like to be involved in that if we're going to be on the hook for paying any of those costs.

So we certainly don't have an interest in duplicating or multiplying the already exorbitant costs of litigation.

As for who the targets are. I think the targets are those individuals that were identified in the Receiver's

second report that received funds directly from CAL that have not been sued yet. I think what claims would be asserted by CAL in those actions, would be exactly the claims that I outlined. Fraudulent transfer claims.

I'm not sure if there are other claims. I mean, the other benefit of having the Receiver pursue claims directly as opposed to Compeer asserting fraudulent transfer claims against those individuals or entities on CAL's behalf is the Receiver has access to all of CAL's documents and information and, thus far, we still don't have access to CAL -- to all of CAL's documents and information.

And so the Receiver on CAL's behalf would be enabled to litigate those claims a lot more strongly, would be less subject to standing arguments and challenges.

But really our goal here is just to go after where the payoff proceeds were transferred to by Mr. Cook. Why now? It's -- the answer on that is because we now have reached essentially the terminus of the investigation portion, at least from our perspective, of the Receiver's investigation. I think the last couple of reports have been relatively light. I think the Receiver -- I'm sure Mr. Mitchell can tell you sort of what's left for the Receiver to investigate. But apart from turning over some of CAL's documents, I think most of the Receiver's investigation, you know, it's revealed what it's going to reveal without

further powers to pursue litigation from these individuals.

Now, could we have the Receiver have a more narrow focus to pursue discovery against these individuals and issue subpoenas? Sure. But, you know, if those subpoenas reveal what we think they're going to reveal, which is these individuals received the funds that were fraudulently transferred by CAL, then, you know, the next step thereto would still be litigation against those individuals.

As for why alternatives are not sufficient, I think as I mentioned, claims by Compeer -- you know, I just practically don't think that -- I think that those claims will be more robust coming from the Receiver on CAL's behalf because they're CAL's claims, fraudulent transfer claims are CAL's claims, and the Receiver would have access to all of CAL's documents and information and be able to make the robust version of those claims. If we have to assert them on Compeer's [sic] behalf, you know -- I'm sorry, on CAL's behalf by Compeer, you know, I guess we can do that.

As for other tools that are available to the Receiver. I'm not sure what other tools besides litigation might be available to go out and actually avoid those fraudulent transfers. I don't know that there are

any.

THE COURT: So what's the gap? Is there an open question now about the recipients of the fraudulent transfers? Do you know who those entities are? Is there discovery that has to be done to shore that up?

MR. BOYLAN: I don't believe so. I think we know who received the money directly from CAL.

What happened after they received that money is unclear, but certainly I don't think the Receiver has received any information that the money came back from those recipients back to CAL.

THE COURT: So it ought to be possible then for Compeer to be more specific about who, what, entities it intends to sue and what claims. Do you know that now?

MR. BOYLAN: I think we would want to -- I think we understand the broad outline right now and I think it's as I described.

I would want to, you know, make sure that we have the information -- the information that the Receiver has and sort of how the conversation with the Receiver about that. But certainly it's possible for us to address any concerns that the Court has and get as specific as you need to -- as the Court needs to feel comfortable --

THE COURT: To the extent there's any guidance in my sort of probing around with this, looking for rifle shots

and not shotguns, in how this might be approached and would like for Compeer to narrow what powers it is seeking for the Receiver to serve as a litigation surrogate and to be specific about it, not that it won't be subject to being amended or updated, but I don't want to be broad and plenary just out of the gate because I don't know kind of what that portends with all the other litigations that are currently extant, and that it could lead to its own profusion of both confusion and unnecessary activity before this and other courts.

MR. BOYLAN: Understood.

THE COURT: Well let me stop there, Mr. Boylan, and let me hear from Mr. Nelson.

MR. NELSON: Thank you, Your Honor.

Yeah, with respect to the third-party litigation. I think the real question in our mind not knowing, as Your Honor does not, who they would intend to have the Receiver sue on CAL's behalf.

The question is, is why can't Compeer just bring the claims itself? That's what Compeer did against the alleged third-party transferees in the Eastern District of California.

I think that, you know, Mr. Boylan's explanation of what their understanding is and what the Receiver has found is almost an outline of, you know, the elements of a

fraudulent transfer claim under California law.

Of course we don't --

THE COURT: Isn't that -- Mr. Nelson, isn't that begging the question of why CAL, or CAL, hasn't brought the claims itself since it owes the money and then have standing?

So why hasn't your client done it.

MR. NELSON: Yeah, and I don't know the answer to that.

THE COURT: Mr. Nelson, that's the question here. So it rings awfully hallow to hear from you discussing what else Compeer can do to get at funds that may have been fraudulently conveyed by your client when your client's not bringing an action itself for fraudulent transfer or doing anything to recoup the monies, from what I'm hearing this morning.

MR. NELSON: Well, and the simplest answer, of course, is that we don't concede that the funds were fraudulently transferred, right? I mean --

THE COURT: Well, Mr. Nelson, if they weren't fraudulently transferred, then go get the money. Pick one.

So the funds are to be returned. They haven't been. So if the funds weren't fraudulently transferred, then simply go get the money.

MR. NELSON: Yeah. And I understand that's been the issue --

THE COURT: Yeah -- wait, wait. Yeah is not a response. So, listen. Listen.

Please go ahead finish your point.

MR. NELSON: I understand that's been the issue since day one. I think that the question here is, you know, is -- does Compeer need to have the Receiver do this on CAL's behalf or can Compeer just do it itself?

And I don't -- I mean, what I heard Mr. Boylan say is, you know, CAL may -- CAL, may have, you know, documents or something that might help them litigate it better. I just don't think that that showing has been made.

I think if Compeer is correct about what happened and if the Receiver's correct about what happened, you know, Compeer would have pretty much just as good as claims as CAL would.

THE COURT: Well, if it's the same to you, a claim for fraudulent transfer, what difference does it make to CAL whether Compeer does it in its own right or standing in for CAL when the substance is the same? What difference does it make?

MR. NELSON: Well, CAL doesn't, of course, agree with the claim, right? I mean, CAL doesn't agree that it's

a good claim. But if it were, if Compeer were correct, then Compeer could bring it almost as well as CAL could.

So that's the -- and I guess I would just for the Court's guidance, both sides have referred to this, and maybe Your Honor's already all over this, but I think, you know, the best thing in the record about the sort of what the state of play is, because I know this was the very first question you asked me, it is the Receiver's second report at Docket 210, paragraph 2, has a table of -- and this is the Receiver's best take on, you know, what happened to the money, right?

So, I guess the thing to note from that -- I mean, the Receiver -- the Receiver says that $33 million almost has gone back to Compeer. I understand that Mr. Boylan, you know, has raised questions about some of that money. But, you know, our best guess, not having heard anything more on it today, our best guess about who the defendants in these third-party cases would be must be the people -- the other entities listed in that table. They're not the defendants in the Eastern District of California action but, I mean, my question would be, couldn't a similar action be brought by Compeer against them?

I know that, you know, the single biggest, you know, category in that table other than the payments back to Compeer is Prosperity Farms, which is the owner of the

infamous grant deed that we've been talking about.

And so, you know, again, I have no certain information about this. I don't know what Compeer hopes to have the Receiver do, but I fear that this is going to turn into litigation about the grant deed all over again or the assets of Prosperity Farms which, you know, I don't have their balance sheet in front of me but I know that the grant deed is a big one.

So those are the things that I wonder about. I don't have the answers, but they're questions.

THE COURT: All right.

Anything further then, Mr. Nelson?

MR. NELSON: I don't believe so.

Well, does Your Honor want to hear about the grant deed order? Not the confirmation of but what the Receiver is empowered to enforce it?

THE COURT: I'll hear you out on it.

MR. NELSON: Sure. Yeah. I think -- I mean, our basic question there is just, you know, how does that relate to what a receiver is needing to do?

This isn't a situation where an asset has been dissipated or where there's no remedy for it. I mean, the -- that with respect to the grant deed order, CAL's position is we want the grant to be available and Compeer does not.

It appears that Compeer has a good remedy. Your Honor has already ruled this morning. They also have their California action which is, you know, filed in the county where the property is and where the grant deed was recorded and they're seeking to avoid it.

So it's just not clear to me, not clear to us, you know, what the Receiver needs to do with respect to that, or really why it would make a practical difference.

THE COURT: Well, with respect to the deed-related authority. I found that the requested authority to implement the Phase II awards is both narrow and I also found it was consistent with the original purpose of the Receivership, which was to preserve and to recover the payoff proceeds and to effectuate the arbitration awards.

CAL's only objection to the deed-related authority depended on its opposition to confirming that grant deed order, which once confirmed, which it has been, that objection falls away.

So for these limited purposes, executing assignments and effectuating the deed order, since CAL hasn't done it, I feel that the Receiver's authority in expanding to that extent is justified. And if CAL wants to go ahead in the now and -- well, just strike that. I'm not even going to say that. CAL could have done this already.

But given the current posture of the case,

executing the assignments and effectuating that deed order, is a power that I will grant to the Receiver kind of at this point to get that done and to bring an end to sort of the Mickey Mousing around about it. And so that extent, that will be granted to the Receiver.

As to the other litigation authorities -- and I will put this into an order which would be a request from Compeer to be more specific about the Receiver's additional litigation authorities, and it will be along the lines of, Mr. Boylan, what I've asked about this morning, just ask you to be sort of more thoughtful and more specific about it. Mr. Nelson will have an opportunity to respond to it.

I just want to make sure that to the extent there are going to be expanded litigation powers for the Receiver that there is a case for it as in there are not alternatives that reasonably get to the same point. Reasonable being in terms of cost and time. And then to be real specific about what litigation is envisioned. What, and against whom. And I want to umpire that just to make sure that this stays within some parameters and lessens the likelihood that this bumps into other litigations and causes issues and confusions with the broader authority.

And we can revisit it down the line, but that would be us attempting to set a starting point for the other litigation.

So let me to stop there to see if there are other issues that either party needs to raise this morning.

Mr. Boylan, anything further?

MR. BOYLAN: No, Your Honor.

THE COURT: Mr. Nelson?

MR. NELSON: No, Your Honor.

THE COURT: Well, thank you all. It's good to see my fellow Minnesotan, Mr. Folk.

And you all have a nice day.

Court will stand adjourned.

MR. MITCHELL: Thank you, Your Honor.

MR. NELSON: Thank you, Your Honor.

MR. BOYLAN: Thank you, Your Honor.

(Court adjourned at 11:40 a.m.)

* * *

**REPORTER'S CERTIFICATE**

I certify the foregoing pages of typewritten material constitute a full, true and correct transcript of my original stenograph notes, as they purport to contain, of the proceedings reported by me at the time and place hereinbefore mentioned.

/s/Lynne M. Krenz
Lynne M. Krenz, RMR, CRR, CRC